IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

| | | |
|---|---|---|
| THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL<br><br>Plaintiff<br><br>v.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br><br>Defendant | ) | No. CA 06 362 S |
| EUGENIA CARVALHAL<br><br>Plaintiff<br><br>v.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br><br>Defendant | ) | No. CA 07 007 S |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF THE PLAINTIFFS' EXPERT WITNESSES AND FOR SUMMARY JUDGMENT**

NOW COME the Defendants, MIDEA USA, INC. and GENERAL ELECTRIC COMPANY, by and through their attorneys, and submit this Memorandum of Law in Support of their Motion for an Order precluding any testimony from Plaintiffs' designated expert witnesses, Hossein Davoodi, Ara Nalbandian and Michael Cooney, and seeking Summary Judgment. Defendants are also filing herewith its Statement of Material Facts ("SMF") as to which there is no genuine issue to be tried, which is hereby incorporated by reference. In support of their Motion, Defendants state as follows:

Plaintiffs' injuries stem from a house fire that occurred at the Carvalhal residence on February 27, 2004. Mr. Davoodi is expected to testify that the water dispenser manufactured and distributed by the Defendants was the origin of the subject fire. However, his testimony is flawed in that there is no scientific or engineering basis for the opinions that he hopes to express, other than his own subjective belief in the truth of what he says. While Mr. Davoodi performed an on-site investigation of the fire scene at issue in this case, he failed to follow the standard guidelines for performing such an investigation as codified in NFPA 921. As a result, Mr. Davoodi is unable to provide any scientific evidence or test results which would serve as a scientific basis for the opinions he is attempting to render in this case. Furthermore, Mr. Davoodi is also unable to identify any reliable evidence (published studies, authoritative treaties, or the like) that support his opinions regarding the origin of the fire in this case. Without any such objective, reliable evidence to support his conjecture that the fire at the Carvalhal household originated within the water dispenser manufactured and distributed by the Defendants, Mr. Davoodi's opinion that said water dispenser was the origin of the Carvalhal fire is nothing more than unsupported speculation. Accordingly, because Mr. Davoodi's testimony does not pass muster under the standards established by *Daubert* and *Kumho Tire*, his testimony must be excluded.

Likewise, the causation opinions to be provided by Plaintiffs' other two experts, Mr. Ara Nalbandian and Mr. Michael Cooney, are similarly flawed. More specifically, the Plaintiffs' product defect experts, Ara Nalbandian and Michael Cooney, lack sufficient expert qualifications to render opinions regarding the alleged defects in the Defendants' product. In addition to lacking adequate expert qualifications, neither Mr. Nalbandian nor Mr. Cooney have a sufficient scientific or engineering basis for their opinion that a defect in the Carvalhals' water dispenser

caused the fire at issue in this case. Although these product design experts determined that design characteristics in the Defendants' water dispenser allowed a stainless steel hot water tank to corrode, they lack any scientific basis or empirical support for the claim that any aspect of the disputed product caused or contributed to the fire that occurred at the Carvalhal residence. Like Mr. Davoodi, neither Mr. Nalbandian nor Mr. Cooney are able to identify any reliable evidence (published studies, authoritative treatises or the like) to support their contention that a design defect in the water dispenser was the proximate cause of the Carvalhal fire. Without such objective, reliable evidence to support their opinions in this matter, Mr. Nalbandian's and Mr. Cooney's opinion that a defect in the water dispenser caused the Carvalhal fire amounts to nothing more than unsupported speculation. Accordingly, because the testimony of the Plaintiffs' product design experts does not pass muster under the standards established by *Daubert* and *Kumho Tire*, their respective testimony must be excluded.

## I. APPLICABLE LAW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir. 2004) (citing Fed. R. Civ. P. R. 56(c)). Once the moving party avers the absence of genuine issues of material fact, the non-movant must show, through materials of evidentiary quality, that such a dispute exists. *Id.* A properly supported motion for summary judgment cannot be defeated by relying upon improbable inferences, conclusory allegations, or rank speculation. *Id.*

In determining whether an expert is qualified to testify as to scientific knowledge, the federal courts look to Rule 702 of the Federal Rules of Civil Procedure, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786, 2794 (1993) (citing Fed. R. Civ. Proc. R. 702). Rule 702 contemplates some degree of regulation of the subjects and theories about which an expert may testify. *Id.* at 589. The adjective "scientific" implies a grounding in the methods and procedures of science. *Id.* at 590. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. *Id.*

When faced with a proffer of expert scientific testimony, the trial judge must determine at the outset, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id.* at 592. Rule 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174 (1999).

