IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

| | |
|---|---|
| THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL<br><br>Plaintiff<br><br>v.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br><br>Defendant | No. CA 06 362 S |
| EUGENIA CARVALHAL<br><br>Plaintiff<br><br>v.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br><br>Defendant | No. CA 07 007 S |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF THE PLAINTIFFS' EXPERT WITNESSES AND FOR SUMMARY JUDGMENT**

NOW COME the Defendants, MIDEA USA, INC. and GENERAL ELECTRIC COMPANY, by and through their attorneys, and hereby submits the following statement of material facts as to which there is no genuine issue to be tried.

1. On February 27, 2004, a fire occurred at the private residence of Alberto and Eugenia Carvalhal, located at 76 Willet Avenue, in East Providence, Rhode Island (hereinafter referred to as "the Incident"). Pursuant to a homeowner's policy issued by The Hartford, the Carvalhals filed a claim seeking coverage of their related losses. In order to recover the funds that they paid out to the Carvalhals, The Hartford subsequently filed a six-count products

liability lawsuit on July 14, 2006 against these Defendants. (See generally, The Hartford's Complaint, a true and accurate copy of which is attached hereto as Exhibit "A")

2. Eugenia Carvalhal filed her own lawsuit seeking recovery of her uninsured losses stemming from the Incident. Eugenia Carvalhal's current Compliant, as amended on April 3, 2007, is essentially identical to The Hartford's original Complaint at Law. (See generally Eugenia Carvalhal's Amended Complaint, a true and accurate copy of which is attached hereto as Exhibit "B".)

3. At the time that the fire occurred, a General Electric water dispenser, Model No. GXCF05D, was located within the Carvalhals' kitchen. (See Exhibits "A" and "B".)

4. To establish the origin of the Carvalhal fire, The Hartford retained Crawford Investigations, whose agent, Hossein Davoodi, investigated the fire scene and completed a related written report dated September 10, 2004 . (See generally the Crawford Investigations' Report, a true and accurate copy of which is attached hereto as Exhibit "C".)

5. The National Fire Protection Association (NFPA), publishes authoritative guidance for performance of fire investigations, commonly referred to as NFPA 921. Chapter 4 of NFPA 921 sets forth broad guidelines for the completion of fire investigations and expressly acknowledges the need to apply the scientific method and completing same. (pp. 14-15) Chapter 15 of NFPA 921 acknowledges the importance of a fire investigator thoroughly and accurately documenting his or her investigation of a fire scene as being critical to the validity of any resultant opinions or conclusions. (p. 109, Sect. 15.1) In particular, fire investigators are admonished that the diagrams and drawings that they produce as part of their inquiry are only as useful as the accuracy of the data used to create them. (p. 116, Sect. 15.4). Chapter 24 of NFPA 921 provides clear guidance for the analysis of appliances as part of a fire investigation. (p. 180-

181). The subject guidelines admonishes fire investigators that until an adequate origin determination has been made it, is not recommended that any appliance be explored as a potential ignition source. (p. 180, Sect. 24.1.1) In determining whether an appliance is a competent cause of a fire, NFPA 921 notes that determining the location of the suspect appliance within the area of origin is particularly important. (*Id.*, Sect. 24.2.2) To that end, fire investigators are advised that they should take measurements that will establish the location of the appliance. Id. (See generally selected portions of the 2004 edition of NFPA 921, a true and accurate copy of which is attached hereto as Exhibit "D".)

6. During his deposition, Mr. Davoodi testified that he possesses a Masters Degree in fire protection engineering which he relied upon in attempting to render opinions in this case. (p. 24) Other than his degree in fire protection, Mr. Davoodi stated that he does not have any other professional engineering experience. (p. 26). He is not a professional mechanical engineer, and is not a professional electrical engineer. *Id.* Mr. Davoodi does not claim to have any expertise regarding the design or manufacture of products such as the water dispenser at issue. (pp. 39-42) Mr. Davoodi has not rendered any opinions regarding any alleged defect in the water dispenser, nor does he have any opinions regarding the actual ignition source of the Carvalhal fire. (p. 40) (See cited pages of the deposition transcript of Hossein Davoodi's deposition transcript, true and accurate copies of which are attached hereto as Exhibit "E".)

