# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND
C.A. NO. 06362 S

---

THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

UNITED STATES DISTRICT COURT
OF RHODE ISLAND
C.A. NO. 07-007 S

---

EUGENIA CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

DEPOSITION OF HOSSEIN DAVOODI, PE, taken on behalf of the Defendant at the offices of Dunn & Goudreau Court Reporting Services, Inc., One State Street, Boston, Massachusetts, on Friday, April 13, 2007, commencing at 10:15 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
(617)742-6900

A By the time that Hartford calls the company and gives them the assignment and they contact me, it may be a day sometimes. Not 24 hours but going from like day twice; might be from March 2nd to March 3rd.
Q So what you're saying to me is this, that Crawford Investigations gets the assignment and then they contact you?
A Correct. That's correct. Sometimes adjustors when they get to call you directly first. But I don't believe this was the case here.
Q And to the degree Crawford's offices might have got a phone call the day before the 3rd, you're not sure one way or the other?
A It wouldn't be very long before I got it.
Q Let me ask you this question: Do you remember the circumstances surrounding this claim being referred to you by Crawford, Hartford, Mr. Loftus' office, or anyone else? Do you remember anything independently along those lines?
A The only thing I remember right now is my manager called me and told me about that assignment. I don't think there was anybody else.
Q Your manager's name is?



A John Phalnz.
Q Can you spell the last name for the court reporter?
A P-H-A-L-N-Z.
Q Do you recall what your manager told you about this claim when he initially called you and told you it had been assigned to you?
A Yes.
Q What did he tell you?
A I don't remember. Just that we got this file case, go do.
Q So nothing unusual; no special instructions? Didn't give you any background of the facts?
A The assignments, they say whatever then, which isn't much, that they have the loss and the --
Q The address?
A The address.
Q Do you remember your manager talking to you about a water cooler at that point?
A No.
Q I'm going to ask you some more questions.
A I'm sorry; let me rephrase that. I do remember that my manager didn't talk about the water



cooler. It's not that I don't remember if he talked about it or not; he didn't talk about the water cooler at that point.
Q What else didn't he talk to you about that day?
MR. D'AMICO: Objection.
MR. LOFTUS: Objection.
A You mean as far as the facts of the case are concerned?
Q (By Mr. Elges) Yeah.
A Well, again, besides the date and time of the loss, and contact person, just the site investigation; nothing else.
Q Do you remember taking any notes regarding the assignment initially; written notes?
A At the scene I took some notes.
Q We'll talk about those in a minute. Just before I move on for the purposes of making a clean record: Deposition Exhibit 16 is Bate-stamped H512 through H609. We're going to set that aside for the time being and I'm going to ask you some questions about your CV. Your CV is attached as a portion of Defendant's Exhibit 15. It's a two-page CV. I need you to look at it and tell me whether it's complete,



accurate, and up-to-date.
A It does look like it's my most updated CV.
Q There is nothing new in your background, experience, or credentials that would establish variances in this case that's not included in your two-page resume that we're looking at now; true?
A There is nothing new.
Q On your educational background you have a master's degree in fire protection engineering?
A That's correct.
Q Are you relying on your degree in fire protection engineering in rendering your opinions in this case?
A Yes.
Q How are your fire protection engineering background -- how is your background relevant in this instance?
A My background, getting education in fire protection engineering, one of my expertise in fire behavior; I know how fire behaves.
Q You also have a bachelor's degree in mechanical engineering; true?
A Correct.
Q Are you using your degree in mechanical

engineering in rendering any opinions in this case?
A No.
Q I can strike that throughout --
A Oh, sorry. Let me rephrase. There might be some minor parts that I relied on with my mechanical background, but it wasn't -- I don't remember that they had any thing to do with the conclusion I reached.
Q Okay. As you sit here today can you tell me off the top of your head any way, shape, or form you're relying on your background in education and mechanical engineering in rendering an opinion in this case?
A As far as my opinion is concerned, no.
Q You're a professional engineer? You're a registered professional engineer in the field of fire technician; correct?
A Correct.
Q To make your deposition shorter I'm going to refer to the concept of professional engineer as "PE" during the rest of this deposition. Do you understand that?
A Yes.
Q Do you have that sort of background in any



other area beyond fire protection?
A You meaning a professional engineering?
Q Yes, sir.
A No.
Q So you're not a professional engineer with regards to mechanical engineering; true?
A That's correct.
Q You don't have a PE in electrical engineering; true?
A That's correct.
Q I note that you're a PE registered in various states there set forth on Page 1 of your CV. Do you hold registration in any other state other than the four jurisdictions listed here?
A No.
Q So you're not a PE registered in the state of Rhode Island; true?
A That's correct.
Q Do you have any certifications in Rhode Island whatsoever?
A Note that I can recall.
Q Have you ever testified in any Rhode Island state or federal court?
A Definitely not.



Q Have you performed any work in Rhode Island that you can remember other than your work on this particular case?
A There might have been some other cases there that I've done, fire cases.
Q Do you remember any of them as you sit here today?
A (Witness nods.)
Q That's no?
A Yes. I don't recall.
Q Are you aware of the Rhode Island licensing requirement and regulations pertaining to the work you've done in this case?
A No.
Q Are you relying upon your certification as a explosion and fire investigator in this case?
A Yes, I am.
Q When did you receive that certification?
A That was a long time ago. Again, I'm not sure but I think it was in '96; around that time.
Q Suffice it to say, that's not a certification you need to renew?
A Yes, you have to renew it every year.
Q When was the last time you renewed your



certification as an explosion and fire investigator?
A I believe it was last year.
Q So in 2004 when you performed the work in this case, the Carvalhal case, the certification was current, to your knowledge?
A Yes, I had that certification.
Q Somewhere in your vast offices, or garage, or somewhere you've got documentation of that certification in 2004?
A I should have something somewhere.
Q Can you briefly explain to me how you go about becoming certified as an explosion fire investigator?
A You have to take a test to become certified.
Q How many times did you take that test?
A Once. As far as renewing it, I don't remember, but I think that it required continuing education hours, but that I am not sure; I don't remember.
Q Fair enough. Have you ever been subject to any professional discipline in any field of expertise upon which you're relying and rendering opinions in this case?

