# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

THE HARTFORD INSURANCE COMPANY, :
AS SUBROGEE OF ALBERTO CARVALHAL:
:
VS. : C.A. NO. 06-362S
:
GENERAL ELECTRIC COMPANY AND :
MIDEA USA, INC. :

DEPOSITION OF MICHAEL COONEY, a witness in the above-entitled cause, taken on behalf of the Defendants, before Barbara Warner, RPR, Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, 536 Atwells Avenue, Providence, RI, on May 16, 2007, at 10:00 A.M.

APPEARANCES:

FOR THE DEFENDANTS............. CLAUSEN MILLER, PC
BY: RODD E. ELGES, ESQUIRE

FOR THE PLAINTIFF.............. LAW OFFICE OF STUART BLACKBURN
BY: ERIK LOFTUS, ESQUIRE

FOR THE PLAINTIFF.............. D'AMICO & BURCHFIELD
BY: ROBERT A. D'AMICO, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND
401-946-5500

Page 21

that we have not already talked about that reflects your qualifications or foundation, for that matter, for rendering any opinion in the Carvalhal case?
A. The second paragraph and the fourth paragraph.
Q. Can you point out to me how the second paragraph relates to your involvement in the Carvalhal case?
A. Performing metallurgical examinations of tanks, specifically. The last sentence in the second paragraph, corrosion-related failure mechanisms.
Q. How about the other paragraph you referenced?
A. It also references my performing failure analysis in corrosion investigations of stainless steel materials, which the tank and the hot water tank for this water cooler was fabricated from stainless steel. And the last sentence references my experience in evaluating stress corrosion cracking.
Q. That was my sense, that the expertise you were drawing upon in rendering opinion in

Page 22

the Carvalhal case relates essentially to your expertise in corrosion issues involving stainless steel, true?
A. Corrosion and failure mechanisms associated with stainless steel.
Q. And the failure mechanisms aspect of this investigation is your laboratory's supposed identification of chlorides being present in the foam insulation surrounding the stainless steel tank in the Carvalhal case, true?
A. Yes.
Q. Above and beyond that, can you tell me where you have experience, expertise for a foundation to render any other opinion in this case based upon your experience set forth in this CV?
A. No.
Q. So as far as electrical issues, you are not an expert in electrical engineering, true?
A. Correct.
Q. And you are not an expert in electrical systems incorporated into consumer products like the Hartford water cooler, like the Carvalhal water cooler, true?

Page 23

A. Yes.
Q. Other than your opinions related to what caused the stainless steel tank on the Carvalhal water cooler to corrode and leak, can you think of anything else you are qualified to render expert testimony about in this case?
A. Identification of a source of the initiation of the fire from prior research and discussions with other engineers and also with identification of the fire source from the FP&L case interpreting fire patterns.
Q. That is the welding case?
A. Yes.
Q. Tell me about your work interpreting burning patterns in the Florida case?
A. The burn patterns indicated the site of where the fire initiated based upon the V pattern came right back to the source of the fire.
Q. And that fire occurred in a power plant?
A. Yes.
Q. Do you recall what evidence you relied upon in that case in making that determination?

Page 24

A. I just described it.
Q. The V patterns?
A. Yes.
Q. So did you visit the scene?
A. Yes.
Q. So you yourself visited the scene in the Florida power case and you observed yourself directly the V patterns, as you put it, which indicated to you what the source of the fire was, true?
A. True.
Q. Did you visit the source -- strike that. Did you visit the Carvalhal house at any time in this case?
A. The home?
Q. Yes.
A. No, I didn't.
Q. The kitchen where this fire occurred?
A. No.
Q. You never visited there, true?
A. True.
Q. What else did you rely upon in the Florida power case in rendering your cause and origin opinions?
A. That was the sole piece of evidence.

Page 101

Q. Can you flip to Page 1 of that exhibit, it should be a cover letter that looks like this; do you see what I am talking about?
A. Yes.
Q. It is a cover letter dated November 5, 2004. We are looking at the same document?
A. Yes.
Q. Signed by Mr. Nalbandian?
A. Yes.
Q. In the third paragraph, the last sentence, do you see a sentence that reads, "The heater coil generated sufficient heat to cause localized burning in the fire that occurred on February 27, 2004." Am I reading that right?
A. You read that word for word.
Q. Do you hold an opinion to a reasonable degree of scientific certainty that that statement is true?
A. It should be amended to say the heating system, not necessarily the heater coil.
Q. So you do not hold an opinion to a reasonable degree of scientific certainty that, "The heater coil generated sufficient heat to cause localized burning in the fire

