# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

THE HARTFORD INSURANCE COMPANY, :
AS SUBROGEE OF ALBERTO CARVALHAL:
:
VS. : C.A. NO. 06-362S
:
GENERAL ELECTRIC COMPANY AND :
MIDEA USA, INC. :

DEPOSITION OF MICHAEL COONEY, a witness in the above-entitled cause, taken on behalf of the Defendants, before Barbara Warner, RPR, Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, 536 Atwells Avenue, Providence, RI, on May 16, 2007, at 10:00 A.M.

APPEARANCES:

FOR THE DEFENDANTS............. CLAUSEN MILLER, PC
BY: RODD E. ELGES, ESQUIRE

FOR THE PLAINTIFF.............. LAW OFFICE OF STUART BLACKBURN
BY: ERIK LOFTUS, ESQUIRE

FOR THE PLAINTIFF.............. D'AMICO & BURCHFIELD
BY: ROBERT A. D'AMICO, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND
401-946-5500

fiber water dispenser, true?
A. Yes.
Q. And the same set of facts is true regarding exemplar number 1, you did not determine the ignition temperature or type of plastics in exemplar number 1, true?
A. Yes.
Q. You cannot testify to a reasonable degree of scientific certainty that the plastic in the Carvalhal water dispenser caught fire and caused this fire, true?
A. We only have visual evidence, we have no other testing, correct.
Q. I know about visual evidence. We talked about that before, the photographs you took, showing the panels on the water dispenser, those are metal, right?
A. Yes.
Q. So we know about the fire damage that was caused to the metal panels, your specialty, metallurgy, and we talked about that. My question is different. My question is, as you sit here today, based upon any information from any source that is available to you, you yourself cannot



testify to a reasonable degree of scientific certainty that the plastic components located in the Carvalhal water dispenser ignited and caused this fire, true?
A. True.
Q. You don't have a foundation for that opinion and you are not going to offer that at trial, true?
A. True.
Q. Other than the plastic components, is there any other fuel source within the Carvalhal water dispenser that could have started on fire and caused the fire to spread throughout the kitchen, to your knowledge?
A. Not to my knowledge.
Q. I did an examination of the -- strike that. We talked before about the fire triangle?
A. Yes.
Q. I know there is oxygen in the kitchen, so you don't have to give me that to opine regarding the cause of the fire in this case. We just talked about the fuel, and you cannot offer testify regarding what the fuel was that started the fire, we have



established that now, true?
A. Potential sources have not been definitive.
Q. What potential sources have you identified in this case other than the plastic?
A. That is a source.
Q. But you cannot say to a reasonable degree of scientific certainty the plastic caught fire and started the larger fire, true?
A. True.
Q. So you don't have the fuel, part of the triangle, you will not offer testimony regarding fuel that started this fire, correct?
A. I can't prove that, right.
Q. As far as a heating source, what was the heating source, if you know, to a reasonable degree of scientific certainty, the source of ignition?
A. We have not done testing to establish temperature, so I can't say what the temperatures would have been generated by any specific component.
Q. So you don't have that part of the triangle either to a reasonable degree of scientific



certainty?
A. Yes.
Q. So how could you offer a causation opinion in this case, do you know?
A. Based upon the visual examination and showing you have a condition in the tank had deposit and corrosion products leak down to a thermal sensor covering it.
Q. Let's talk about that now. The thermal sensor, that is an electrical device?
A. Yes.
Q. And you are not an electrical engineer?
A. No.
Q. You don't hold yourself out as an expert in electrical devices?
A. That's correct.
Q. What foundation, basis, education or anything else do you have to render opinions regarding the functioning of the thermal sensors in the Carvalhal water dispenser?
A. It is a thermal insulating issue. I have extensive experience in boilers and generation of internal oxide which provides a thermal insulating barrier which results

Page 73

A. I don't know.
Q. Are you aware of testimony in this case indicating that Mrs. Carvalhal had a practice of burning candles in her kitchen?
MR. D'AMICO: Objection.
A. I have no knowledge.
Q. I am going to ask you to assume for the purposes of this next question that Ms. Carvalhal told fire investigators that she had a practice of burning candles on the countertop in her kitchen?
MR. D'AMICO: Objection.
A. Okay.
Q. Based upon that information, does that impact your opinion in any way, shape or form in this case?
A. No.
Q. You yourself have not ruled out candles, open flames, as a cause and origin of this fire, true?
A. As an origin, correct. As an origin, yes, we did not do an on-site investigation.
Q. As far as the cause goes, if you don't do the origin investigation, you cannot rule

Page 74

something out as a cause?
A. We have a clear source by a fire pattern. We have a clear, at least one source, which is the water dispenser, that is an indication that is shown in our report.
Q. As far as fire patterns at the scene of the fire at the Carvalhal kitchen, you are not taking any of that into account in rendering your opinions, true?
A. We took Mr. Davoodi's opinion on the origin.
Q. Other than the Carvalhal water dispenser, did you or Mr. Nalbandian consider any other alternative cause of the Carvalhal fire?
A. No.
Q. So your hypothesis -- I am going to ask you about how you employed the scientific method in reaching your conclusions in this case. My understanding is you used the scientific process or method. You start off with a hypothesis and do testing to prove or disprove that hypothesis; is that your understanding of the scientific

Page 75

method?
A. That is a fair description.
Q. In this case, what was your hypothesis?
A. The hypothesis was the water dispenser was a source of, a heat source that ignited a fire from the metallurgical, the laboratory examination testing of it to determine if there was any evidence that would support it, any condition which would have provided a heat source that could have ignited combustible material.
Q. And you concluded there was -- strike that. You concluded to a reasonable degree of scientific certainty that there was a heat source within the water dispenser in the Carvalhal's kitchen sufficiently hot to ignite the fire, true?
A. Evidence showed that something had ignited, yes.
Q. What I am trying to get at is the way you responded to my prior question led me to conclude that you don't know whether the material that initially ignited in this case was within the water dispenser itself or adjacent to the water dispenser in the

Page 76

Carvalhal kitchen; is that a fair interpretation of your opinions in this case?
A. The burn pattern goes back to the area that the water heater was at. That is our evidence of where the fire initiated.
MR. LOFTUS: Objection.
Q. As far as ignition, from your perspective, what does the term ignition mean?
A. When a material, you need fuel, oxygen and a sufficient energy source to ignite for a particular material to ignite. It is specific to the material.
Q. That is the fire triangle accepted by everyone?
A. Yes.
Q. As far as ignition goes, one of the things I will try to establish during your deposition today is your opinions regarding the point of ignition. Just to put a finer point on what I am getting at, is the fire triangle dependent on fuel and fuel is physical material, and I am interested to know what fuel source you think ignited starting this fire, do you understand what