**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| THE HARTFORD INSURANCE COMPANY, As Subrogee of Alberto and Eugenia Carvalhal | : | |
| v. | : | C.A. No.: 06-362S |
| GENERAL ELECTRIC COMPANY and MIDEA USA, INC. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF HARTFORD INSURANCE COMPANY'S OBJECTION TO DEFENDANTS' MOTION TO PRECLUDE THE PLAINTIFF'S EXPERTS AND OBJECTION TO SUMMARY JUDGMENT**

NOW COMES the Plaintiff, The Hartford Insurance Company, by and through its attorneys, and submits this Memorandum of Law in Support of its Objection to Defendants' Motion to Preclude its Expert Witness and Objection to Summary Judgment. In support of its objection, the Plaintiff states the following:

## A. FACTS[1]

On February 27, 2004, a fire occurred at the home of Alberto and Eugenia Carvalhal located at 76 Willet Avenue, East Providence, Rhode Island. The fire was extensive and destroyed a significant portion of the structure as well as the Carvalhals' personal possessions. The Carvalhals were insured through the Plaintiff Hartford Insurance Company which evaluated the damage and made payments under the policy in excess of $237,000.

[1] The Plaintiff has summarized the relevant background facts of the claim without citation to materials in the record. These facts are provided simply for the Court's benefit and are not relied upon by the Plaintiff to be a response to the Defendants' motion.

Shortly after being notified of the fire, the Plaintiff retained the services of Crawford Investigations to conduct a cause and origin investigation of the fire. Crawford assigned the file to Hossein Davoodi who conducted a site inspection on March 3, 2004. (Ex. A, Davoodi report, p.6.) Mr. Davoodi determined that the fire originated in the southwest corner of the Carvalhal kitchen at the point where a General Electric hot/cold water dispenser (manufactured by Midea, Inc.) had been located.[2] (Ex. A, p.1.) Further inspection of the water dispenser allowed Mr. Davoodi to pinpoint the exact origin of the fire as being the hot water heater components of the water dispenser. (Ex. A, p.1.)

After being informed of Mr. Davoodi's conclusions, the Plaintiff retained the services of Thielsch Engineering to conduct a cause investigation relative to the water dispenser. Thielsch assigned the file to Ara Nalbandian who was present for a non-destructive visual examination of the water dispenser which took place at the Rhode Island State Fire Marshal's facility. (Ex. B, Thielsch report, p.2.) Mr. Nalbandian made a determination at that time that further investigation was warranted and a destructive examination and testing subsequently took place at the Thielsch facility, with all interested parties present. (Ex. B, p.3.) Mr. Nalbandian, a registered professional engineer with a focus on mechanical engineering, enlisted the assistance of his associate Michael Cooney who was also a registered professional engineer, but with a focus on metallurgical engineering. (Ex. C, Nalbandian resume; Ex. D, Cooney resume.) Together, through a series of visual, microscopic and chemical composition examinations, Mr. Nalbandian and Mr. Cooney determined that the root cause of the fire was a design defect within the water dispenser. (Ex. B, p.2-9.) The insulation surrounding the stainless steel hot water tank contained

[2] The water dispenser had been previously removed from the scene by the East Providence Fire Department as they determined it was also the origin of the fire. (Ex. A, p.8.)

chlorides which caused the steel tank to corrode and crack. (Ex. B, p.8-9.) As a result, water was allowed to escape leaving residue and corrosion on various electrical components of the water heating subsystem. (Ex. B, p.8-9.) Those electrical components malfunctioned, and generated sufficient heat as to ignite the surrounding plastic combustibles. (Ex. B, p.8-9.)

After due notice and demand to both General Electric and Midea, the Plaintiff filed a subrogation lawsuit alleging negligence, product liability, breach of express warranty, and breach of implied warranty of merchantability as against both parties. Shortly thereafter, Eugenia Carvalhal, the only surviving insured of the Plaintiff, filed a similar suit seeking damages for uninsured losses. That suit was consolidated with the Plaintiff's suit and subsequently amended to seek damages only for emotional distress.

**B. ANALYSIS**

The defendants have argued that the Plaintiff's experts are not qualified to render the opinions they present, that they lack any scientific foundation for their opinions, and that they are not able to identify any reliable evidence to support their opinions. In support of these arguments, the Defendants have presented numerous "undisputed facts" referencing the experts' deposition transcripts as well as fire investigation guideline NFPA 921. Unfortunately for both the Plaintiff and the Court, the Defendants have misrepresented several of these "facts", presented their interpretation of testimony as "facts", and misled and mischaracterized the "facts" by failing to present the full picture of both the experts' testimony and the contents of NFPA 921.