The Hartford and Eugenia Carvalhal have both filed six-count products liability lawsuits naming MIDEA USA, INC. and GENERAL ELECTRIC COMPANY as Defendants. The allegations set forth in the respective Plaintiffs' Complaints pertaining to liability are essentially identical. Counts I and IV of the Plaintiffs' Complaints seek recovery pursuant to both negligence and strict liability theories. Counts II and V of the Plaintiffs' Complaints seek recovery from the Defendants pursuant to a breach of express warranty claim. Finally, in Counts III and VI of the Plaintiffs' Complaints, The Hartford and Eugenia Carvalhal seek recovery pursuant to an implied warranty theory.

All of the Plaintiffs' theories of liability require that they establish that the Defendants' product was: (1) defective, and (2) that the defect was the proximate cause of their injuries. Rhode Island has adopted the doctrine of strict liability of tort in products liability cases as set forth in the Restatement (Second) of Torts §402A. *Olshansky v. Rehrig International*, 872 A.2d 282, 285 (R.I. 2005). One who sells a product in a defective condition unreasonably dangerous is subject to liability for harm suffered by the ultimate user or consumer if: 1) the seller is engaged in the business of selling such a product; and 2) the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. *Id.* The plaintiff has the burden of proving a defect in the design or manufacture that makes the product unsafe for its intended use and also that the plaintiff's injury was proximately caused by this defect. *Id.* The doctrine of strict liability in tort, while eliminating proof of negligence as a requirement for recovery, does not obviate the need to show a casual connection between the defect and the injury. *Salk v. Alpine Ski Shop, Inc.*, 342 A.2d 622, 626 (R.I. 1975).

To set forth a prima facie cause of action for breach of express warranty, Section 6A-2-313 of the Rhode Island General laws provides that a plaintiff must show that the defendant created an express warranty as follows:

> 1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> 2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> 3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*Thomas v. Amway Corp.*, 488 A.2d 716, 720 (R.I. 1985). It is not necessary to the creation of an express warranty that the seller use formal words such as warrant or guarantee or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. *Id.* In addition, in a claim for breach of warranty, the burden is on the plaintiff to prove that: 1) the product is defective, 2) it was in a defective condition at the time it left the hands of the seller, and 3) the said defect is the proximate cause of the injury. *Plouffe v. Goodyear Tire & Rubber, Co.*, 373 A.2d 492, 495 (R.I. 1977).

The five elements of an action for breach of implied warranty of merchantability are: 1) that a merchant sold goods, 2) which were not merchantable at the time of sale, and 3) injury and damages to the plaintiff or his property; 4) caused proximately and in fact by the defective nature of the goods, and 5) notice to seller of injury. *Electric Terminal Corp. v. Cessna Aircraft*, 520 A.2d 144, 146 (R.I. 1987).

Although claims for product liability and breach of express and implied warranties provide separate theories of recovery, the elements for each claim have some overlap. *Simmons v. Lincoln Electric Co.*, 696 A.2d 273, 275 (R.I. 1997). For each claim, the plaintiff must prove that a defect attributable to the product was the proximate cause of the plaintiff's injury. *Id., see* also *Oberlander v. General Motors Corp.*, 798 A.2d 376, 379 (R.I. 2002).

## II. ARGUMENT

Plaintiffs' theory of liability in this case asserts that the fire started because a defect inside the water dispenser caused it to ignite and the resultant fire spread from the unit to involve the rest of the kitchen. To substantiate this theory, Plaintiffs rely upon three retained witnesses for expert fire cause and origin opinions. As explained in detail below, none of the opinion testimony offered by Plaintiffs' experts satisfies the admissibility thresholds set forth in *Daubert*

and *Kumho Tire*. In the absence of competent expert opinions, Plaintiffs cannot establish a prima facie case for any of the product liability claims set forth in their respective Complaints.