7. During his deposition, Mr. Davoodi acknowledged that for opinions regarding the origin of a fire to be valid, they must be based upon scientific evidence. (p. 53) He testified that he was aware of, and abided by, the guide for performance of fire investigations published by the National Fire Protection Association (NFPA), which is commonly referred to as NFPA 921. (pp. 54, 43). Mr. Davoodi characterized NFPA 921 as "the bible for fire investigators". (p. 43)

Mr. Davoodi stated that courts rely upon NFPA 921 in evaluating opinions rendered by fire investigators. (p. 53)

8. During his deposition, Mr. Davoodi acknowledged that the diagram that he prepared of the first floor of the Carvalhal household was "grossly simplified" and not to scale. (p. 116) Mr. Davoodi also stated that the diagram itself is inaccurate on its face. (p. 117) Mr. Davoodi testified that he did not take and record any dimensions of the kitchen where this fire allegedly originated. (p. 118) Mr. Davoodi stated that it was his custom and practice to take such measurements, but his report does not document that such measurements were taken, and Mr. Davoodi was unable to recall what those dimensions were during the course of his deposition. (pp. 118-119) He did not document the height of the ceiling, the respective heights of the countertops and cabinets, and did not measure or otherwise document the burn patterns on the walls of the Carvalhals' kitchen which he believes serve as support for his origin opinions in this matter. (p. 158)

9. Mr. Davoodi testified that he established the location of the water dispenser in the Carvalhals' kitchen by examining photographs and demarcations on the floor of the Carvalhals' kitchen. (p. 126) Mr. Davoodi did not take any empirical measurements establishing the approximate location of the water at the time of the fire, and he acknowledged that the depictions of the water cooler location found in his resultant report were not to scale. (pp. 126-127). Mr. Davoodi did not rely upon any objective measurements or other quantitative data in producing the other diagrams in his written report which supposedly illustrate how the smoke and burn patterns at issue originated from the area where the Defendants' water dispenser was located. (p. 124) He stated that the computer program he utilized to generate this key illustration was generic software, and not designed to depict the findings of fire cause and origin investigations.

(p. 123) Like all the other diagrams and illustrations in his report, Mr. Davoodi's computer generated fire and smoke pattern diagram is not drawn the scale, not based upon any empirical evidence, but rather simply reflects his subjective impressions of the fire scene. (pp. 125-126).

10. Mr. Davoodi acknowledged that NFPA 921 required that he retain, preserve, and protect evidence from a fire scene that may enable someone else to further evaluate the cause and origin of a fire. (p. 143) Furthermore, he agreed that it was incumbent upon him as a fire investigator to retain all physical evidence (including appliances) that could reasonably be considered as a potential cause of the fire. (p. 142) In an attempt to comply with this requirement, Mr. Davoodi retained a mixer because it was located in the southeast corner of the kitchen, in the area where he believed that the fire originated. (pp. 136-137) Mr. Davoodi admitted that photographs taken by the East Providence Fire Department immediately after the Carvalhal fire indicated that in addition to the mixer, the Carvalhals' coffeemaker was also located in the southeast corner of the kitchen where he believes this fire originated. (p. 170) After initially testifying that he probably retained the coffeemaker from the fire scene (p. 137), Mr. Davoodi subsequently testified that he did not retrieve the coffeemaker and does not know what happened to it. (pp. 170-171). While Mr. Davoodi also retained an electrical outlet from the Carvalhals' kitchen, he testified that he did not know if it was the same outlet that the water dispenser was plugged into when the fire occurred. (p.132). Furthermore, because he does not know which outlet the water dispenser was plugged into, Mr. Davoodi stated that he is unable to opine as to whether or not the outlet in question was functioning properly at the time of the fire (p. 135).