there was a defective product issue?
A Again, one more -- there is one more I can recall right now, which is the case of little transformers that you use for phones; you hook them up to the line and use them for the phone.
Q You're talking about an electrical converter that converts AC into current that can be used by a phone; true?
A Something like that.
Q Any other product liability cases you can remember being involved in as an investigator?
A I've done more product liability cases but I can't recall specifically as a fire investigator. But I have done one as a mechanical engineer that I can recall.
Q What was that case about?
A That case was about a faulty -- actually, it was not a faulty -- that was about a double check valve. Double check valve that apparently malfunctioned and basically screwed up the entire pump house.
Q That was for steam, or water, or what was that for?
A That was water damage, yes.



Q So we've got the toaster oven, the telephone adapter, we've got the fuse box, we've got the double check valve?
A These are the ones I remember right now.
Q The double check valve, that didn't have anything to do with a fire; true?
A No, it didn't.
Q So if you remember any other instances where you testified regarding the cause and origin of a fire regarding a defective product during the course of your deposition today, let me know.
A Okay.
Q As far as those first three we talked about where there was a fire involved, my understanding of your work as an expert on the issue of product defects occurred while you were living in Canada; true?
A I'm sorry, can you repeat that?
Q You were prior involved in origin cause and origin investigations regarding defective products, that was while you were living in Canada?
A Pre-'98.
Q Before '98?
A '98 I moved to the States.



Q It was over 10 years ago?
A Some of them, yes.
Q Describe for me your educational, professional, or other background that qualifies you to rendered any opinions regarding the alleged defect in this case.
A Well, again, I'm giving you my opinion as a fire investigator that fire started -- where fire originated. As what kind of defect that product has that was the source of the -- the ignition source, I haven't rendered any opinion on that.
Q Okay. So as I understand it, as you sit here today what you're going to render opinions about is what you saw at the Carvalhal household as far as the origin of the fire?
A Not just that but that was -- I relied on that to form my opinion, but that wasn't the whole thing.
Q Okay. Just so I'm clear, I'm an attorney, what do I know? My understanding is when it comes to cause and origin investigations, it's called cause and origin because it's two separate things; right?
A Yeah.



Q You have to establish the origin of the fire --
A First.
Q If you can't establish the origin you can't establish the cause?
A That's correct.
Q As far as the origin opinions regarding this case, that has nothing to do with the alleged defects in the water cooler; true?
A Well, the origin of the fire, that's as far as my limited expertise is the fire originated here. What was the ignition source and why the ignition source was there, I haven't rendered an opinion on that. I just said the fire started at this location.
Q When we say "this location," my understanding is that you have used your expertise to establish the geographical physical location in the Carvalhal kitchen where this fire originated; true?
A In the kitchen and in the water cooler.
Q Now, that's where I get a little bit fuzzy about the opinions you're going to render in this case. You're saying that you will testify -- you

will render opinions to Mr. Davoodi's level of certainty, whatever that may be, establishing where in the kitchen this fire started; true?
A That's correct.
Q And you also rendered opinions to Mr. Davoodi's level of certainty that there was a fire inside the water cooler; is that true?
A I rendered an opinion that where in the water cooler fire started.
Q But as far as why the water cooler ignited, you're not going to render any opinions about that; true?
A I have not, yes.
Q So all you're going to say is there was a fire in the Carvalhal's kitchen in this particular corner and there was a fire inside of the water cooler that was sitting there; true?
A That's correct.
Q You're not going to say this is why the water cooler caught fire; true?
A That's correct.
Q You're not going to render an opinion saying this is the defect in the water cooler that caused it to catch fire; true?



A That's correct.
Q You don't have any product liability opinions in this case?
A No, I don't.
Q That will make your deposition much shorter. I thank you for kind of walking me through it. Having said that, let me ask one or two more questions. I think we talked about what you remember doing product liability analysis on; do you remember?
A Yes.
Q As far as your background in that aspect of what you do, you don't remember doing such a product liability analysis involving another water cooler other than this case; true?
A I have not done any other water cooler cases.
Q This is your first water cooler case as either a cause and origin expert? I'll object to my own question -- strike it. To avoid the compound nature of what I'm going to ask you, I'll ask a better question. As a cause and origin investigator, you have not investigated another fire involving a water cooler; true?



A To my knowledge. I don't recall any.
Q As far as your other work where you were involved rendering opinions regarding product defects, you don't ever remember being involved in a case where you rendered opinions about a product defect in a water cooler; right?
A That is correct.
THE WITNESS: Can we take a little break?
MR. ELGES: Absolutely. Take a short one.
(Off the record.)
MR. ELGES: (On the record.)
Q (By Mr. Elges) I want to revisit your CV real quickly, move on with this and get on with your opinions in this case. You're currently employed by the National Fire Protection Association; true?
A That is correct.
Q They issue guidelines regarding the work that you do as a fire investigator?
A One of their guidelines is -- their business is the fire and safety business. And one of their guidelines is NFPA 921, which is like the bible for fire investigators.
Q When you say "bible" -- people rarely use the word "bible." Let me see if I can explore what



you mean by "bible." NFPA 921, those are rules that fire investigators using cause and origins investigations must follow; true?
A Not really. The NFPA 921 is a guide, it's not a standard, but it's full of good information.
Q Your supervisor back in the office in Quincy wouldn't be upset to hear you say it was only a guide?
A They shouldn't be, that's my opinion.
Q Let me ask you about your work for your current employer. Are you involved in the amendment, development, revision of 921?
A No.
Q So if you come to court you're not going to come in and say, I work for NFPA and that means that I have particular expertise in 921? You're not going to say that?
A No. No. My knowledge of 921 has nothing to do with me working at NFPA.
Q So the fact that you work for that association doesn't give you special qualifications or authority to speak about 921?
A No.
Q What do you do for the association,