Page 102

that occurred on February 27, 2004," true?
A. True. It was in the vicinity of the heater.
Q. Now I am confused. That is a statement that is on the cover sheet of this report?
A. It could have, it is not necessarily.
Q. That is a statement that is on the cover sheet of the report. Flip to Page 9.
A. Okay.
Q. Page 9 is your conclusions in this case, true?
A. Our conclusions, yes.
Q. By our, you are talking about yours and Mr. Nalbandian's, true?
A. Yes.
Q. Did anyone else work on this case? Is anyone other than you and Mr. Nalbandian responsible for the contents of this written report and the conclusions set forth therein?
A. No.
Q. If you look at Paragraph 3 on Page 9, the conclusion section, the heater coil -- strike that. It reads, "The heater coil generated sufficient heat to cause

Page 103

localized burning in the fire that occurred on February 27, 2004." Is that correct?
A. Yes.
Q. And you are saying that you don't hold that opinion to a reasonable degree of scientific certainty, true?
A. That could have been one source, yes.
Q. We will talk about would have, could have, should have in a minute. For purposes of this question, I am asking you whether or not it is your opinion to a reasonable degree of scientific certainty that the heater coil generated sufficient heat to cause localized burning in the fire that occurred on February 27, 2004?
A. Yes, we still believe the heat came from the heater, heating system.
Q. But not the heating coil specifically?
A. It very well could have. The evidence is the burn pattern pointed right back to the hot water heater.
Q. Let's talk about what you just said. Assume for the moment that the heating coil, part of what you are now calling the heating system, did not cause this fire,

Page 104

are you with me?
A. Go ahead.
Q. What did cause ignition in the water dispenser, specifically?
A. What could have?
Q. To a reasonable degree of scientific certainty, what other source of ignition was there other than the heating coil in this water dispenser in your scientific opinion?
A. The wires. The ignition source would have been the insulation on the wire. It could have been the insulation on the wires associated with the heating system.
Q. Anything else?
A. Not that I can think of.
Q. You are not an electrical expert, are you?
A. No.
Q. Are you qualified to render opinions regarding fires being generated by electrical shorts?
A. By electrical shorts, yes, I can identify a short metallurgically.
Q. And metallurgically you look for arcing?
A. Yes.

Page 109

cause localized burning in the fire that occurred on February 27, 2004." Assume that for the purposes of these next couple of questions. The coil made reference to in that portion of someone's report is the coil located inside of the stainless steel container which held the hot water in this water dispenser, true?
MR. D'AMICO: Objection.
A. Yes.
Q. If for hypothetical purposes that coil inside of the hot water vessel got so hot it ignited the items within the water dispenser or next to the water dispenser, how hot are we talking, do you know?
A. No.
Q. Would you assume that if this opinion was true and what happened caused this fire, that that coil would be operating outside of its normal operating range?
A. I don't know.
Q. What you are saying to me is that if this statement in the report is true and the heating coil in this unit caused localized burning, the coil could have been operating

Page 110

within its designed parameters?
A. Possibly. I know stainless steel for oxidation purposes occurs at 1300 degrees Fahrenheit.
Q. I don't doubt your foundation for metallurgically-related opinions in this case. I think what you just said is you read in the Appendix B that that particular unit was intended and designed to as it were to dispense water in the range of 190 degrees Fahrenheit, true?
A. Yes.
Q. You are saying if the heating coil was operating in a manner consistent with that design parameter, it would generate water at that temperature, it could cause a localized fire in this instance, is that your opinion?
A. State that again.
Q. Are you saying the heating coil itself, if it was operating in normal operating parameters at a temperature range that would generate hot water out of the dispenser at 190 degrees, that under those circumstances it could cause a localized

Page 111

fire?
A. No.
Q. My understanding is if that heating coil was a source of localized fire, it would have to be at a temperature that would cause the water coming out of the stainless steel tank to be at a temperature itself above 190 degrees, true?
A. Yes.
Q. Getting back to Mr. Davoodi's observation of the Carvalhal's water dispenser providing hot water that, as he put it, was not hot enough to make a cup of coffee, is that consistent, is that observation consistent with the theory that the heater coil was operating outside of its normal design parameters?
MR. LOFTUS: Objection.
A. It may have been.
Q. How?
A. It may not have had sufficient hot water in that to heat up. It had leaks that were not designed, areas of penetration in the top of the hot water heater that were not designed to be there.