Accordingly, when presented with the full picture of the true "facts" in this matter, it is clear that the Plaintiff's experts are sufficiently qualified to render the opinions they

have reached, that their opinions are based on sound scientific principles and knowledge and that their opinions are both reliable and relevant to the factual issues presented. As such, based on the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny, the Defendant's Motion to Preclude must be denied and Plaintiff's experts allowed to testify. Accordingly, the Defendants' Motion for Summary Judgment must also be denied.

## I. APPLICABLE LAW

### a. Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999) (citing Fed.R.Civ.P. 56(c)). The record is evaluated in the light most favorable to the non-moving party, in this case the Plaintiff. *Id.* "Summary judgment is appropriate only if the evidence taken in that light fails to yield a trialworthy issue as to some material fact. *Id.* Stated differently, the task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The Plaintiff acknowledges that all of its claims require a showing by the Plaintiff that the product complained of was defective and the proximate cause of the Plaintiff's injury. See *Simmons v. Lincoln Electric Co.*, 696 A.2d 273, 275 (R.I. 1997).

**b. Standard for Admission of Expert Testimony**

Federal Rule of Evidence 702 states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

"This rule imposes a gate-keeping role on the trial judge to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *U.S. v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Expert testimony must be reliable, such that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The expert testimony must also be relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 80 (1st Cir.1998) (citing *Daubert*, 509 U.S. at 591-92).

"The inquiry under Rule 702 is a 'flexible one.'" *Vargas*, 471 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594). "The trial court enjoys broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow. . . . The Supreme Court has emphasized the importance of such broad latitude, noting that, without it, the trial court 'would lack the discretionary authority needed both to avoid unnecessary `reliability' proceedings in ordinary cases where the reliability of an expert's

methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.'" *Vargas*, 471 F.3d at 262 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Before accepting expert testimony, a district court must determine that a witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. "It is well-settled that trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses." (Internal quotations omitted.) *Diefenbach v. Sheridan Tramp.*, 229 F.3d 27, 30 (1st. Cir. 2000). "It is not required that experts be blueribbon practitioners with optimal qualifications." (Internal quotations omitted.) *Vargas*, 471 F.3d at 262.

"The district court's responsibility under Rule 702 and *Daubert* is only to find that the expert's conclusion has a reliable basis in the knowledge and experience of [the expert's] discipline. . . . [*Daubert*] demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion. We have specifically noted that *Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. . . . Once the district court finds that the expert's methodology is reliable, the expert is allowed to testify as to the inferences and conclusions he draws from it." (Citations omitted; internal quotations omitted.) *Vargas*, 471 F.3d at 265. "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process — competing expert testimony and active cross-examination — rather than excluded from jurors' scrutiny for

fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." (Citations omitted; internal quotations omitted.) *Ruiz-Troche v. Pepsi Cola of Puerto Rico*, 161 F.3d 77 (1st Cir. 1998).

## II. ADMISSIBILITY OF HOSSEIN DAVOODI'S EXPERT OPINIONS

### a. Mr. Davoodi's Qualifications

Hossein Davoodi has been offered by the Plaintiff as an expert in the field of fire investigation to give opinions related to the origin of the February 27, 2004 fire at the home of the Carvalhals. (Ex. E, Davoodi expert disclosure.) With respect to Mr. Davoodi's qualifications to render such an opinion, the Defendants are correct in noting he has a Master's Degree in fire protection engineering. (See Defendants' Statement of Material Facts ("DSMF") ¶6.) However, the Defendants have failed to inform the Court that Mr. Davoodi is also a registered professional engineer in the field of fire protection in three states and a province in Canada, nor have the Defendants informed the Court that Mr. Davoodi is a Certified Fire Inspector with the National Association of Fire Investigators. (Plaintiff's Statement of Disputed and Additional Undisputed Facts ("PSDF") ¶10; Ex. F, Davoodi resume.) Further, the Defendants have failed to note that Mr. Davoodi has investigated over 400 fires in a career spanning almost twenty years. (PSDF ¶10 ; Ex. G, Davdoodi depo, p.35.) Certainly, with his education, certifications, and experience, Mr. Davoodi is more than competent to render expert opinions related to fire origin.

### b. Mr. Davoodi's Opinions and Methodology

As noted previously, Mr. Davoodi conducted a fire scene investigation on March 3, 2004. (PSDF ¶11; Ex. A, p.6.) Mr. Davoodi conducted an extensive examination of the

structure and primarily relied on the burn patterns within to arrive at his opinion regarding the origin of the fire. (PSDF ¶11; Ex. A, p.8.) However, in addition to the scene examination, Mr. Davoodi interviewed the Carvalhals and fire department personnel, reviewed fire department records and photographs of the scene, attended non-destructive and destructive testing of the water dispenser involved in the fire, and examined similar units to broaden his understanding of how such water dispensers operated. (PSDF ¶10; Ex. A, p.2-15.) Based on this information, Mr. Davoodi determined that the February 27, 2004 fire originated in the southwest corner of the Carvalhals' kitchen at the precise location in which the water dispenser was located. (PSDF ¶11; Ex. A, p.1.) Further, he was able to further pinpoint the origin of the fire to the hot water heater system within the water dispenser. (PSDF ¶11; Ex. A, p.1.)