**A. Hossein Davoodi's Opinions are Inadmissible Because His Investigation of the Origin of the Carvalhal Fire is Scientifically Invalid**

The Hartford retained Hossein Davoodi, a fire investigator employed by Crawford Investigations, to perform an inquiry as to the cause and origin of this fire. Mr. Davoodi conducted an investigation of the Carvalhal fire scene on March 3, 2004. (SMF, p. 2, para. 4) The findings of his investigation in this regard were memorialized in his written report dated September 10, 2004. *Id.*

Mr. Davoodi possesses a Masters Degree in fire protection engineering which he relied upon in attempting to render opinions in this case. (SMF, p. 3, para. 6). Other than his degree in fire protection, Mr. Davoodi does not have any other professional engineering experience. *Id.*. Furthermore, he is not a professional mechanical engineer, and is not a professional electrical engineer. *Id.* While Mr. Davoodi does have other experience investigating fires, he does not claim to have any expertise regarding the design or manufacture of products such as the water dispenser at issue. *Id.* Consequently, Mr. Davoodi has not rendered any opinions regarding any alleged defect in the water dispenser, nor does he have any opinions regarding the actual ignition source of the Carvalhal fire. *Id.* Thus, although Mr. Davoodi claimed to conduct a "cause and origin investigation of this Incident", his opinions in this matter are limited to the origin of the fire.

Mr. Davoodi himself acknowledged that for opinions regarding the origin of a fire to be valid, they must be based upon scientific evidence. (SMF, p. 3, para. 7). Mr. Davoodi testified that he was aware of, and abided by, the guidelines for performance of fire investigations published by the National Fire Protection Association (NFPA), which is commonly referred to as

NFPA 921. *Id.* NFPA 921 itself expressly acknowledges the need to apply the scientific method when conducting fire investigations (SMF, p. 2, para. 5 ). Mr. Davoodi went so far as to characterize NFPA 921 as "the bible for fire investigators". (SMF, p. 3, para. 7). Significantly, Mr. Davoodi volunteered that it was his understanding that courts rely upon NFPA 921 in evaluating opinions rendered by fire investigators. (SMF, p. 4, para. 7).

Although Mr. Davoodi claims that he followed NFPA 921 during his investigation of the Carvalhal fire, a closer examination of his conduct and the subject standards reveals that this is simply not true. In this instance, Mr. Davoodi violated the subject guidelines by failing to adequately document the conditions in the Carvalhal kitchen which he claims support his conclusion that the fire originated in the area where the water dispenser was located. Virtually every aspect of Mr. Davoodi's written report confirms this assertion. For example, Mr. Davoodi acknowledges that the diagram that he prepared of the first floor of the Carvalhal household was "grossly simplified" and not to scale. (SMF, p. 4, para. 8). In addition to lacking any dimensions or indications of measurements that might have been taken during his investigation of the fire scene, Mr. Davoodi acknowledged that the diagram itself is inaccurate on its face. *Id.* In addition to failing to document physical dimensions of the first floor of the Carvalhal residence generally, Mr. Davoodi also failed to take and record any dimensions of the kitchen where this fire allegedly originated. *Id.* While Mr. Davoodi claimed that it would have been his custom and practice to take such measurements, his report does not document that such measurements were taken, and Mr. Davoodi was unable to recall what those dimensions were during the course of his deposition. *Id.* Mr. Davoodi's failures in this regard violates the principles set forth in Chapter 15 of NFPA 921, which notes the importance of a fire investigator thoroughly and accurately documenting his or her investigation of a fire scene as being critical to the validity of

any resultant opinions or conclusions. (SMF, p. 2, para. 5). In particular, NFPA 921 warns fire investigators that the diagrams and drawings that they produce as part of their inquiry are only as useful as the accuracy of the data used to create them. *Id.*

In addition to failing to measure and document the dimensions of the Carvalhal kitchen generally, Mr. Davoodi failed to take measurements of other key physical characteristics of the Carvalhal kitchen which appear to be vital to his conclusions in this case. More specifically, he did not document the height of the ceiling, the respective heights of the countertops and cabinets and, most importantly perhaps, Mr. Davoodi did not measure or otherwise document the burn patterns on the walls of the Carvalhals' kitchen which he believes serve as support for his origin opinions in this matter. (SMF, p. 4, para. 8).