11. Mr. Davoodi claimed that he ruled out the gas range located in the Carvalhal kitchen as a potential cause of the fire. (p. 160) In explaining his justification for this conclusion,

Mr. Davoodi stated that the gas range could not have been the source of the fire because it was not in the area where the fire originated. *Id.* While he noted that the plastic knobs used to control the range top burners had been burned off during the course of the fire, Mr. Davoodi admitted that he failed to perform an evaluation of the metal shafts to which such control knobs would have been attached, in order to determine the position of said control at the time of the fire. *Id.* Mr. Davoodi testified that even if the evidence had shown that all four of the burners on the Carvalhals' range top had been turned on full blast at the time of the Carvalhal incident, it would still be his opinion that the Defendants' water dispenser was the origin of the fire. (p. 162).

12. Mr. Davoodi acknowledged that a fire investigation cannot establish the cause of a fire until the origin of the fire has been established. (pp. 39-40).

13. To establish the cause of the Carvalhal fire, The Hartford retained Thielsch Engineering, Inc., whose agents, Ara Nalbandian and Michael Cooney, completed a report evaluating the Carvalhal water dispenser (the "Report"). The Report concluded that:

> The presence of stress corrosion cracking in the stainless steel tank and the corrosion deposits on the two heat sensors located on the outside surface of the cylinder wall, further indicate that in the absence of proper temperature sensor response, heater coil generated sufficient heat to cause localized burning and the fire that occurred (at the Carvalhal residence) on February 27, 2004 (p. 9)

14. Prior to reaching this conclusion, Mr. Nalbandian performed a visual examination of the water dispenser on May 7, 2004. (p. 7). Mr. Nalbandian noted that the source of the fire was not evident from his initial visual examination, and that further evaluation of the water dispenser (including destructive laboratory testing) was required to "establish the source and possible causes of the fire". (p. 3). During the course of the subsequent destructive disassembly and laboratory analysis, Mr. Nalbandian and Mr. Cooney identified corrosion of the hot water tank component, and concluded that the condition was caused by the presence of chloride in

foam insulation adjacent to the hot water tank. (pp. 4-6). (See generally the Thielsch Engineering, Inc. Report, a true and accurate copy of which is attached hereto as Exhibit "F".)

15. During his deposition, Mr. Nalbandian conceded that he does not know how the temperature control switches work on the water heater at issue. (p. 156). He agreed that he cannot opine that the switches malfunctioned on the day the Carvalhal fire occurred. (p. 157). Mr. Nalbandian acknowledged that he is unaware of the normal operating parameters of the heating coil located in the Carvalhal water dispenser. (p. 123). Mr. Nalbandian also does not know what temperature the heating coil would have reached under normal operating conditions, nor does he know what the temperatures would have been achieved had the heating coil been allowed to run continuously. (p. 134-135). Mr. Nalbandian was unable to testify as to the temperature that the heating coil would have reached had the temperature sensors on the side of the hot water tank failed to shut it off properly. (p. 142). Mr. Nalbandian acknowledged that he did not perform any tests on the heating coils located in the Carvalhal water dispenser, or the exemplar water dispenser. (p. 135-137). (See cited pages of the deposition transcript of Ara Nalbandian's deposition transcript, true and accurate copies of which are attached hereto as Exhibit "G".)

16. While Mr. Nalbandian speculated that a malfunction could allow the heating coil in the water dispenser to overheat and ignite surrounding components, he admitted that he had failed to determine the precise composition of any of the surrounding components, and he is unable to testify as to how hot the surrounding components needed to be before they ignited. (pp. 146-148). Mr. Nalbandian claimed that a substantial portion of the components within the water dispenser were plastic, but he did no testing to identify the actual types of plastics involved. (p. 147). Mr. Nalbandian's lack of knowledge regarding the precise composition of the plastic parts

present in the Carvalhal water dispenser preclude him from providing opinions regarding the temperature at which those same components would catch on fire. (pp. 148-149). Mr. Nalbandian admitted that he made no attempt whatsoever to gain this knowledge despite the availability of the Carvalhal water dispenser and two exemplar water dispenser units. (pp. 150-151). Finally, Mr. Nalbandian was forced to acknowledge that he lacks the scientific basis to offer any opinion to the effect that some non-plastic component found in the Carvalhal water dispenser caught fire as a result of some internal malfunction in the unit. (p. 152).