Page 53

Q Suffice it to say, it was doing the same general work you did in this case; true?
A Yes.
Q Any nuances I need to know about doing cause and origin investigations in Canada?
A I don't know what "nuance" means.
Q That's a good point. When you're doing fire investigations in Canada do you have to follow NFPA 921?
A Nobody even here now, nobody forces you to follow NFPA 921, but courts rely on that and, again, 921 provides a lot of good information for investigators.
Q How do courts rely on that standard?
A From what I've read, not personal involvement, that you have to have -- you have -- you have to back up your opinion by scientific evidence. And now courts -- the article that I read, it said that courts rely on the procedures and things that are in NFPA 921 to render their opinion.
Q You agree with that approach?
A NFPA 921, there is a lot of good information there, a lot, but it's not perfect; that's why they don't call it a standard yet.

Page 54

Q Let me ask you a broad question and see if you can answer it. In conducting your work in investigating the cause and origin of the Carvalhal fire, did you follow NFPA 921?
A Yes, I did.
Q And to the degree you followed 921, is it your opinion that that bolsters or substantiates any opinions you're going to render in this case?
A I'm sorry; I didn't understand.
Q We talked before about the level of certainty to which you would testify regarding your opinions.
A Okay.
Q Does following 921 increase your confidence that your opinions are scientifically sound?
A I don't know if I can answer that.
Q You listed your membership and affiliations on Part 2 of your CV. Do any of these memberships or affiliations make you a more qualified expert to render opinions in this case?
A Just because of being a member of that association?
Q Yes, sir.

Page 55

A Well, National Association of Fire Investigators and International Association of Arson Investigators?
Q Your participation in those groups makes you a better expert in this case; true?
A Because you have to pass a test so you have to have a certain level of knowledge before you're qualified to do fire investigations.
Q You couldn't join the National Association of Fire Investigators nor could you join the International Association of Arson Investigators unless you passed a test; true?
A The first one is correct. The second one I'm not sure. I'm not sure of the International Association of Arson Investigators. I don't remember whether I took a test or not.
Q You've written two publications regarding cause and origin; true? Strike that. Your CV lists two publications, two articles that you published; true?
A Yes.
Q Are there any other articles that you have published?
A Since then, I would say no.

Page 56

Q So it would be fair to say based upon my review of these two things, these two articles, neither of them deal with cause and origin; true?
A That's correct.
Q You've never published anything regarding cause and origin; true?
A Correct.
Q The same would be true regarding products liability -- you have never published anything regarding products liability; correct?
A That is true.
Q I'm going to ask you to find a copy of your report in this case. You can either use the original, you can use the Bate-stamp version of it, which should be to your left, probably with the yellow tab on it. If you go to the second yellow tab, I'm hoping that will be the cover sheet for your case.
MR. LOFTUS: Feel free to reference this, it's updated.
MR. ELGES: Feel free to look at any documents we have here today if you feel the need.
Q (By Mr. Elges) Can you give me the Bate

you tell me what it was made out of?
A Well, a lot of it is steel. As far as the plastic part you're talking about?
Q Yes.
A No, I cannot tell you that.
Q There are many types of plastic?
A Many, many kinds.
Q Every type of plastic has different performance standards?
A That's true.
Q And every type of plastic has different combustible levels?
A That's correct.
Q As far as steel goes, steel is pretty much steel?
A It's not combustible.
Q You don't know the chemical composition of any combustible components that are part and parcel of Unit 1; true?
A I do not know that.
MR. ELGES: Off the record.
MR. ELGES: On the record.
Q (By Mr. Elges) I'm interested to know whether or not you took any notes, did any drawings,



made any notations, or have any other information documenting your inspection of the Carvalhal household on March 3rd, 2004, other than the materials that are in front of you now.
A Well, I did have some hand notes, couple of pages.
Q The couple of pages of hand notes, have you had a chance to look at the materials we have before you to see if those hand notes are anywhere in the exhibits that we previously identified.
A I haven't seen them here yet.
Q Can you recall what those hand notes contained what they reflected?
A They wouldn't have anything that's not stated here.
Q Okay. All right. To kind of help things move along here I'm going to let you take the floor and I want you to describe to me how you as a fire investigator approached your inspection on March 3rd, 2004. To the degree you remember independently, you can say what you remember independently. If you need to refer to your report, if that refreshes your recollection, that's fine too. I want to know how you came to conclude by the



time you left that house on March 3rd, 2004, that the fire in this instance originated in that particular corner of the Carvalhal kitchen. So however you want to explain it for me, I'm going to let you to that.
A Okay. On a typical -- I mean, any fire scene you go to, in general, you go from the least damaged area, you try to follow the traces to go to the most damaged area. So after I was in the house I first checked the first floor -- sorry, the basement and the second floor, and relative to the first floor they weren't damaged at all; it was mostly smoke damage. When following the patterns that was visible from -- I made a conclusion that the fire was on the first floor. Being in the first floor just by looking at the fire patterns at the two door openings of the kitchen -- there is one door opening into the hall and one into the dining room, which would be the one in the living room is south, the one in the dining room would be west -- that the fire was coming out of those two door openings from the kitchen into those areas.
Q I'm going to interrupt real quick because I've never been to the Carvalhal household. And to



inform me and members of the jury and maybe the other attorneys here, I'm going to ask you to look at H348. Do you recognize that document?
A Yes, I did that.
Q And I'm going to stand close to you so we can both look at it without me looking upside down. Would it be fair to say that that particular document is a diagram of the first floor of the Carvalhal household that you generated based upon your inspection?
A Yeah. Grossly simplified one, yeah.
Q When you say "grossly simplified," one of the things that's grossly simplified is it's not to scale?
A That's correct also.
Q When I say "it's not to scale," there are no dimensions, measurements, or anything else reflected in that diagram; correct?
A You're correct. That was to show the relative area of fire origin.
Q Okay. Just to put a finer point on it, can you do me a favor and put a "K" in the center of the kitchen as it's depicted on that particular diagram?