Page 112

It could have allowed water to escape and lower the water level. So your hot water, instead of coming out your main outlet, was going out other areas.
Q. If that was the case, if water was readily escaping the stainless steel tank prior to the fire, you would expect the homeowners to report leaks, true?
A. If they saw it.
Q. Getting back to my point, the Carvalhals did not say that the water dispenser did not dispense any hot water whatsoever, did they?
A. Not that I am aware of.
Q. And they did not complain about a lack of hot water coming out of the dispenser, they just said it wasn't hot?
MR. LOFTUS: Objection.
A. That is what was told to me.
MR. LOFTUS: They also never said what time. It could have been when they first bought it.
Q. Does it matter to you?
A. Yes.
Q. It would have been helpful to know more

Page 133

Q. Other than the results of the testing that those individuals performed, what other input, if any, did those other individuals have in your report?
A. None.
Q. Are any of these individuals qualified to render any opinions set forth in that report, or do they just gather the information for you and Mr. Nalbandian to rely upon?
A. They just gather the information and data for us.
Q. I will ask you to look at Figure Number 25?
A. Okay.
Q. Using whatever points of reference are available to you, can you identify the rust color deposits you are making reference to in the written report? My suggestion is you do it this way, explain which photograph you are looking at, the top, the middle or bottom, and that way you can identify what you are talking about and describe it to the best of your ability.
A. The top and middle photographs are taken of the actual stainless steel can,

Page 134

hot water heater can. On the top photograph, it is more of an overall photograph. The top of a hot water heater as installed is located on the left side of the photograph. There are rust colored stains present in various locations extensively over that top surface. There are black deposits which are associated with the thermal insulation which was adhering to the metal can. Along the side of the can or shell of the can there are also rust colored deposits evident on the surface, the external face. The middle photograph is a close-up of the top of this can. It shows the separation of the cracking that occurred around the nozzles that came out the top of the can, as well as the rust colored deposits and the black thermal insulation deposits. The bottom photograph is a photograph of the inside surface, the top portion of the foam insulation that had been used to cover the outside of the tank.
Q. Those photographs do a better job of depicting the small diameter pits that you

Page 135

make reference to in your report?
A. No. They are too small to see at this level.
Q. So that is an observation you made by what means?
A. Through optical, I think a metallurgical examination.
Q. Same question with regards to cracks or cracking, are those three photographs depicting cracks or cracking, in your opinion?
A. Yes. The nozzles, that indicates there was cracking occurring around the nozzle, the holes you see in the middle photograph.
Q. Back to the written report, Page 4, the fourth paragraph, last line, evidence of damage of degradation of the heating coil was not observed; do you see that sentence?
A. Yes.
Q. Why did you include that observation in your report?
A. It was important to note arcing would have been an indication of a source of heat that could have potentially resulted in the ignition of the combustible material.

Page 136

Q. That reflects the fact you and/or Mr. Nalbandian evaluated the heating coil and determined it had not failed from an electrical standpoint, true?
A. Yes.
Q. The fact it was not damaged or degraded, the heating coil in question, does that indicate to you that it did not malfunction and exceed its intended temperatures?
A. No.
Q. How hot would this particular heating coil need to get before it would exhibit physical damage or degradation?
A. I don't know the exact temperature.
Q. Do you know, what do you know about the heating coil?
A. I don't know details surrounding it. I know the wires, the heating coil internal to the conduit.
Q. What kind of wires are in that heating coil?
A. I don't know.
Q. You don't know the gauge, type or composition of the wires inside the heating coil?

Page 137

A. True.
Q. Do you know the materials used to encase the heating wires?
A. I did not test it. I would imagine it is stainless steel.
Q. But you don't know that for a fact one way or the other?
A. True.
Q. Is there a coating on the metal outside of the heating oil as well?
A. I don't know that.
Q. As far as that heating coil generally, do you know the temperature range that heating coil reaches during normal operating conditions?
A. The coil itself?
Q. Yes, sir.
A. No, I don't.
Q. Do you know how it works?
A. It is resistive heating. You have a highly electrical resistant conductor inside of the coil that when currents pass through the resistance causes a generation of heat which would be convected or conducted through the metal to the water in