With respect to their allegations against Mr. Davoodi, the Defendants apparently insist that *NFPA 921: Guide for Fire and Explosion Investigations* ("NFPA 921") is a standard by which all fire investigators must follow, and failure to follow each provision makes an expert's fire origin opinion scientifically invalid. While NFPA 921 has been found to be a guide qualified as a reliable method endorsed by a professional organization, *Fireman's Fund Ins. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058 (8th Cir. 2005), NFPA 921 itself declares that it is not a standard for fire investigation.

NFPA 921 is titled "Guide for Fire and Explosion Investigations." (PSDF ¶12; Ex. H, NFPA 921, cover.) Section 3.2 defines "guide" as "A document that is *advisory or informative* in nature and that contains only *nonmandatory* provisions. A guide may contain mandatory statements such as when a guide can be used, *but the document as a whole is not suitable for adoption into law.*" (Emphasis added.) (PSDF ¶12; Ex. H, p. 9.)

Indeed, NFPA 921 declares that it is a document "designed to assist" (sec. 1.1) and that "not every portion of this document may be applicable to every fire or explosion incident" (sec. 1.3.3). (PSDF ¶12; Ex. H, p.6.)

The Defendants have erroneously claimed that Mr. Davoodi testified that NFPA 921 is "the bible for fire investigators." (PSDF ¶1; DSMF ¶7.) The actual quote from Mr. Davoodi was that NFPA 921 is "like the bible for fire investigators." (PSDF ¶1; Ex. G, p.43.) The Defendants also failed to note that Mr. Davoodi, shortly thereafter, qualified his statement by stating that "[t]he NFPA 921 is a guide, its not a standard" and that NFPA 921 is "not perfect; that's why they don't call it a standard." (PSDF ¶13; Ex. G p.44, 53.) Mr. Davoodi's insistence that NFPA 921 is only a guide, not a standard, is synonymous with NFPA 921's stated scope and purpose as previously noted.

Despite the fact that NFPA 921 is not a standard by which fire investigators must abide, Mr. Davoodi did conduct his fire investigation in accordance with NFPA 921. (PSDF ¶13; Ex. G, p.54.) Mr. Davoodi's primary focus in his origin investigation was to identify and follow the burn patterns from the point of least damage to the point of heaviest damage. (PSDF ¶13; Ex. G, p.85.) NFPA 921 Sec. 6.1.1 states that this type of investigation is one of the major objectives of a fire scene examination used in order to determine point(s) of origin. (PSDF ¶13; Ex. H, p.30.) It is curious that the Defendants have stated that Mr. Davoodi is unable to identify any reliable evidence (i.e., publications) to support his conclusion when (1) defense counsel never asked Mr. Davoodi to identify such publications; and (2) the guide that Defendants insist is a standard contains an entire chapter devoted to burn pattern examinations. (Ex. G; Ex. H, Chapter 6.)

The Defendants take specific exception to Mr. Davoodi's investigation with respect to four areas: (1) an implication that Mr. Davoodi failed to take measurements in accordance with NFPA 921 (PSDF ¶2; DSMF ¶5); (2) an allegation that Mr. Davoodi's diagrams do not conform to NFPA 921 requirements (PSDF ¶5; DSMF ¶9); (3) an implication that Mr. Davoodi failed to follow NFPA 921 as it relates to appliance fires (DSMF ¶5); and (4) an implication that Mr. Davoodi failed to retain key evidence as required by NFPA 921 (PSDF ¶6; DSMF ¶10).

With respect to the first area of contention, the Defendants specifically state in their Statement of Undisputed "Facts" that Mr. Davoodi took no measurements of the Carvalhal kitchen. (PSDF ¶2; DSMF ¶8.) This is a blatant misrepresentation of the actual testimony of Mr. Davoodi and Defendants should be admonished for claiming it as an undisputed fact. While Mr. Davoodi was unable to recall certain specific measurements at the time of his deposition, he clearly stated, on three separate occasions, that he did take measurements of the kitchen. (PSDF ¶2, 14; Ex. G, p.118, 119, 121.) The Defendants further allege that Mr. Davoodi failed to adequately document the key characteristics of the kitchen. (PSDF ¶3; DSMF ¶8.) However, Mr. Davoodi not only took extensive photographs of the kitchen, but he also drafted a diagram indicating a general layout of the first floor of the structure, drafted diagrams indicating the flow of fire based on burn pattern examinations, and took several measurements, including the height of the countertop (which Mr. Davoodi was able to recall, but which Defendants specifically allege he failed to do.) (PSDF ¶3, 14; Ex. G, p.116-122, 158.) Despite the insistence by the Defendants that precise measurements were necessary, NFPA 921 Sec. 15.2.1 states that photographs are the most efficient reminders of what an investigator