Mr. Davoodi testified that he established the location of the water dispenser in the Carvalhals' kitchen by examining photographs and demarcations on the floor of the Carvalhals' kitchen. (SMF, p. 4, para. 9). That claim notwithstanding, Mr. Davoodi did not take any empirical measurements establishing the approximate location of the water at the time of the fire, and he acknowledged that the depictions of the water cooler location found in his resultant report were not to scale. *Id.* Mr. Davoodi's conduct in this regard is contrary to Chapter 24 of NFPA 921 which provides clear guidance for the analysis of appliances as part of a fire investigation. (SMF, pp. 2-3, para. 5). The subject guidelines admonish fire investigators that until an adequate origin determination has been made, it is not recommended that any appliance be explored as a potential ignition source. *Id.* In determining whether an appliance is a competent cause of a fire, NFPA 921 notes that determining the location of the suspect appliance within the area of origin is particularly important. *Id.* To that end, fire investigators are advised that they should take measurements that will establish the location of the appliance. *Id.*

The absence of any scientific or empirical documentation of the basic characteristics of the Carvalhals' kitchen and the smoke and burn pattern evidence available to Mr. Davoodi represent a fatal flaw which undermines all of his conclusions and opinions in this case. Notably, Mr. Davoodi acknowledged that he did not rely upon any objective measurements or other quantitative data in producing the other diagrams in his written report which supposedly illustrate how the smoke and burn patterns at issue originated from the area where the Defendants' water dispenser was located. (SMF, p. 4, para. 9). Moreover, he admitted that the computer program he utilized to generate this key illustration was generic software, and not designed to depict the findings of cause and origin investigations of fires. *Id.* Like all the other diagrams and illustrations in his report, Mr. Davoodi's computer generated fire and smoke pattern diagram is not drawn the scale, not based upon any empirical evidence, but rather simply reflects his subjective impressions of the fire scene. (SMF, p. 4-5, para. 9).

Mr. Davoodi acknowledged that NFPA 921 required that he retain, preserve, and protect evidence from a fire scene that may enable someone else to further evaluate the cause and origin of a fire. (SMF p. 4, para.10). Furthermore, he agreed that it was incumbent upon him as a fire investigator to retain all physical evidence (including appliances) that could reasonably be considered as a potential cause of the fire. (SMF, p. 5, para. 10). In an attempt to comply with this requirement, Mr. Davoodi retained a mixer because it was located in the southeast corner of the kitchen, in the area where he believed that the fire originated. (SMF, p. 5, para. 10). Mr. Davoodi admitted that photographs taken by the East Providence Fire Department immediately after the Carvalhal fire indicate that in addition to the mixer, the Carvalhals' coffeemaker was also located in the southeast corner of the kitchen where he believes this fire originated. *Id.* After initially testifying that he probably retained the coffeemaker from the fire scene, Mr.

Davoodi subsequently testified that he did not retrieve the coffeemaker and does not know what happened to it. *Id.* Likewise, Mr. Davoodi did not retain the other potential ignition sources he identified in the Carvalhals' kitchen (i.e., a microwave and toaster oven). *Id.* While Mr. Davoodi also retained an electrical outlet from the Carvalhals' kitchen, he testified that he did not know if it was the same outlet that the water dispenser was plugged into when the fire occurred. *Id.* Furthermore, because he does not know which outlet the water dispenser was plugged into, Mr. Davoodi is unable to opine as to whether or not the outlet in question was functioning properly at the time of the fire. *Id.*

Mr. Davoodi claimed that he ruled out the gas range located in the Carvalhal kitchen as a potential cause of the fire. (SMF, p. 5-6, para. 11). In explaining his justification for this conclusion, Mr. Davoodi employs circular reasoning to the effect that the gas range could not have been the source of the fire because it was not in the area where the fire originated. *Id.* Mr. Davoodi's flawed logic in this regard is confirmed by his acknowledgement that he failed to perform even a cursory examination of the gas range. While he noted that the plastic knobs used to control the range top burners had been burned off during the course of the fire, Mr. Davoodi admitted that he failed to perform an evaluation of the metal shafts to which such control knobs would have been attached, in order to determine the position of said control at the time of the fire. *Id.* As a result, Mr. Davoodi acknowledged that he did not know whether the burners on the Carvalhals' range top were on or off at the time of this fire. Even after Mr. Davoodi's lack of a foundation to rule out the range as a potential source of the fire had been pointed out to him, he insisted that his conclusions were not flawed. More specifically, Mr. Davoodi testified that even if the evidence had shown that all four of the burners on the Carvalhals' range top had been

turned on full blast at the time of the incident, it would still be his opinion that the Defendants' water dispenser was the origin of the fire. *Id.*