17. During his deposition, Mr. Cooney claimed that while he understood the underlying principles utilized for temperature sensor units, he acknowledge that he did not know the exact details of how the temperature sensors on the Carvalhal water dispenser functioned. (p. 150). Mr. Cooney was unable to explain why there were two separate heating sensors located on the hot water tank, and he does not know if they served different functions. (p. 154). Mr. Cooney admitted that his belief that both of the temperature sensors had failed was based solely upon his visual observation of the sensors alone, and no other scientific evidence. (p. 154-155). Citing budgetary concerns, Mr. Cooney acknowledged that he neither examined nor tested the undamaged temperature sensors located on either of the other two water dispenser exemplars made available to him. (pp. 147, 153-154). Mr. Cooney acknowledged that he lacks the necessary expertise to testify or render opinions regarding electrical systems incorporated into consumer products such as the Carvalhal water cooler. (pp. 22-23). (See cited pages of the deposition transcript of Michael Cooney's deposition transcript, true and accurate copies of which are attached hereto as Exhibit "H".)

18. During his deposition, Mr. Cooney disavowed the claim in the Thielsch Engineering report that "the heater coil generated sufficient heat to cause localized burning in the

fire that occurred on February 27, 2004." (pp. 101-102). Mr. Cooney does not know the specific performance parameters of the heating coil, or how hot it would have needed to get to cause a localized fire within the water dispenser unit itself. (pp. 109-111). Ultimately, Mr. Cooney acknowledged that while he and Mr. Nalbandian performed a cursory evaluation of the heating coil and determined that it did not look damaged by the fire, he was unaware of its precise design, how it operated, and its operating characteristics. (pp. 136-138). Mr. Cooney confirmed that no one from Thielsch Engineering performed any testing on the heating coil in the Carvalhal water dispenser or the two exemplar water dispensers that had been made available to them. (pp. 138-139). In addition, Mr. Cooney acknowledged that he does not have a scientific foundation to opine that any of the plastic components within the Carvalhal water dispenser ignited and caused this fire. (pp. 141-142). Mr. Cooney also acknowledges that he is unaware of any non-plastic component within the Carvalhal water dispenser that could have ignited and started this fire. (p. 142).

Dated: June 8, 2007

/s/ Rodd E. Elges, Esq.
DOMINICK W. SAVAIANO
RODD E. ELGES
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010
dsavaiano@clausen.com
relges@clausen.com
Attorneys for Defendants

AND

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio, Esq.
Attorney #3910
McKinnon & Harwood
1168 Newport Avenue
Pawtucket RI 02861
(401) 723-9655
contact@mckinnonharwood.com

## CERTIFICATE OF MAILING AND ELECTRONIC SERVICE

I hereby certify that a true and correct copy of the above and foregoing was mailed to the following attorney(s) of record with sufficient postage thereon, on the 8th day of June, 2007. I hereby further certify that a true and correct copy of the above and foregoing was transmitted electronically to the following attorney(s) of record, on the 8th day of June, 2007.

Mark Dana, Esq.
Robert A. D'Amico, II, Esq.
536 Atwells Ave., Suite 1
Providence, RI 02909
401.454.1212
Fax: 401.454.4809
rad@dblawri.com
mwd@mdlawri.com

Richard Ari Van Tienhoven, Esq.
Van Tienhoven & Cotter, Ltd.
312 South Main Street
Providence, Rhode Island 02903;
ravt.ksc@conversent.net

Erik Loftus
Law Office of Stuart Blackburn
Two Concorde Way, PO Box 608
Windsor Locks, CT 06096
860.292.1116
eloftus@sbcglobal.net

Joseph-Anthony DiMaio
McKinnon & Harwood
1168 Newport Avenue
Pawtucket, Rhode Island 02861
(401) 723-9655
Fax: (401) 722-9106
contact@mckinnonharwood.com

/s/ Rodd E. Elges, Esq.
Rodd E. Elges
CLAUSEN MILLER P.C.
10 S. LaSalle St.
Chicago, Illinois 60603
Phone: (312) 855-1010