Page 117

A (Witness draws.)
Q So "K" is where the kitchen is depicted on this diagram and your diagram is not intended to indicate that the kitchen at the Carvalhal household represented that proportion of the overall floor space of the first floor?
A That's correct; it's not in scale.
Q No. You were kind enough before to explain to us how the Carvalhal kitchen had two doorways; correct?
A Yes. One to the south and one to the west here.
Q And the diagram doesn't really depict the west door?
A Yeah. Again, this was just for showing the relative location of fire in the house.
Q Okay. And is that the southern door to the kitchen, that's the doorway to what room?
A I would call it the living room.
Q Could you put "LR" right below the area of origin so I can remember which doorway we're talking about. Suffice it to say, that the western doorway off of the kitchen of the Carvalhal household went to the dining room?

Page 118

A That's correct.
Q Can you put "DR" there so I can keep it straight?
A (Witness draws.)
Q Thank you very much. Did you do any other diagrams of the Carvalhal household?
A I did some figures to try to show how the fire pattern developed. But not -- no, I don't have any other floor plans or anything like that.
Q Suffice it to say, you don't have the physical dimensions of the first floor of the Carvalhal house; correct?
A That's correct. Not that I can recall.
Q You don't have the physical dimensions of their kitchen; correct?
A No.
Q You don't know how wide it was or how narrow it was or anything along those lines?
A General habit that I have -- I think I do remember measuring it but I don't remember what the dimensions are.
Q You think you measured the dimensions of the Carvalhal kitchen?
A Yes.

Page 119

Q Do you think you have those measurements here with you today?
A Well, I didn't bring anything with me today.
Q Well, to the degree somewhere out there in space there are dimensions to the Carvalhal kitchen, if you find them after the deposition is concluded I'm going to ask you to give them to Mr. Loftus so he can give it to me. If you think they're here today, let's look for them. I don't think you have documented the dimensions of the Carvalhal kitchen.
A You mean on paper?
Q Yes.
A I can't say yes or no. I remember measuring it.
Q When you measured it did you write it down, the dimensions of the Carvalhal kitchen?
A Generally I would.
Q Did you incorporate the dimensions of the Carvalhals' kitchen into your report dated September 10th, 2004?
A I don't remember if I did or not.
Q You can look for them or Mr. Loftus can look for them or Mr. D'Amico could look for them.

Page 120

If anyone can find the dimensions of the Carvalhal kitchen in any documents they produced by the defendants it would be helpful if they pointed that out to us. We talked about dimensions generally. I want to make sure we covered the waterfront. I'm not only concerned with the width, the horizontal dimensions of the Carvalhals' household. Do you know how high the ceilings were in the Carvalhal kitchen?
A I would say seven and a half to eight.
Q And that's your mental picture estimate? Yes?
A Yes.
Q You don't have any written documentation indicating you took a tape measure or laser device or any other device and measured floor to ceiling in the Carvalhal kitchen; correct?
A Not that I remember.
Q Just to drive a stake through the entire measurement issue, did you find anywhere in these documents any measurements of any of the interior aspects of the Carvalhal kitchen: How high the countertops were, how high the cabinets were, dimensions of anything inside the Carvalhal kitchen?

A I don't know -- I don't think there are such numbers in the report.
Q Maybe when we take another break I'll flip through your report again, but my sense is the only dimension -- the only document as part of your cause and origin was the dimensions of the water cooler at issue. Does that sound fair to you?
A Yes. Well, the only dimensions I remember for sure I did are those. I remember measuring the kitchen, actually just length and width; those I remember taking.
Q As you sit here today you don't have those measurements with you; correct?
A No. I forwarded everything to Crawford.
Q Thank you very much to the degree that Crawford has those measurements or any other documents they haven't already produced in this case I'm going to ask that counsel for The Hartford look into it if there are any documents we haven't seen to the degree they preserve any documents we don't have today, we're going to reserve the right to redepose you regarding that newly-found information if it ever becomes necessary. You explained to me before we took a break how you went about narrowing



the focus of your site inspection to the Carvalhals' kitchen. You visited the entire house and observed fire damage, smoke damage, and burn patterns which enabled you to narrow in and focus upon the kitchen. Fair to say?
A That's correct.
Q Now, during the process of doing that you took photographs?
A Yes.
Q All right. Other than the photographs, did you take videotapes?
A No, I did not take videotapes.
Q We talked about notes. You think you might have took some notes?
A Yeah, I took notes.
Q We don't have those. Do you remember anything you would have written down that would be on those notes we don't have today?
A Anything that was on those notes should be in the report.
Q You did that one diagram based on your site visit too?
A That's correct.
Q You generated some --



A Computer-generated figures.
Q Can you identify the Bates number on that document you're now looking at?
A 349.
Q H349 is an example of a computer depiction of the Carvalhal kitchen?
A That's correct; not in scale.
Q I was going to ask you what computer program did you use to generate those drawings.
A It was a simple one, 3-D something Crawford gave me. When I was finished with them I just gave it back. I don't remember the exact name.
Q Was it Crawford's proprietary software?
A No.
Q It's off the shelf?
A I think it's one of the softwares that comes with the other softwares you buy.
Q Was it designed to depict findings in cause and origin investigations?
A No.
Q Is it like AutoCAD?
A No, it's very basic. AutoCAD is a lot more complicated than it was.
Q Using this simple computer program you



generated -- what do you want to call those pictures?
A Figures. I call them figures in the report.
Q How did you go about -- what data did you enter into the computer that led to the generation of the figures that were incorporated into your report?
A I didn't put any data. This program is very simple. All -- you enter, like you said, Box Q, put a counter here. It's very easy. It's not comparable to a program like AutoCAD. It's a program for a really basic. And one application of it, as I recall, on the package for garden.
Q Gardening applications in the software used had to generate the figures in your fire cause and origin report aside, you sit down at the computer, as I understand it, you've got a blank screen, the software pops up, and you have to enter in some information for the program to be able to generate the figures you incorporated in your report. Let me tell you what I think. I don't think you put in the computer program any measurements; true?