Page 138

the tank.
Q. How hot does that heating coil need to get before it stops working?
A. Based upon the information in the owner's manual, 190 degreed.
Q. That was a bad question. My question is, to your understanding, do you know if this heating coil reached a certain temperature that it would fail and stop emanating heat?
A. No, I don't know.
Q. I will ask you the same series of questions I just asked you as to what information you have regarding heating coil inside of the Carvalhal water dispenser. Do you have similar information regarding heating coils that were in exemplar number 1 which Mr. Davoodi took and brought to Thielsch Engineering and took back with him; do you have any information about that heating coil along those same lines?
A. No.
Q. Do you have any information regarding the heating coil in the fiber water dispenser which Thielsch still has, any operating parameters or information of the nature I

Page 139

just asked you about regarding that particular heating coil?
A. No.
Q. Did you test the Carvalhal heating coil?
A. No.
Q. Did you test the heating coil in the fiber water dispenser?
A. No.
Q. Did you test the heating coil in exemplar number 1?
A. No.
Q. What was the fuel source that ignited in this case?
A. We did not identify the specific fuel source. Most of it would have been a plastic material inside of the water cooler.
Q. What sorts of plastics were inside of the Carvalhal water cooler?
A. I know there were thermoplastics above it, above the hot water tank.
Q. Did that catch fire?
A. It melted. Thermal insulation on the electrical wiring.
Q. What was the ignition temperature for the

Page 140

thermoplastics used in the Carvalhal water heater?
A. I don't know.
Q. Other than thermoplastics you just told me about, are you aware of the composition of any of the other plastic components inside of the Carvalhal water dispenser?
A. No.
Q. In light of the fact you don't know what types of plastics were there, you cannot tell me at what point they would have caught fire, true?
A. True.
Q. Now, can you tell me what kind of plastic components are incorporated into the fiber water dispenser?
A. No, I can't.
Q. And you did not take a sample of any of the plastic in the fiber water dispenser and test them like you tested the insulation in the Carvalhal water dispenser to determine its composition, true?
A. True.
Q. So you cannot tell me the ignition temperature for any of the plastics in the

fiber water dispenser, true?
A. Yes.
Q. And the same set of facts is true regarding exemplar number 1, you did not determine the ignition temperature or type of plastics in exemplar number 1, true?
A. Yes.
Q. You cannot testify to a reasonable degree of scientific certainty that the plastic in the Carvalhal water dispenser caught fire and caused this fire, true?
A. We only have visual evidence, we have no other testing, correct.
Q. I know about visual evidence. We talked about that before, the photographs you took, showing the panels on the water dispenser, those are metal, right?
A. Yes.
Q. So we know about the fire damage that was caused to the metal panels, your specialty, metallurgy, and we talked about that. My question is different. My question is, as you sit here today, based upon any information from any source that is available to you, you yourself cannot



testify to a reasonable degree of scientific certainty that the plastic components located in the Carvalhal water dispenser ignited and caused this fire, true?
A. True.
Q. You don't have a foundation for that opinion and you are not going to offer that at trial, true?
A. True.
Q. Other than the plastic components, is there any other fuel source within the Carvalhal water dispenser that could have started on fire and caused the fire to spread throughout the kitchen, to your knowledge?
A. Not to my knowledge.
Q. I did an examination of the -- strike that. We talked before about the fire triangle?
A. Yes.
Q. I know there is oxygen in the kitchen, so you don't have to give me that to opine regarding the cause of the fire in this case. We just talked about the fuel, and you cannot offer testify regarding what the fuel was that started the fire, we have



established that now, true?
A. Potential sources have not been definitive.
Q. What potential sources have you identified in this case other than the plastic?
A. That is a source.
Q. But you cannot say to a reasonable degree of scientific certainty the plastic caught fire and started the larger fire, true?
A. True.
Q. So you don't have the fuel, part of the triangle, you will not offer testimony regarding fuel that started this fire, correct?
A. I can't prove that, right.
Q. As far as a heating source, what was the heating source, if you know, to a reasonable degree of scientific certainty, the source of ignition?
A. We have not done testing to establish temperature, so I can't say what the temperatures would have been generated by any specific component.
Q. So you don't have that part of the triangle either to a reasonable degree of scientific



certainty?
A. Yes.
Q. So how could you offer a causation opinion in this case, do you know?
A. Based upon the visual examination and showing you have a condition in the tank had deposit and corrosion products leak down to a thermal sensor covering it.
Q. Let's talk about that now. The thermal sensor, that is an electrical device?
A. Yes.
Q. And you are not an electrical engineer?
A. No.
Q. You don't hold yourself out as an expert in electrical devices?
A. That's correct.
Q. What foundation, basis, education or anything else do you have to render opinions regarding the functioning of the thermal sensors in the Carvalhal water dispenser?
A. It is a thermal insulating issue. I have extensive experience in boilers and generation of internal oxide which provides a thermal insulating barrier which results