observed. (PSDF ¶3, 14; Ex. H, p.109.) Further, the Defendants claim that Mr. Davoodi took no empirical measurements to determine the location of the water dispenser. (PSDF ¶4; DSMF ¶9.) Despite this allegation, it has already been demonstrated that Mr. Davoodi took measurements of the kitchen, including the adjacent countertop. (PSDF ¶4, 14; Ex. G, p.116-122, 158.) In addition, Mr. Davoodi reviewed fire department photographs depicting the water dispenser in place, and interviewed the Carvalhals and fire department personnel regarding the location of the water dispenser. (PSDF ¶4, 11; Ex. G p.125, 128.)

The Defendants have also argued that Mr. Davoodi's diagrams do not conform to NFPA 921 requirements in that they are not drawn to scale and contain spatial inaccuracies. (PSDF ¶5; DSMF ¶5, 9.) Mr. Davoodi appended to his report a simplified floor plan of the first floor of the premises (Ex. I) as well as nine diagrams depicting fire pathways (Ex. J). (PSDF ¶15.) NFPA 921 Sec. 15.4 states that various techniques may be used to prepare drawings, that they are intended to be used to support the investigator's memory, and that it is the investigator's decision as to the level of detail included in the drawings. (PSDF ¶5, 15; Ex. H, p.116.) With respect to the simplified floor plan, Mr. Davoodi acknowledges that it is not to scale, but that it was only intended to demonstrate a general area of origin within the structure. (PSDF ¶5, 15; Ex. I, Ex. G, p.116.) With respect to the drawing's intended purpose, the drawing is accurate, and there was no need to include exact measurements to achieve this stated purpose. With respect to the nine diagrams depicting fire pathways, NFPA 921 Sec. 17.2.3 allows for the use of Heat and Flame Vector Diagrams which allow the investigator, through the use of arrows, to note his interpretation of the direction of heat or flame spread based on the

fire patterns. (PSDF ¶5, 15; Ex. H, p.132.) NFPA 921 does not require that these vector diagrams be drafted using specialized software or that they contain precise spatial measurements, despite the Defendants contention that they must. (PSDF ¶5, 15; Ex. H, p. 132.)

The Defendants also contend that Mr. Davoodi failed to follow NFPA 921 requirements for the investigation of appliance fires. (DSMF ¶5.) This allegation is completely misplaced. When Mr. Davoodi was assigned this investigation, he was not told anything about the potential cause of the fire. (PSDF ¶16; Ex. G, p.23.) When Mr. Davoodi began his examination of the fire scene, he had received no information as to the potential cause of the fire and the water dispenser had been previously removed by the fire department. (PSDF ¶16; Ex. G, p.77.) Mr. Davoodi subsequently determined the area of origin based on fire patterns with no knowledge that the water dispenser was previously present at that location. (PSDF ¶16; Ex. G, p.85.) The Defendants contend that NFPA 921 requires that until an area of origin is determined, there should not be an exploration of an appliance as the source of the fire. (DSMF ¶5.) Based on the foregoing, the Plaintiff is dumbfounded as to how Mr. Davoodi violated this guideline. The Defendants contend that NFPA 921 holds that in determining whether an appliance is the cause of the fire, location within the area of origin is important and that measurements should be taken to establish that location. (DSMF ¶5.) Again, it is unclear what Mr. Davoodi did erroneously as he determined that the water dispenser was in the area of origin by taking measurements of the kitchen, including the adjacent countertop, reviewing fire department photographs depicting the water dispenser in place, and

interviewing the Carvalhals and fire department personnel regarding the location of the water dispenser. (PSDF ¶16; Ex. G, p.116-125, 128.)