Mr. Davoodi's clear failure to follow proper scientific methodology in conducting his cause and origin investigation was not limited to his failure to adequately investigate and document the fire scene itself. To the contrary, Mr. Davoodi also failed to document, collect, evaluate and retain evidence that was key to his conclusions in this case. By doing so, he has deprived the Defendants (and the Court, for that matter) key evidence necessary to more fully understand and test his opinions. Mr. Davoodi acknowledged that a fire investigation cannot establish the cause of a fire until the origin of the fire has been established. (SMF, p. 6, para. 12). The Plaintiffs' other two expert witnesses did not conduct their own investigation into the origin of the fire at issue, but rather relied upon Mr. Davoodi's flawed inquiry. Consequently, if Mr. Davoodi's expert testimony regarding the origin of the Carvalhal fire is excluded, the opinions of the Plaintiffs' remaining experts about the root cause of the fire must likewise be excluded.

**B. Ara Nalbandian's and Michael Cooney's Opinions are Inadmissible Because their Evaluation of the Water Dispenser is Scientifically Invalid**

Assuming, *arguendo*, that Plaintiffs were able to provide competent expert testimony regarding the origin of the Carvalhal fire by using Mr. Davoodi, they still lack competent expert opinions regarding the cause of the fire.

For a fire to occur, there must be oxygen, fuel, and a source of energy sufficient to cause the fuel to ignite. This scientific principle is commonly known as the "fire triangle". In order to explain what ultimately caused the Carvalhal fire with any degree of scientific validity, Plaintiffs' experts must account for all three elements of the fire triangle. The presence of oxygen in the Carvalhals' kitchen is (obviously) not in dispute in this case. However, Plaintiffs' experts have not (and cannot) establish what material within the Defendants' water dispenser

served as a fuel source, and they have not (and cannot) identify how that fuel was ignited with any degree of scientific certainty whatsoever. Because Plaintiffs' experts cannot explain how a fire could have originated within the Defendants' water dispenser, they cannot provide the proximate cause opinions necessary to establish liability in this case.

In order to establish cause of the Carvalhal fire, The Hartford retained Thielsch Engineering, Inc. to perform an evaluation of the Carvalhal water dispenser. Thielsch assigned Ara Nalbandian and Michael Cooney to conduct the resultant investigation. The Thielsch Engineering Report concluded that:

> "The presence of stress corrosion cracking in the stainless steel tank and the corrosion deposits on the two heat sensors located on the outside surface of the cylinder wall, further indicate that in the absence of proper temperature sensor response, heater coil generated sufficient heat to cause localized burning and the fire that occurred (at the Carvalhal residence) on February 27, 2004" (SMF, p. 1)

Prior to reaching this conclusion, Mr. Nalbandian performed a visual examination of the water dispenser on May 7, 2004. (SMF, p. 6, para. 13). Mr. Nalbandian's report noted that the source of the fire was not evident from this initial visual examination, and that further evaluation of the water dispenser (including destructive laboratory testing) was required to "establish the source and possible causes of the fire" (SMF, p. 6, para. 14). During the course of subsequent destructive disassembly and laboratory analysis, Mr. Nalbandian and Mr. Cooney identified corrosion of the hot water tank component, and concluded that the condition was caused by the presence of chloride in foam insulation adjacent to the hot water tank. (SMF, pp. 6-7, para. 14 ).

While the product analysis conducted at Thielsch Engineering allegedly establishes that the cause of stress corrosion and alleged leakage of water from the hot water tank located in the Carvalhals' water dispenser, they failed to thoroughly evaluate or test the two heat sensors located on the outside of the hot water tank which they claim malfunctioned and caused the unit

to overheat. Likewise, they failed to thoroughly evaluate or test the heater coil which supposedly remained continuously energized when the temperature sensors failed. Moreover, they failed to evaluate or test the flammability of any of the materials located in proximity to the heater coil. Ultimately, careful consideration of the analysis of the water dispenser performed by Mr. Nalbandian and Mr. Cooney establishes that they have no scientific basis to offer causation opinions in this case.