A I don't remember. Again, if I did it was just to get something visual out. It's nothing to scale.
Q You didn't measure the cabinets, the height of the cabinets, the dimensions of kitchen, and incorporate that specific information into the computer to have it generate the figures; correct?
A No. The figures are just guidelines.
Q Do you recall how you came to have the figures look the way they do? Were you doing it from memory? Were you looking at the photographs aftermath-wise or how did you do it; do you remember?
A It is from the photographs, from what I remembered on-site and -- yeah, it was from both photographs and what I remembered on-site and, actually, the fire department photographs because when I was there the cooler wasn't there, so...
Q In generating the figures which were in your report you relied upon your on-site investigation, the fire department photographs, the photographs you took aftermath, and anything else?
A Not that I can recall.
Q So, how do you know that the water cooler



was in the location that you've depicted in Figure No. HG349?
A You mean the orientation?
Q Yes.
A You mean the way it's set on the floor?
Q Yeah.
A Well, from the demarcations on the floor, actually.
Q So photographs of the flooring led you to position the water cooler in that particular figure in the manner that you've positioned it; true?
A Again, this is a relative location but I looked at the floor itself, I looked at the demarcations and the demarcations showed that the water cooler was set like this and the fire department pictures showed that.
Q As far as that figure goes, though, you've acknowledged it's not to scale; correct?
A That's correct.
Q So the relative size of the water cooler in the figure that we're talking about is not meant to be proportionate to the counter it's next to?
A Yes, that's correct. This water cooler looks like a midget.



Q Let's talk about it. The water cooler is shorter than the counter?
A It looks like it.
Q That's not the way it looked in the Carvalhal household?
A No. These figures are just to show the general burn patterns; that's it. It's not meant to do anything else. I think that on each figure I do say that.
Q What camera did you use to take pictures at the Carvalhal household?
A The make of it?
Q Is it 35-millimeter?
A Yes, it was a 35. It was a Canon -- oh, sorry. It was -- I think it was a Nikon; sorry. I don't remember the specific number.
Q Do you remember if it was 35-millimeter?
A It was 35.
Q Do you remember the settings you used to take these photographs?
A I believe they were on auto.
Q The lenses, flash, anything along those lines? What else can you tell me about the manner in which your photos were taken?



A I'm not sure I understand.
Q What kind of film did you use?
A The film was -- I think it was Fuji.
Q Who developed it?
A CVS.
Q Are all the photographs you took on-site that day in the three-ring binder you have in front of you?
A There are some of them are mounted in the report. There are some extra ones we added as an appendix to the report.
Q Which CVS did you take that film to be developed?
A Route 9, Shrewsbury.
Q Do you have any documentation regarding the chain of custody of the film?
A You mean to CVS and back?
Q Right.
A No.
Q Do you know if they developed it on-site there?
A Yes.
Q How was the scene of the fire different from the day you did your inspection from the day

the fire occurred?
A Again, I'm not sure. I wasn't there the day the fire occurred.
Q We've established that the fire department removed the water cooler from the scene of the fire before you arrived?
A It was not there when I got there for my site investigation.
Q Other than the water cooler not being there, are you aware of any changes to the interior of the Carvalhal kitchen before you had a chance to do your inspection?
A Nothing that I'm aware of.
Q Did you look into any alterations to the fire scene that might have occurred prior to making your report?
A Alterations to the fire scene happens as soon as the fire department gets there. Unfortunately, it's just like a side effect, whatever you want to call it, of the firefighting operations. Things get destroyed, moved around.
Q All right. Once you narrowed in to that portion of the kitchen -- I think it's on the other diagram we flipped away from. If you flip from the



other file one back we may be back to where we were. The diagram indicates there what you believe to be the origin of the fire of the kitchen; true?
A That's correct.
Q Based on your determination of the approximate origin of the fire, what potential ignition sources did you consider during the course of your investigation?
A The only ignition source in that area was -- as far as I know was the water cooler. However, on top of the counter there were some electrical appliances that I checked them and I ruled them out. I checked them just to rule them out but they were out of -- they were not in the area of fire origin. But I checked them anyways. I ruled them out. You know what I mean?
Q Actually, I'm a bit confused. Your diagram says that you concluded that the fire originated in one particular corner of the kitchen; correct?
A That's correct.
Q That happens to be the corner of the kitchen where you believe the water cooler was located; correct?



A That's correct.
Q Now, what you just testified to was that there were no other ignition sources in that corner of the kitchen?
A In that corner of the kitchen at the height that it showed the fire demarcations were it's three-dimensional.
Q Now, I know what you're getting at. My question is this: Ignore the height, let's talk about that corner of kitchen which you designated in that kitchen, which you believe to be the origin of the fire.
A Yes.
Q Are you with me in the corner now?
A Yes.
Q Ignoring the burn patterns, what other electrical appliances were in that corner of the kitchen?
A Well, on the counter I believe was the Kitchen Aid mixer and I know there were a couple of things; I just don't remember what they were.
Q Is there anything in your report that would refresh your recollection?
A It should be because I check them out just



to make sure that they had nothing to do with fire.
Q You're saying the mixer was by the water cooler? Yes?
A Well, it was on the counter.
Q Was it plugged in?
A I don't recall.
Q The water cooler was plugged in?
A The water cooler wasn't there when I was there.
Q You retrieved an outlet from the Carvalhal kitchen; correct?
A Yes, I did.
Q Where was that outlet located?
A That was on the southeast -- on the south wall on the east of the wall.
Q How far was that outlet from where you believe the water cooler was on the day of the fire; feet, inches?
A Just two-dimensional thinking?
Q However you want to conceive of it.
A From where I think the original fire was, that mixer was a good 30 inches apart.
Q Three zero?
A Yeah.