Page 145

in overheating of weather tubes. In this case you had an insulating material being deposited on to a sensing device which could have prevented the proper temperature from being sensed.
Q. That is all depicted in Figure 30, correct?
A. Yes.
Q. Figure 30, it is three photographs, I personally like the middle photograph the best. What do those photographs depict, to your knowledge?
A. Deposit covering the thermal sensing devices.
Q. When you say deposit, is that the white substance depicted in Figure Number 2?
A. Yes. There is white and if you look closely, there is also rust coloration.
Q. What is the white substance?
A. We did not test that.
Q. What is the other substance you are talking about?
A. Rust is iron oxide.
Q. So the white substance you did not test, you cannot testify to a reasonable degree of scientific certainty what that is, true?

Page 146

A. Yes.
Q. You don't know what the properties are and the composition?
A. I know what contains soluble material and as it evaporates, you get hardening deposits.
Q. You cannot testify what the hardening deposits are to a reasonable degree of scientific certainty?
A. Visually I can, chemically, no.
Q. What are the properties of the white substance?
A. Calcium carbonate or magnesium carbonate.
Q. It is from evaporating water?
A. Yes.
Q. Do you know if that is evaporating water or you think that is the case?
A. It makes sense, based upon the evidence.
Q. Now, in the narrative of the report, the section that talks about Figure 30, it is on the bottom of Page 4, that paragraph there, the last sentence, what does that read?

Page 147

A. Evidence in particular and electrical arcing or shorts was not observed.
Q. Based upon that observation in the report and your photographs there, there is no evidence that the temperature sensors used in this unit malfunctioned electrically, true?
A. They did not arch, that is what the statement says.
Q. Do you have any evidence that indicates that those temperature sensors malfunctioned electronically?
A. No.
Q. Do you have any evidence whatsoever that they malfunctioned?
A. No. We did not test them because of extensive damage. It was not worth the effort.
Q. How do they work under normal conditions?
A. They sense the temperature of the hot water on the surface of the tank, and there is a switch that due to expansion of metal surfaces that they expand and separate at a sufficient temperature to break the current, the connection.

Page 148

Q. Just so I understand what you believe to be the operation of the sensors, assume for the moment we have a water dispenser identical to the one in the Carvalhal fire?
A. Yes.
Q. How do the sensors on this unit, what do they do?
A. Once the temperature is reached, 190, that causes the breakage of the circuitry, it cuts off current flow to the coil so you have an absence of power being sent to the coil. It senses the temperature until it reaches the set point and then it opens the circuit.
Q. Your understanding is the default for these sensors is that the circuit is closed and if the circuit is closed, the heating element is energized, true?
A. Yes.
Q. If there is no water in there whatsoever, the circuit stays closed and the heating element will stay energized?
A. Yes.
Q. And that condition will come about if there was an empty water bottle on the top of the

Page 149

Carvalhal water dispenser, true?
A. Yes.
Q. Do you know one way or the other as to whether there was an empty bottle on top of the Carvalhal water dispenser at the time this fire occurred?
A. No.
Q. If there was an empty bottle, and the hot water vessel was empty and the circuits on the sensors were closed, would that cause the heating element to run continually?
A. I don't believe so.
Q. Why not?
A. Once the temperature is reached, the current to the hot water heater will be shut off.
Q. So you are saying that if there is no water in the stainless steel vessel, the stainless steel vessel itself would reach the triggering temperature as it were to break the circuit on the sensors?
A. Yes.
Q. And do you know that to a reasonable degree of scientific certainty?
A. No, I did no testing.