The Defendants' final attack on Mr. Davoodi's methodology is their allegation that he failed to retain all physical evidence that could reasonably be considered potential causes of the fire. (PSDF ¶6; DSMF ¶10.) NFPA 921 Sec. 16.2.2 states that the decision as to what evidence to collect from a fire scene rests with the fire investigator. (PSDF ¶6, 17; Ex. H, p.122.) Nowhere in NFPA 921 is there a suggestion that the fire investigator must retain evidence not located within his determined area of origin. (PSDF ¶6, 17; Ex. H.) Mr. Davoodi was clear that his area of origin was very small and the only potential ignition source within that area of origin was the water dispenser. (PSDF ¶6, 17; Ex. G, p.130.) Despite this determination, Mr. Davoodi went above and beyond the requirements of NFPA 921 by retaining an electric mixer and wall outlet that were not in, but rather "near" (within 30 inches), the area of origin. (PSDF ¶6, 17; Ex. G, p.132, 141.) The Defendants emphasize that Mr. Davoodi retained the wall outlet despite not knowing if it was the outlet in which the water dispenser was plugged into at the time of the fire. (PSDF ¶7; DSMF ¶10.) However, this is another mischaracterization of the facts, as Mr. Davoodi was able to testify that it was the outlet the water dispenser was plugged into after reviewing additional materials. (PSDF ¶7 ,17; Ex. G, p.193.) The Defendants claim that the fire department photographs depict a "coffeemaker" located on the countertop by the mixer, and that Mr. Davoodi failed to retain it as evidence. (PSDF ¶8, 17; DSMF ¶10.) It should be noted that the item was identified as a "coffeepot" by defense counsel only, Mr. Davoodi was unsure what it was. (PSDF ¶8; Ex. G, p.170.) Further, Mr. Davoodi testified that not only was the coffeepot not present at the time of his inspection,

but that it would not have been in his area of origin anyways. (PSDF ¶8, 17; Ex. G, p.171, 194.) Finally, the Defendants criticize Mr. Davoodi's investigation because, they allege, he not only failed to retain other potential ignition sources, but failed to perform a detailed analysis of all the other items in the kitchen, including the gas range. (DSMF ¶10-11.) This is a common theme throughout the Defendants' motion, as they constantly criticize the Plaintiff's experts for failing to measure and evaluate each and every detail, whether or not relevant to the fire cause and origin. Mr. Davoodi was 100% confident he accurately determined the area of origin and evaluated completely all items in and near that area. (PSDF ¶17; Ex. G, p.33-34, 132, 141.) The Defendants have failed to cite to any publication which requires fire investigators to evaluate items outside the area of origin. NFPA 921 does not require as much, and Mr. Davoodi testified that he did not believe it would have made sense for him to check everything. (PSDF ¶17; Ex. H; Ex. G, p.139.)

**c. Mr. Davoodi's Opinion Admissibility**

Despite the Defendants' best efforts to mischaracterize Mr. Davoodi's testimony and shift the focus away from the relevant inquiry, it is clear that Mr. Davoodi should be allowed to testify to his opinions in full. As noted above, "[t]he district court's responsibility under Rule 702 and *Daubert* is only to find that the expert's conclusion has a reliable basis in the knowledge and experience of [the expert's] discipline. . . . [*Daubert*] demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion. *Vargas*, 471 F.3d at 265. Mr. Davoodi's qualifications to offer a fire origin opinion are impeccable and his conclusions were reached in reliance on a scientifically

sound investigation. Mr. Davoodi's methodology for determining the origin of the fire is a proper, accepted and commonly used practice within the fire investigation community based on basic physics principles. The scientific basis for determining origin based on fire demarcations is not novel or unique and any perceived failure by Mr. Davoodi to properly document the scene should go to the weight of his testimony, not its admissibility.

## III. ADMISSIBILITY OF ARA NALBANDIAN AND MICHAEL COONEY'S EXPERT OPINIONS

It should be noted that Ara Nalbandian and Michael Cooney delivered a joint opinion which incorporates expert opinion from each based on their particular specialties. Based on the collaborative nature of the opinion, it is important to discuss both experts jointly.

### a. Mr. Nalbandian and Mr. Cooney's Qualifications

The Defendants have made a blanket statement that Mr. Nalbandian and Mr. Cooney lack sufficient qualifications to render an opinion as to an alleged defect in the Defendants' product. The Defendants have not, however, presented any background on Mr. Nalbandian or Mr. Cooney to support that vague assertion.

Ara Nalbandian has received both a B.S. and M.S. in Mechanical Engineering from University of Rhode Island and has been active in the engineering field for over 42 years. (PSDF ¶18; Ex. C.) He is a registered professional engineer in six states, including Rhode Island and is an active member of the American Society of Mechanical Engineers, National Society of Professional Engineers, Rhode Island Society of Professional Engineers and the Providence Engineering Society. (PSDF ¶18; Ex. C.) He has provided expert testimony in product liability cases on numerous occasions and has been retained

by manufacturers to design residential water heater which operate on the same fundamental principals as the water dispenser at issue in this case. (PSDF ¶18; Ex. C; Ex. K, Nalbadian deposition, p. 26-28.) Clearly, with his education, certifications, and experience, Mr. Nalbandian is more than competent to render expert opinions related to a product design defect within something as basic as a residential water dispenser.