Plaintiffs' product design experts have no scientific basis for their claim that there was an "absence of proper temperature sensor response". Inasmuch as this malfunction is the first in a series of events they claim caused overheating in the water dispenser that lead to the ignition of the fire, Plaintiffs' experts are unable to provide opinions about this element of the "fire triangle". Mr. Nalbandian conceded that he does not know how the temperature control switches work. (SMF, p. 7, para. 15). In light of that admission, he agreed that he cannot opine that the switches malfunctioned on the day the Carvalhal fire occurred. *Id.* While Mr. Cooney claimed that he understood the underlying principles utilized for temperature sensor units, he acknowledged that he did not know the exact details of how the temperature sensors on the Carvalhal water dispenser functioned. (SMF, p. 8, para. 17). Consequently, Mr. Cooney was unable to explain why there were two separate heating sensors located on the hot water tank, and he does not know if they served different functions. *Id.* Ultimately, Mr. Cooney admitted that his belief that both of the temperature sensors had failed was based solely upon his visual observation of the sensors alone, and no other scientific evidence. *Id.* Although he claimed that the fire damage precluded him from testing the functionality of the temperature sensors on the Carvalhal water dispenser, Mr. Cooney, citing budgetary concerns, acknowledged that he neither examined nor tested the undamaged temperature sensors located on either of the other two water

dispenser exemplars made available to him. *Id.* Mr. Cooney's tortured explanations notwithstanding, he himself acknowledged that he lacks the necessary expertise to testify or render opinions regarding electrical systems incorporated into consumer products such as the Carvalhal water cooler. *Id.*

The evaluation of the heating coil incorporated into the Carvalhal water dispenser conducted by Thielsch Engineering is likewise flawed from a scientific standpoint. Mr. Nalbandian acknowledged that he is unaware of the normal operating parameters of the heating coil located in the Carvalhal water dispenser. (SMF, p. 7, para. 15). Mr. Nalbandian also did not know what temperature the heating coil would have reached under normal operating conditions, nor does he know what the temperatures would have been had the heating coil been allowed to run continuously. *Id.* In other words, Mr. Nalbandian was unable to testify as to the temperature that the heating coil would have reached had the temperature sensors on the side of the hot water tank failed to shut it off properly. *Id.* Mr. Nalbandian acknowledged that he did not perform any tests on the heating coils located in the Carvalhal water dispenser, or the exemplar water dispensers. *Id.*

Mr. Cooney's deposition testimony reflects a similar lack of scientific certainty regarding the role that the heating coil allegedly played in the Carvalhal fire. During his deposition, Mr. Cooney actually disavowed the claim in the Thielsch Engineering report that "the heater coil generated sufficient heat to cause localized burning in the fire that occurred on February 27, 2004." (SMF, pp. 8-9, para. 18). Like Mr. Nalbandian, Mr. Cooney does not know the specific performance parameters of the heating coil, or how hot it would have needed to get to cause a localized fire within the water dispenser unit itself. *Id.*. Ultimately, Mr. Cooney acknowledged that while he and Mr. Nalbandian performed a cursory evaluation of the heating coil and

determined that it did not look damaged by the fire, he was unaware of its precise design, how it operated, and its operating characteristics. (SMF, p. 9, para. 18). Mr. Cooney confirmed that no one from Thielsch Engineering performed any testing on the heating coil in the Carvalhal water dispenser or the two exemplar water dispensers that had been made available to them. *Id.*

In addition to failing to develop an adequate scientific basis for opinions regarding the conditions within the Defendants' water dispenser which could represent an ignition source, neither Mr. Nalbandian nor Mr. Cooney are able to provide competent testimony regarding what components within the unit would serve as a fuel - the other missing element of the "fire triangle". While Mr. Nalbandian speculated that a malfunction could allow the heating coil in the water dispenser to overheat and ignite surrounding components, he admitted that he had failed to determine the precise composition of any of the surrounding components. Thus, he is unable to testify as to how hot the surrounding components needed to be before they ignited. (SMF, p. 7, para. 16). More specifically, Mr. Nalbandian claimed that a substantial portion of the components within the water dispenser were plastic, but he did not perform any testing to identify the actual types of plastics involved. *Id.* Mr. Nalbandian's lack of knowledge regarding the precise composition of the plastic parts present in the Carvalhal water dispenser preclude him from providing opinions regarding the temperature at which those same components would catch on fire. (SMF, p. 7-8, para. 16). Mr. Nalbandian admitted that he made no attempt whatsoever to gain this knowledge despite the availability of the Carvalhal water dispenser and two exemplar water dispenser units. *Id.* Finally, Mr. Nalbandian was forced to acknowledge that he lacks the scientific basis to offer any opinion to the effect that some non-plastic component found in the Carvalhal water dispenser caught fire as a result of some internal malfunction in the unit. *Id.* . Likewise, Mr. Cooney acknowledged that he does not have a scientific foundation to opine that