Q You're talking --
A It is an approximate.
Q You're saying the countertop mixer was 30 inches away from the outlet that you believe the water cooler was plugged into?
A I don't know where the water cooler was plugged into; it wasn't there when I got there.
Q How many outlets did you retrieve from the Carvalhal kitchen?
A Just that one that was in the corner, the southeast corner.
Q Do you recall how many outlets there were in the Carvalhal kitchen?
A No. I don't remember.
Q So when you went to do your site observation you looked for the electrical outlet which would have been closest to where the water cooler was sitting?
A I didn't look for an electrical outlet. I, again, followed the fire patterns and that led me to that area in the corner. Again, it was not in the area of fire origin, that's where I think the fire was, original fire was, but I took it out, checked it anyway.



Q Because you thought the outlet that you retrieved was the outlet the water cooler was plugged into; correct?
MR. LOFTUS: Objection.
A No.
Q (By Mr. Elges) Do you know what outlet the water cooler was plugged into on the day of the fire?
A No. I don't recall right now.
Q So as you sit here today you can't rule out the possibility that the water cooler was plugged in to an outlet that you did not retrieve from the fire scene?
A You mean, are you trying to get into that it was hooked up to another outlet?
Q Yes.
A Yeah. I can't tell which outlet.
Q So you don't know what outlet the water cooler was plugged into?
A That's correct.
Q You didn't test the outlet -- to your knowledge, you can't say I tested the outlet the water cooler was plugged into; correct?
A I tested the outlet that was in that



corner.
Q But you don't know what outlet the water cooler was plugged into?
A Correct.
Q So if it was plugged in the ones you did not test, you don't know whether the outlet the water cooler was plugged in to was functioning properly?
A I didn't check it. I can't tell.
Q So the answer to my question is yes? I'll rephrase the question. As you sit here today you can't state or testify that you tested the outlet that the water cooler was plugged into and offer any opinions as to whether that particular outlet was functioning properly on the day this fire occurred?
A That's correct, I didn't check it.
Q Did you ask anyone what outlet the water cooler had been plugged into?
A I do not recall.
Q Do you know if anything was plugged into the outlet you retrieved from the fire scene on the day of the fire?
A I believe there was something that was plugged in. I don't remember what it was. I think



it was one of the devices on the counter.
Q Now, you mentioned devices on the counter. As I understand it, when you left the scene of the fire that day you retrieved and took with you one electrical appliance; correct?
A I remember taking the mixer and the outlet with the chunk of wire, and I don't remember if I took anything else. But I think I took everything that was on top of that counter, electrical device.
Q So are you saying that when you left the Carvalhal household after your inspection if there was anything on any kitchen counter that operated with electric you took it with you?
A No. In that corner.
Q So we're just talking about the corner of the kitchen identified on your diagram; correct?
A Southeast corner of the kitchen.
Q As we sit here today do you remember anything specific you took from the scene other than the outlet?
A The mixer and I don't recall.
Q So following what you just told me, the only thing in that corner of the kitchen when you did your inspection was the mixer on the countertop

Page 137

and the outlet; right?
A Yes.
Q The microwave oven wasn't in that corner?
A I believe it was under the counter. Not under the counter, over the counter.
Q Over the counter in the southeast corner of the kitchen.
A Somewhere in that area.
Q How about the coffee maker?
A I don't recall.
Q How about the toaster oven?
A That I don't recall either.
Q Do you remember seeing a TV in the kitchen?
A Vaguely. I think there was a TV in the -- on the north side.
Q Of all those electrical appliances, the only one that you took with you to your recollection was the mixer and the outlet; right?
A Those are the ones that I remember.
Q There might have been more. You might have taken the coffee maker with you?
A That's probably.
Q In your report or anywhere else in the

Page 138

files before you do you show any documentation regarding the evidence that you left the Carvalhal house with on the day you did your investigation?
A It should say what I took. My report should say that.
Q While you're looking through it, I found documentation in the paperwork indicating that you had the mixer?
A Okay.
Q I actually show a transfer chain of custody regarding storage of the mixer and I think my experts have seen the mixer. And I think we've seen the outlet. As far as the coffee maker, the microwave oven, toaster oven --
A I didn't take the microwave that I know.
Q Is there any documentation indicating you took anything else from the scene of the fire?
A Anything that I took from the scene of the fire is documented.
Q That's what I'm getting at. I've got documentation regarding the outlet and the mixer.
A Then that must be it.
Q I've got reference in correspondence indicating that someone thought you had the coffee

Page 139

maker too. Do you recall retrieving the coffee maker from the Carvalhal kitchen?
A I don't remember.
Q Okay. Now, I think you said that the only other electrical appliance in that corner of the kitchen was the mixer; correct?
A That I remember, yes.
Q Despite the fact you're saying the toaster oven, the coffee maker, and the microwave were not in that corner of the kitchen, you still evaluated those appliances when you were on scene that day; correct?
A I evaluated the appliances that were a little close to where I think or thought the area of origin is. Was for me when I think that the area of origin is in southeast of the kitchen, it makes no sense for me to go check something on the north side. It's not -- the fire patterns dictate that the fire was in another location, it makes no sense to check everything.
Q Your written report indicated that you reevaluated those other items and ruled them out as a ignition source; correct?
A If the report says so. I say, given those