Page 150

Q. So you don't know how the sensors work; isn't that true?
A. Not in detail.
Q. Not at all?
MR. D'AMICO: Objection.
MR. LOFTUS: Objection.
Q. What is the foundation for your information -- strike that. What foundation do you yourself have personally to base any opinions regarding these two sensors? I know you saw them. I saw them, too, but I don't know how they work. How do you know how they work?
A. I know they are supposed to be thermal sensing devices that are supposed to cut off the energy. It has to work by conductance. If you have a thermal insulating barrier between the sensor surface and heat generating surface, how does it know what temperature it sees.
Q. Is that the only way a temperature sensing switch can operate?
A. I don't know.
Q. You don't know whether or not there is a temperature sensing switch which uses a

Page 151

transistor to do that, true?
MR. LOFTUS: Objection.
A. I don't know how that would affect. Explain to me how that would work.
Q. I don't know. I am trying to figure out how you know when the sensor works when all you did was a visual inspection, but I will move on. My understanding is this, it is your testimony that if the stainless steel vessel has no water in it, the ambient temperature of the stainless steel vessel itself would trigger the sensors to turn off the heating unit, is that your understanding?
A. Not the ambient temperature.
Q. How are the sensors going to be tripped if there is no water in the vessel?
A. You have to have the power switch turned on first. You used the word ambient temperature.
Q. Ignore ambient. It seems we attorneys get ourselves in trouble by using terms we should not use. I think what you are saying is if the vessel is empty, no water in it, then the sensors on the side are

Page 152

going to shut off the heating element, that is your testimony, correct?
A. Yes.
Q. How?
A. If the main power switch is turned on and it is energized, it will heat up and the thermal sensor senses the maximum level temperature and breaks the circuit to shut off the power to the hot water tank.
Q. At what temperature will the sensor on the Carvalhal water dispenser break the circuit and discontinue power to the heating source?
A. I did no testing to determine what temperature they would have, but based upon the literature provided, they are supposed to shut off at 190 degrees.
Q. As far as the owner's manual, it says be advised that the water coming out of the spigot is in the range of 190 degrees, that is what it says?
MR. LOFTUS: Objection.
Q. Let's look at it. If you could read that into the record?
A. The dispenser heats water to a

Page 153

temperature of approximately 190 degrees Fahrenheit.
Q. It is your testimony that that blurb in Appendix B serves as the foundation for your assertion that the switch dispenses the power to the heating coil at 190 degrees, true?
A. Approximately, yes.
Q. Other than that observation, do you have any other information regarding at what temperature that switch is going to discontinue power to the heating coil?
A. No.
Q. Did you test the heating sensors on that unit to determine what temperature would need to be reached before they discontinue the power to the heating coil?
A. No.
Q. Did you do a test of that nature with exemplar 1?
A. No.
Q. Did you do a test of that nature with regard to the fiber water dispenser?
A. No, nor did anybody.
Q. That's true. Was there anything stopping

Page 154

you from doing that?
A. We had a budget for the first one, so.
Q. Why are there two heating sensors on the side of this unit?
A. I can't explain that.
Q. Do they serve different functions?
A. I don't know.
Q. How many heating sensors were on the side of exemplar 1?
A. I don't recall.
Q. How many heating sensors are inside of the fiber water dispenser?
A. I don't recall. From my recollection, it was the same number as on the Carvalhal water dispenser.
Q. Which one of the sensors on the Carvalhal water dispenser failed?
A. There was a deposit penetrating into the tank surface side on both sensors.
Q. You think both sensors failed?
A. Yes.
Q. Do you have any scientific evidence indicating that either sensor failed above and beyond your visual observations in this case?

Page 155

A. No.
Q. For this fire to happen, did both sensors need to fail or would one failing be sufficient?
A. I don't know.
Q. Do you believe that the -- off the record.
(OFF THE RECORD)
MR. ELGES: Mr. D'Amico is outside of the room. In his absence I will walk Mr. Cooney through the contents of my file provided to me prior to his deposition today. I will not ask substantive questions outside of Mr. D'Amico's presence.
Q. You were kind enough to bring your file here today. Part of that file appears to be six CDs containing photographs related to your inspection of various water coolers in this case, true?
A. Yes.
Q. Other than the photos, do you have any other photographs above and beyond that?
A. Not color photographs, but I have black and white photographs.
Q. Those are part of the file that my arm is

Page 156

on, correct, those other photographs are in there?
A. No.
Q. I was going to ask you about these. You provided all copies of photographs to Mr. Loftus; is that correct?
A. Yes.
Q. And it is your understanding he passed those on to us, true?
A. Yes.
Q. I will hand you a series of manila envelopes.
A. They contain negatives of the photo micrographs that were included in the metallurgical examination portion of our report, Exhibit Number 20.
Q. In addition to that small manila envelope, I have larger manila envelope, can you tell me what is inside of those?
A. Those are the negatives for all of the color photographs taken of which we included a CD copy of those photographs.
Q. Turning our attention now to some of the paper in your file, you got a copy of Mr. Davoodi's September 10, 2004 report