Michael Cooney has a B.S. in metallurgical engineering from the University of Notre Dame and is a registered professional engineer in Connecticut. (PSDF ¶19; Ex. D; Ex. L, Cooney deposition, p.9.) He is a member of the National Association of Corrosion Engineers and the American Welding Society and has extensive experience in performing corrosion analyses. (PSDF ¶19; Ex. D.) He has extensive laboratory experience with a variety of metallographic techniques and has previously offered opinions in another water dispenser fire case. (PSDF ¶19; Ex. D; Ex. L, p.11-12.) Mr. Cooney's primary role in the Carvalhal water dispenser examination was to conduct a metallurgical failure analysis of the metal components of the water dispenser, specifically the hot water storage tank and associated heating subsystem components and to interpret the metallurgical findings. (PSDF ¶19; Ex. L, p.21.) Certainly, his education, certifications and experience allow him to competently testify as to the results of that analysis.

**b. Mr. Nalbandian and Mr. Cooney's Opinions and Methodology**

Prior to examining the Defendants' allegations regarding Mr. Nalbandian and Mr. Cooney's opinions and methodology, it is important to understand their basic opinion as it relates to the cause of the Carvalhal fire.

Per their report, Mr. Nalbandian and Mr. Cooney determined that the stainless steel hot water storage tank was subject to cracking and corrosion pitting resulting from the

presence of high chloride levels in the insulation attached to the outer surface of the tank. (PSDF ¶20; Ex. B, Thielsch report, p.8-9.) They further determined that the cracking and corrosion to the tank resulted in corrosion deposits on the two heat sensors attached to the exterior surface of the tank, which caused the heat sensors to provide a proper temperature response, which resulted in the heater coil overheating causing localized burning. (PSDF ¶20; Ex. B, p.8-9.) Mr. Nalbandian and Mr. Cooney expanded upon this opinion at their depositions and acknowledged that due to the destruction caused by the fire, they cannot precisely state that the heater coil was the ignition source of the fire, but burn patterns dictate that it was some component of the heating subsystem within the water dispenser, which included the insulated wires, wire connections and thermal switches. (PSDF ¶20; Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.) Despite the electrical system being the ignition source, it is not their opinion that the electrical system was defectively designed. Rather, it is their opinion that the design defect of placing a high chloride content insulation against the stainless steel tank caused the tank to crack and corrode allowing water and corrosion to escape and come into contact with the electrical heating subsystem which caused the same to malfunction and overheat igniting plastic within the water dispenser. (PSDF ¶20; Ex. K, p.124; Ex. L, p.195-196.)

With respect to their methodology, Mr. Nalbandian attended a visual examination of the water cooler at the office of the Rhode Island State Fire Marshal on May 7, 2004. (PSDF ¶21; Ex. K, p.55.) At that point, Mr. Nalbandian determined that destructive testing was necessary as the source of the fire was not evident from this initial visual examination. (PSDF ¶21; Ex. B, p.3.) On June 29, 2004, the water dispenser was transported to Thielsch Engineering where destructive testing occurred. (PSDF ¶21; Ex.

K, p.179.) Mr. Nalbandian enlisted the aid of Mr. Cooney to assist with the examination and inspection. (PSDF ¶21; Ex. K, p.179.) The water dispenser was disassembled to remove the hot and cold water assemblies, and the insulation covering the hot water tank was removed. (PSDF ¶21; Ex. B, p.3.) Beyond an exhaustive visual examination of the various components, the burn patterns and damage, an energy dispersive x-ray spectroscopy was performed on portions of the stainless steel tank and insulation to determine their elemental composition. (PSDF ¶21; Ex. B, p.5.) Further, pieces of the stainless steel tank were removed and subject to varying levels of magnification. (PSDF ¶21; Ex. B, p.6.) From these examinations and tests, as well as their review of literature regarding stress cracking and fire investigation handbooks, Mr. Nalbandian and Mr. Cooney arrived at the opinions expressed in the preceding paragraph. (PSDF ¶21; Ex. K, p.37-38, 44.)

As with their attack on Mr. Davoodi, the Defendants focus their allegations against Mr. Nalbadian and Mr. Cooney not on some alleged defect in the testing and examination that they did perform, but rather on extraneous variables and factors that the Defendants claim should have been tested. The Defendants allege that Mr. Nalbandian and Mr. Cooney failed to adequately evaluate the heating coil and temperature switches on the damaged water dispenser, and failed to identify the plastic components within the water dispenser to determine their ignition temperatures. (DSMF ¶15-18.) The Defendants gloss over the testimony that the components were too fire damaged to adequately test and claim that exemplar units should have been tested to determine this information. (Ex. K, p. 136; Ex. L, p.100-107, 147; DSMF ¶15-18.) Further, the Defendants claim that it is significant that neither Mr. Nalbandian nor Mr. Cooney were able to precisely describe

the inner mechanics of the heat sensors used on the damaged water dispenser, ignoring testimony from both indicating that they were familiar with how such sensors operate. (PSDF ¶9; DSMF ¶15-17; Ex. K, p.155; Ex. L, p.145.) Indeed, the Defendants' focus on testing of the heater coil and temperature sensors is misplaced in light of Mr. Nalbandian and Mr. Cooney's testimony that it was one of the components of the electrical subsystem that malfunctioned and overheated, not necessarily the heater coil or temperature sensors. (PSDF ¶22; Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.)