any of the plastic components within the Carvalhal water dispenser ignited and caused this fire. (SMF, p. 9, para. 18). Like Mr. Nalbandian, Mr. Cooney also acknowledges that he is unaware of any non-plastic component within the Carvalhal water dispenser that could have ignited and started this fire. *Id.*

Because Plaintiffs' experts have not (and cannot) establish what material within the Defendant's water dispenser served as a fuel source, and they have not (and cannot) identify how that fuel was ignited with any degree of scientific certainty whatsoever, they cannot render competent opinions regarding what caused this fire. Because Plaintiffs' experts cannot explain how a fire could have originated within the Defendants' water dispenser, they cannot provide the proximate cause opinions necessary to establish liability in this case

**C. Plaintiff's Product Design "Experts" Lack Sufficient Qualifications and Scientific Foundation for Rendering Opinions in this Case**

The First Circuit has recognized that general engineering knowledge is not sufficient to qualify an expert to provide opinion testimony in a products liability case. To the contrary, an expert must possess knowledge and expertise as to the *particular* product in question. In *Hochen v. Bobst Group, Inc.*, 290 F.3d 446 (1st Cir. 2002), the plaintiff claimed to be injured after a printing press exploded. The trial court excluded the testimony of the plaintiff's expert engineer, holding that while the expert may have had general expertise regarding the electronic controls on industrial machinery, he failed to acquire sufficient knowledge as to the particular printing press which was the subject of the litigation. *Id.*, 290 F.3d at 452. In affirming the trial court's holding, the First Circuit noted that if a generalist expert fails to conduct adequate investigation into a particular product which is the subject of litigation, the expert's testimony is inadmissible. *Id.*, 290 F.3d at 453, footnote 6.

In light of the principles set forth in *Hochen*, it is clear that neither Mr. Nalbandian nor Mr. Cooney performed the work necessary to overcome their lack of direct personal experience regarding either the temperature switch or the heating element component in the Defendants' water dispenser. As noted above, neither one of the Plaintiffs' product design experts performed any testing to confirm their hypothesis, nor were they able to cite any support for their conclusions in scientific or engineering literature, or in any other source. The only support for Mr. Nalbandian's and Mr. Cooney's conclusion that a defect in the Defendants' water dispenser was the cause of the Carvalhal fire, are their own unsupported, subjective beliefs, based only upon certain metallurgical issues which were not in fact, the proximate cause of this fire.

**III. Because the Testimony of Plaintiffs' Experts is Inadmissible, Plaintiffs Cannot Prevail on Any of Their Causes of Action and Defendants are Entitled to Judgment in their Favor as a Matter of Law**

In their respective Complaints, Plaintiffs assert a wide variety of causes of action, but the fundamental premise for all of them is that the Defendants' water dispenser was defective. In order to prevail on any of these causes of action, it is the Plaintiffs' burden of proof to show that the water dispenser was in a defective condition, unreasonably dangerous to the end user, and that that defect was the proximate cause of their injuries. Because the existence of a defect in the design or manufacture of the water dispenser at issue is a matter beyond the understanding of a lay person, it is incumbent upon the Plaintiffs to provide expert testimony on the issues of defect and causation. Because the testimony of the Plaintiffs' cause and origin and product design experts is inadmissible, Plaintiffs cannot prove that a defect in the water dispenser was the proximate cause of their injuries.