Page 140

things my report should say that even though not in area of fire origin I checked them.
Q On Page 9 of your report and 9 is in the upper right-hand corner you guys put on, do you see that?
A Yep.
Q What's the Bates number?
A 461.
Q H461 is Page No. 9 of your report. Under "Electrical appliances" it reads as follows: "The electrical appliances that could be readily identified in the kitchen were a coffee maker, microwave, toaster oven, and a mixer"; correct?
A Okay.
Q The last sentence, that subsection reads as follows: "However, all of these items were eliminated as a possible ignition source for this fire." Do you see that?
A Yes.
Q You wrote the report?
A Yes.
Q It reflects what you did on-site?
A Yes.
Q You didn't take any of this evidence, to

your recollection, off-site?
A I didn't. Just because I checked them doesn't mean I took them.
Q Explain to me how you evaluated those items in the Carvalhal kitchen that enabled you to rule them out as an ignition source for this fire.
A You look for fire damage and fire pattern and you base your judgment on that.
Q So what you're saying to me, as I understand it, is you looked at those items and your visual evaluation of them enabled you to rule them out as an ignition source in this case?
A That's correct.
Q That's true for all the items listed in that section; correct?
A That's correct.
Q Why did you retain the mixer?
A The mixer was in the corner, the southeast corner right on the counter, right where the water cooler was.
Q So --
A Just because it was close to the area of origin I took it.
Q What you're saying is that as a



responsible, competent fire inspector you took with you the mixer because it was close to the area of origin and might warrant further evaluation; correct?
A I took it just because somebody might come -- I was thinking somebody in the future might come and say, Did you check the mixer over here? I did not think it's in the area of fire origin or it had to do anything with the fire.
Q You thought that other investigators interested in determining the cause of this fire might find the mixer valuable as evidence to determine whether or not you could rule the mixer out?
A That's correct.
Q That was important to do, retain all of the evidence that could reasonably be considered a cause of this fire; correct?
A I think so.
Q That's something you're required to do according to the NFPA standard, correct, 921?
MR. LOFTUS: Objection.
Q (By Mr. Elges) Do you know what I'm talking about? Am I using the right acronym?



A I'm not sure.
Q We walked about a standard that you did not participate in the development of.
A Again, it's not a standard, it's a guide.
Q NFP?
A A.
Q NFPA 921?
A That's correct.
Q Now, the guideline which you considered 921 to be, the guidelines say it's important to retain, preserve, and protect evidence from a fire scene that may enable someone else to further evaluate the cause and origin?
A That's correct.
Q In deciding to take the outlet and mixer you decided by virtue of their proximity of where you think the fire originated it was important to preserve the evidence?
A That's correct.
Q Did you do any subsequent testing on the mixer?
A No.
Q Did you do any subsequent testing on the outlet?



A No.
Q Can you rule out the electrical outlet you retrieved from the Carvalhal kintchen as the cause of the fire?
A Yes.
Q How?
A It was not in the area of origin.
Q Did you consider any other hypothesis regarding the cause and origin of this fire other than the water cooler?
A Besides the water cooler there was no other ignition source in that area as far as I know.
Q Was a garbage can there when you were there?
A No.
Q Do you recall seeing a white garbage can in the photograph?
A There was a garbage can, I think it was in the other side. It was kicked around; it was not in its original place.
Q What makes you say that?
A The way it was sitting there. I think it was tipped over.
Q You didn't test the outlet?

A There was no door.
Q What is this thing here?
A That door is the closet under the stairs.
Q The area of the wall appears to be beige in color located between what appears to be a doorknob and the counter. Do you see what I'm talking about?
A Yes.
Q How wide is that wall?
A I'd say that's about --
Q Did you measure that wall?
A Actually, I did.
Q Do you know what the measurements were?
A I think it was around 90 centimeters.
Q As you sit here today you don't have any documentation that indicates that 90 centimeters was the actual measurement you obtained that day?
A No, everything was forward to Crawford.
MR. ELGES: Once again, we're going to request that The Hartford's counsel inquire as to those documents and reserve the right to further depose Mr. Davoodi should that information become available.
Q (By Mr. Elges) Likewise, did you measure



the height of the counter which is on the left-hand side of this picture?
A Actually, I did that too. I think it was 30. I'm not sure.
Q If we had that information, the width of that wall section and the height of the counter -- let me strike the question and ask you: Can you tell me, do you see where this burn pattern is, the lowest point of it?
A Yes.
Q Can you tell me -- you see where that is? Can you tell me the distance between the lowest point of that burn pattern and the floor below it in centimeters, inches, feet?
A Just visually.
Q Do you have a measurement?
A No. I don't remember.
Q Do you know if you measured it on the day of --
A No.
Q Do you know one way or the other if we could calculate the distance of the floor and the bottom lowest part of that burn pattern that if we had the measurements that you think you took on the



day you did your inspection; do you know one way or the other?
A Well, I don't see how you can calculate it.
Q I guess what I'm saying is that if I knew how wide the beige wall was is in inches or centimeters I could use that as a scale to measure vertically how far -- how much distance there was between the lowest burn pattern in the floor below it.
A I don't think that's correct, actually.
Q Photograph 16 appears to be depicting the contents of a cabinet. Do you know what that photograph was taken to depict or why you took that photograph?
A This is the cabinet right behind the water cooler. The doors to this cabinet showed some fire damage. Again, I took this picture to show there was no fire inside.
Q Now, Picture 17, 18, 19, and 20 all depict the gas range that was located in the Carvalhal kitchen on the day of the fire; correct?
A Yes.
Q Explain to me how you evaluated the gas



range and ruled it out as a potential fire source.
A Again, two things: I checked it. It was damaged as a result of the fire and it was not area of fire origin.
Q Okay. It appears that the plastic knobs have been burned off this unit, the stove?
A Yes.
Q Did you examine the metal attachments to which those plastic knobs would have been affixed prior to the fire? Do you know what I'm asking you about?
A Let me see. We're talking about these?
Q If you look at --
A These little ones?
Q Yeah. You see on the front of the range below the cooktop there are four areas where presumably there were knobs attached. Do you see those?
A Yes.
Q Did you examine the remnants of the stove in that area to determine the position of those controls at the time of the fire?
A I did not determine the position.
Q So in as much you didn't examine the

Page 161

position of the control knobs for the rangetop cooking surface, can you -- how can you opine or can you opine the range wasn't activated? Strike that. Do you have an opinion as to whether or not the burners on the top of the stove in the Carvalhal's kitchen were on or off at the time this fire occurred?