The focal point of the Defendants' attack on Mr. Nalbandian and Mr. Cooney relies on its interpretation of the experts' opinion as it relates to the scientific principle of the "fire triangle". As correctly noted by the Defendants, for fire to occur, three factors must be present: oxygen, fuel and energy sufficient to ignite the fuel. The presence of oxygen is not an issue in this case. With respect to the remaining two factors, the Defendants incorrectly argue that Mr. Nalbandian and Mr. Cooney are unable to prove to any degree of scientific certainty what material served as the fuel source and how that fuel was ignited. Indeed, the Defendants argument belies its misunderstanding of materials performance when exposed to corrosive environments and fires.

Burn patterns trace the origin of the fire to the hot water heating system within the water dispenser. (PSDF ¶23; Ex. K, p.83-91.) While the Defendants may contest this fact, Mr. Davoodi was of the identical opinion. (PSDF ¶11; Ex. G, p.79.) Based on this determination, the fuel and energy sources become obvious. In that area of origin were numerous plastic combustibles including insulation wire and foam tube insulation. Mr. Nalbandian and Mr. Cooney clearly testified that it was these plastics that were the first fuel ignited. (PSDF ¶23; Ex. K, p.153; Ex. L, p.195-196.) It is of little consequence

which type of plastic these were comprised of, because they all eventually heated to the point of ignition. With respect to the energy source which ignited the plastics, the only available energy source was the electrical heating system, which included the heater coil, insulated wires, wire connections and thermal switches. (PSDF ¶23; Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.) As mentioned previously, the destruction to the internal components was too great to make a precise determination as to which electrical component malfunctioned, but it is clear that it happened. (PSDF ¶23; Ex. K, p. 136; Ex. L, p.100-107, 147.) Because the precise failure is unable to be determined due to the fire damage, testing of the heater coil, temperature sensors or components in the exemplar unit would not have yielded practical results. Despite being unable to determine the precise electrical malfunction, Mr. Nalbandian and Mr. Cooney did determine the design defect which caused the electrical system malfunctioned. As stated previously, the use of chloride rich insulation for the stainless steel tank caused the tank to crack and corrode releasing water and corrosion onto the heating subsystem overwhelming it to the point of malfunction. (PSDF ¶23; Ex. B, p.9, Ex. K, p.146, 176.) It is a general engineering proposition that electrical components exposed to moisture and corrosion will malfunction and possibly result in an overheating condition.

**c. Mr. Nalbandian and Mr. Cooney's Opinion Admissibility**

In order to prove a product liability claim, Rhode Island requires that "the plaintiff has the burden of proving a defect in the design or manufacture that makes the product unsafe for its intended use, and also that the plaintiff's injury was proximately caused by this defect. . . . Introducing probative circumstantial evidence that may create inferences

of fact not otherwise subject to direct proof, and which could prove the defect and the causal connection is entirely consonant with the theory of strict liability. The inferences drawn from the evidence, however, may not rely upon mere conjecture or speculation to establish essential elements of this case. *Carlson v. American Safety Equipment,* 528 F.2d 384, 386 (1st Cir. 1976); *Geremia v. Benny's Inc.,* 119 R.I. 868, 872-73, 383 A.2d 1332, 1334 (1978)." *Thomas v. Amway Corp,* 488 A.2d 716, 722 (R.I. 1985). As noted by the *Thomas* court, if the Plaintiff is unable to directly prove the precise malfunction which caused the ignition, proof of the root cause likely causing such a malfunction combined with evidence that such a malfunction occurred, will be sufficient.