In the case at bar, it is impossible for a lay juror to understand the causes and origins of the Carvalhal fire without the assistance of expert testimony. The available evidence in this case suggests that there was a wide variety of potential causes and origin for this fire other than the

Defendants' water dispenser that were not ruled out by Plaintiffs' cause and origin expert. These include, but are not limited to, Mrs. Carvalhal's admitted practice of burning candles in her kitchen, and numerous other ignition sources within the kitchen including, but not limited to, the coffee pot, range top, and/or electrical outlets located in the area. Moreover, by their own admission, the Plaintiffs' purported product design experts are unable to provide any scientifically justified explanation of how the fire could have started in the Defendants' water dispenser. Without admissible expert testimony, jurors would be forced to speculate as to the true cause of the Carvalhal fire. This is not permissible under the Federal Rules of Civil Procedure. Accordingly, because Plaintiffs cannot, as a matter of law, prove any of their causes of action, Summary Judgment should be granted in favor of the Defendants.

## CONCLUSION

In *Kumho Tire*, the Supreme Court notes that expert testimony can be admitted only if the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". 119 F.Ct. at 1176. That holding reinforces a trial court's role as gatekeeper to prevent the admission of so-called "expert" testimony based upon conclusions which lack any scientific, empirical, or other legitimate foundation. As noted above, the opinions to be offered by Plaintiffs' fire cause and origin investigator, or their product design "experts" lack such a scientific or empirical basis. Because these opinions do not meet the same level of intellectual rigor that characterizes the practice of an expert in these respective fields, this Court should not allow a jury to consider such unsupported testimony for purposes of determining liability in this case.

It would be contrary to the fundamental principals that underlie *Daubert* and *Kumho Tire* for the Plaintiffs' experts to render their unsupported opinions regarding the cause and origin of the Carvalhal fire. Rule 702 of the Rules of Evidence allows experts to provide "scientific,

technical or other specialized knowledge". In *Daubert*, the court stated "the word 'knowledge' connotes more than subjective belief or unsupported speculation". 509 U.S. at 590, 113 S.Ct. at 2795. Because the "opinions" of the Plaintiffs' experts in this case are nothing more than subjective belief and unsupported speculation, they must be excluded from evidence.

Without the required expert testimony, Plaintiffs simply cannot prove their case. Consequently, the Defendants are entitled to Summary Judgment as to all of the causes of action set forth in the Plaintiffs' respective Complaints.

WHEREFORE, Defendants, GENERAL ELECTRIC CO. and MIDEA USA, INC., respectfully request that this Honorable Court grant their Motion to preclude the testimony of the Plaintiffs' expert witnesses and for summary judgment and for any other such relief that this Court deems appropriate and just.

Dated: June 8, 2007

/s/ Rodd E. Elges, Esq.
DOMINICK W. SAVAIANO
RODD E. ELGES
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010
dsavaiano@clausen.com
relges@clausen.com
Attorneys for Defendants

AND

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio, Esq.
Attorney #3910
McKinnon & Harwood
1168 Newport Avenue
Pawtucket RI 02861
(401) 723-9655
contact@mckinnonharwood.com

## CERTIFICATE OF MAILING AND ELECTRONIC SERVICE

I hereby certify that a true and correct copy of the above and foregoing was mailed to the following attorney(s) of record with sufficient postage thereon, on the 8th day of June, 2007. I hereby further certify that a true and correct copy of the above and foregoing was transmitted electronically to the following attorney(s) of record, on the 8th day of June, 2007.

Mark Dana, Esq.
Robert A. D'Amico, II, Esq.
536 Atwells Ave., Suite 1
Providence, RI 02909
401.454.1212
Fax: 401.454.4809
rad@dblawri.com
mwd@mdlawri.com

Richard Ari Van Tienhoven, Esq.
Van Tienhoven & Cotter, Ltd.
312 South Main Street
Providence, Rhode Island 02903;
ravt.ksc@conversent.net

Erik Loftus
Law Office of Stuart Blackburn
Two Concorde Way, PO Box 608
Windsor Locks, CT 06096
860.292.1116
eloftus@sbcglobal.net

Joseph-Anthony DiMaio
McKinnon & Harwood
1168 Newport Avenue
Pawtucket, Rhode Island 02861
(401) 723-9655
Fax: (401) 722-9106
contact@mckinnonharwood.com

/s/ Rodd E. Elges, Esq.

Rodd E. Elges
CLAUSEN MILLER P.C.
10 S. LaSalle St.
Chicago, Illinois 60603
Phone: (312) 855-1010