A I cannot tell that if they were on or off but I can tell that the oven was not the source of the ignition and it's not in the fire origin again.

Q So what you're saying is that you can't render an opinion on that, and just so I'm clear, when you say oven --

A The whole thing.

Q I don't want to do the whole thing. Let's break down the range into two separate components. There is an oven which has a cavity which is closed with a door where you place items in, where you bake a cake; I'm not interested in that. For the moment what I'm interested in is the rangetop. The rangetop of that stove we took photographs which utilized gas to heat food?

A Yes.

Q Gas is ignited by some sort of pilot or

Page 162

electronic ignition, the heat generated used to cook food?

A Correct.

Q You don't know one way or the other as to whether the burners were activated or producing flames when the fire occurred?

A I don't know that; correct.

Q Despite that fact, you've ruled out those flames, if they were going, as a source of that fire?

A Correct.

Q All four of those cooktop burners could have been turned on full blast but it is still your opinion the water cooler in the corner caught fire?

A That's correct.

Q If you could find it very quickly, you can look at it. If you can find it in your documents I will mark that as Deposition Exhibit 17. Do you see that document?

A Yes.

Q What is that document?

A That's when I transported the evidence -- give me a minute. This is just to show the physical location of the evidence.

Page 163

MR. ELGES: I'm looking at a preprinted form provided by Crawford Investigations Service which is "Evidence transmittal form." This particular one is dated at the bottom September 13, 2004.

Q (By Mr. Elges) Is that your signature by that?

A That is my signature.

Q And how or why was this particular form generated?

A Let me see the date.

Q My sense is that it represents a transfer of evidence that was collected from the fire scene; true?

A From the fire scene; correct.

Q So when you left the fire scene in March of 2004 did you have any documentation indicating what you took evidence-wise?

A Well, that's it.

Q But I guess what I'm getting at is this --

A Before this?

Q Any other documents regarding --

A Not that I know of.

Q Do you know if the 921 standard indicates

Page 164

that you should log in evidence when you collect it from a fire scene?

A Yes.

Q You didn't do that in this case?

A I logged it in as I stored them.

Q When you stored them we're talking about what you did in September of 2004. Let me see if I can complete the picture for you. Your written report was generated on 9/10/2004; correct?

A Okay.

Q The last line that we talked about in that report is this file is getting closed. When you close the file was it your custom and practice as a fire investigator for Crawford Investigations to put the evidence that you had regarding that file into storage?

A I'm sorry; I was looking at this. I couldn't follow either one.

Q Let me start again. We looked at your report dated September 10th, 2004, and one of the last lines of the report was the notation the file was being closed.

A Okay.

Q I'm asking you whether or not it's your

A The water cooler is right here and you can see the fire demarcations on it.
Q By "right here," you're talking about?
A Southeast corner of the kitchen.
Q And southeast corner of the kitchen to the right of this portion of the rangetop; correct?
A In the picture it's to the right, yes.
Q In the left or the right -- in the right we see a flashlight being held by the fire department person?
A Okay.
Q Yes?
A Yes.
Q To your knowledge, no one else had access to the fire scene before the fire department personnel were in there taking this photograph; correct?
A That's correct.
Q This is a pristine depiction of what that corner of the kitchen looks like immediately after the fire?
A Should be.
Q Look in the left-hand corner of that photograph. Describe to me everything you see on



that countertop.
A Well, this is a mixer. It looks like a water boiler or coffee maker, whatever you want to call it. You can see the wire going into the outlet and I don't see anything else.
Q Now, you say there is a mixer?
A Yeah.
Q And it's the silver object with the black handle here?
A Yes.
Q And you see what you call the water boiler; I'm going to call a coffee pot?
A Yes.
Q In this corner at the time this fire originated whatever the cause there was in addition to the mixer the coffee pot was there; correct?
A Looks like it.
Q You chose to keep the mixer. When you did your site inspection days later you retrieved the outlet because it was in that corner and you retrieved the mixer because it was in that corner; correct?
A That's correct.
Q Did you retrieve the coffee pot --



A Well, if it's not -- no, I don't believe so. The documents don't show that.
Q You say the documents don't show that. Your report doesn't indicate you retrieved the coffee maker?
A The report is the document that shows where the material was stored. It wasn't there at the time I investigated the fire, the coffee maker.
Q Do you know what happened to it?
A My pictures show that too there is no coffee maker.
Q You're unaware of what happened to the coffee maker between the time the fire department took that photograph and the time you did your site inspection?
A Yes. I don't know what happened to it.
Q There was no coffee maker there when you did your inspection?
A That's correct.
(Whereupon the Stenographer marked as Exhibit No. 18 - Email.)
MR. ELGES: Off the record.
MR. ELGES: Back on the record.
Q (By Mr. Elges) Mr. Davoodi, are you



familiar with anyone named Jack Olson?
A I don't think so.
Q You're not familiar with Olson Engineering out of Penn Hills, Pennsylvania?
A I don't believe so.
Q I'm going to ask you to look at what's just been labeled Exhibit 18. This is a series of emails between Mr. Loftus and Mr. Olson regarding certain evidentiary issues in this case. The particular document I've just tendered to you was recently provided to defendants as part of the plaintiff's response to our second request for production of documents. Do you see -- take a moment and read that email exchange and let me know when you're done.
A Okay. Now I am ready.
Q Do you know why Mr. Olson -- in this correspondence Mr. Olson has a dialogue with Mr. Loftus regarding a coffee maker. Do you see that?
A Well, it says that I believe that Mr. Davoodi indicated that he also has a coffee maker.
Q Do you recall having any conversations,