The Defendants have claimed that Mr. Nalbandian and Mr. Cooney should be precluded from testifying because they failed to perform work necessary to overcome their lack of experience with this particular water dispenser and specifically in regard to the temperature sensors or heating coil. As noted, Mr. Nalbandian has significant experience with water heating devices, to the point where he has been retained by manufacturers to design residential water heaters which operate on the same fundamental principals as the water dispenser at issue in this case. (PSDF ¶18; Ex. K, p.26-28.) Further, Mr. Cooney has experience conducting investigations into water dispenser fires in the past. (PSDF ¶19; Ex. L, p.11-12.) Additionally, they both performed extensive investigation and evaluation of the Carvalhal water dispenser, as well as exemplar units. (PSDF ¶21; Ex. B; Ex. K, p.99; Ex. L, p.52-61.) Certainly, any lack of required knowledge regarding the water dispenser was more than made up for based on these evaluations, combined with their experience and education. With respect to specific

functioning of the temperature sensors and heater coil, it has already been demonstrated that such knowledge was uneccessary to their opinions. Mr. Nalbandian and Mr. Cooney have opined that based on the extensive fire damage, it is not possible to determine which heating system electrical component was the precise ignition source. Inasmuch, an intimate knowledge of technical function of the sensors or coil would not assist to support or refute that opinion. (Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.)

As demonstrated, Mr. Nalbandian and Mr. Cooney clearly have the qualifications to present the opinion they have reached. Despite the Defendants' best efforts to shift the focus away from the relevant inquiry, it is clear that they should be allowed to testify to their opinions in full. Their opinions rest on the fundamental laws of physics as well as basic metallurgical and materials science. They incorporated no novel or unique methodology, and the basis for their opinions could hardly be characterized as junk science.

"We have specifically noted that *Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. . . . Once the district court finds that the expert's methodology is reliable, the expert is allowed to testify as to the inferences and conclusions he draws from it." (Citations omitted; internal quotations omitted.) *Vargas*, 471 F.3d at 265. "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process — competing expert testimony and active cross-examination — rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." (Citations omitted; internal quotations omitted.) *Ruiz-Troche v. Pepsi Cola of Puerto Rico*, 161 F.3d 77 (1st

Cir. 1998). It is clear that Mr. Nalbandian and Mr. Cooney arrived at their opinions based on accepted methodology and careful examination of the evidence and they must be allowed to testify.

## IV. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

The Defendants have moved for summary judgment in reliance on their position that the Plaintiff's experts' testimony is inadmissible and, as such, the Plaintiff is unable to prove causation. However, it has been demonstrated that the Plaintiff's experts must be allowed to testify as their opinions are in conformance with the requirements of Federal Rule of Evidence 702 as well as *Daubert*, *Kumho Tire* and their progeny. The Defendants correctly note that the Plaintiff must be able to prove that the water dispenser was defective and unreasonably dangerous and that the defect was the proximate cause of its damages. Based on the testimony of Hossein Davoodi, Ara Nalbandian and Michael Cooney, the Plaintiff has sufficient evidence to prove each element and the Defendants' Motion for Summary Judgment must be denied.

## V. CONCLUSION

As noted, Federal Rule of Evidence 702 "imposes a gate-keeping role on the trial judge to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *U.S. v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Before accepting expert testimony, a district court must determine that a witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. "It is not required that experts be blueribbon practitioners with optimal qualifications." (Internal quotations omitted.) *Vargas*, 471 F.3d at 262. "The district court's responsibility under Rule 702

and *Daubert* is only to find that the expert's conclusion has a reliable basis in the knowledge and experience of [the expert's] discipline. . . . [*Daubert*] demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Vargas*, 471 F.3d at 265. "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process — competing expert testimony and active cross-examination — rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." (Citations omitted; internal quotations omitted.) *Ruiz-Troche v. Pepsi Cola of Puerto Rico*, 161 F.3d 77 (1st Cir. 1998).

As has been demonstrated, Hossein Davoodi, Ara Nalbandian and Michael Cooney all possess exemplary qualification to provide the opinions they have reached, incorporated proper and accepted methodologies to arrive at those opinions and base their opinions of fundamental physics and engineering principles. The Defendants attempt to demonstrate flaws in those methodologies has been shown to be without merit, as the opinions and methodologies are scientifically sound. Inasmuch, the Defendants' Motion to Preclude the Plaintiff's Expert must be denied. Accordingly, the Defendants' Motion for Summary Judgment must also be denied as the Plaintiff's experts provide ample evidence to prove its causes of action.

WHEREFORE, the Plaintiff, HARTFORD INSURANCE COMPANY, respectfully requests that this Honorable Court deny the Defendants' Motion to Preclude Plaintiff's Experts' Testimony. Further, the Plaintiff respectfully requests this Honorable Court to deny the Defendants' Motion for Summary Judgment.

THE PLAINTIFF,

By: /s/ Erik Loftus, Esq.
Erik Loftus, Esq.
Law Offices of Stuart G. Blackburn
2 Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
Tel. (860) 292-1116
Fax (860) 292-1221

/s/ Richard A. van Tienhoven
Richard A. van Tienhoven, Esq
van Tienhoven & Cotter, Limited
312 South Main Street
Providence, RI 02903
Tel. (401) 454-5350
Fax (401) 454-5170