**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| THE HARTFORD INSURANCE COMPANY, As Subrogee of Alberto and Eugenia Carvalhal | : | |
| v. | : | C.A. No.: 06-362S |
| GENERAL ELECTRIC COMPANY and MIDEA USA, INC. | : | |

**PLAINTIFF'S STATEMENTS OF DISPUTED AND ADDITIONAL UNDIPUTED MATERIAL FACTS IN SUPPORT OF ITS OBJECTION TO DEFENDANTS' MOTION TO PRECLUDE EXPERT WITNESSES AND FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, HARTFORD INSURANCE COMPANY, by and through its attorneys, and hereby submits the following statements of disputed and additional undisputed material facts.

**DISPUTED FACTS**

The Defendants have set forth numerous "undisputed" facts in support of their motion. The Plaintiff has specifically noted such disputed facts in its memorandum and provided citation to evidentiary materials. These disputed facts will be recited again at length:

1. The Defendants claim that Hossein Davoodi testified that NFPA 921 is "the bible for fire investigators." (Defendants' Statement of Material Facts ("DSMF"), pg.3 ¶7.) The actual quote from Mr. Davoodi was that NFPA 921 is "like the bible for fire investigators." (Ex. G, Davoodi deposition, p.43.)

2. The Defendants claim that Mr. Davoodi failed to take measurements in accordance with NFPA 921. (DSMF p.2 ¶5.) The Defendants state that Mr. Davoodi took

no measurements of the Carvalhal kitchen. (DSMF p.4 ¶8.) Mr. Davoodi stated, on three separate occasions, that he did take measurements of the kitchen. (Ex. G, p.118, 119, 121.)

3. The Defendants state that Mr. Davoodi failed to adequately document the key characteristics of the kitchen, included failing to measure the height of the countertop. (DSMF p.4 ¶8.) However, Mr. Davoodi not only took extensive photographs of the kitchen, but he also drafted a diagram indicating a general layout of the first floor of the structure, drafted diagrams indicating the flow of fire based on burn pattern examinations, and took several measurements, including the height of the countertop. (Ex. G, p.116-122, 158.) Further, National Fire Protection Association Guide 921 ("NFPA 921") Sec. 15.2.1 states that photographs are the most efficient reminders of what an investigator observed. (Ex. H, NFPA 921, p.109.)

4. The Defendants state that Mr. Davoodi took no empirical measurements to determine the location of the water dispenser. (DSMF p.4 ¶9.) However, Mr. Davoodi took measurements of the kitchen, including the adjacent countertop. (Ex. G, p.116-122, 158.) In addition, Mr. Davoodi reviewed fire department photographs depicting the water dispenser in place, and interviewed the Carvalhals and fire department personnel regarding the location of the water dispenser. (Ex. G p.125, 128.)

5. The Defendants imply that Mr. Davoodi's diagrams do not conform to NFPA 921 requirements. (DSMF p.2, 4 ¶5, 9.) However, NFPA 921 Sec. 15.4 states only that various techniques may be used to prepare drawings, that they are intended to be used to support the investigator's memory, and that it is the investigator's decision as to the level of detail included in the drawings. (Ex. H, p.116.) With respect to the simplified floor

plan, Mr. Davoodi testified that it was only intended to demonstrate a general area of origin within the structure. (Ex. I, Ex. G, p.116.) With respect to the nine diagrams depicting fire pathways, NFPA 921 Sec. 17.2.3 allows for the use of Heat and Flame Vector Diagrams which allow the investigator, through the use of arrows, to note his interpretation of the direction of heat or flame spread based on the fire patterns. (Ex. H, p.132.) NFPA 921 does not require that these vector diagrams be drafted using specialized software or that they contain precise spatial measurements. (Ex. H, p. 132.)

6. The Defendants implies that Mr. Davoodi failed to retain key evidence as required by NFPA 921. (DSMF p.4-5 ¶10.) NFPA 921 Sec. 16.2.2 states that the decision as to what evidence to collect from a fire scene rests with the fire investigator. (Ex. H, p.122.) Nowhere in NFPA 921 is there a suggestion that the fire investigator must retain evidence not located within his determined area of origin. (Ex. H.) Mr. Davoodi testified clearly that his area of origin was very small and the only potential ignition source within that area of origin was the water dispenser. (Ex. G, p.130.) Mr. Davoodi went above and beyond the requirements of NFPA 921 by retaining an electric mixer and wall outlet that were not in, but rather "near" (within 30 inches) the area of origin. (Ex. G, p.132, 141.)

7. The Defendants state that Mr. Davoodi retained the wall outlet despite not knowing if it was the outlet in which the water dispenser was plugged into at the time of the fire. (DSMF p.5 ¶10.) Actually, Mr. Davoodi testified that it was the outlet the water dispenser was plugged into after reviewing additional materials. (Ex. G, p.193.)

8. The Defendants state that the fire department photographs depict a "coffeemaker" located on the countertop by the mixer, and that Mr. Davoodi failed to retain it as evidence. (DSMF p.5 ¶10.) The item was identified as a "coffeepot" by defense counsel

only, Mr. Davoodi was unsure what it was. (Ex. G, p.170.) Further, Mr. Davoodi testified that not only was the coffeepot not present at the time of his inspection, but that it would not have been in his area of origin anyways. (Ex. G, p.171, 194.)

9. The Defendants state that neither Mr. Nalbandian nor Mr. Cooney knew how the temperature sensors worked. (DSMF p.7, 8, ¶15, 17.) However, both testified that they were familiar with how such sensors operate. (Ex. K, Nalbandian deposition, p.155; Ex. L, Cooney deposition, p.145.)

## ADDITIONAL UNDISPUTED FACTS

The Plaintiff hereby submits the following additional undisputed facts as to which there is not genuine issue to be tried:

10. Hossein Davoodi is a registered professional engineer in the field of fire protection in three states and a province in Canada, as well as a Certified Fire Inspector with the National Association of Fire Investigators. (Ex. F, Davoodi resume.) Further, Mr. Davoodi has investigated over 400 fires in a career spanning almost twenty years. (Ex. G, p.35.).

11. Mr. Davoodi conducted a fire scene investigation on March 3, 2004. (Ex. A, Davoodi Report, p.6.) Mr. Davoodi conducted an extensive examination of the structure and primarily relied on the burn patterns within to arrive at his opinion regarding the origin of the fire. (Ex. A, p.8.) Mr. Davoodi interviewed the Carvalhals and fire department personnel, reviewed fire department records and photographs of the scene, attended non-destructive and destructive testing of the water dispenser involved in the fire, and examined similar units to broaden his understanding of how such water

dispensers operated. (Ex. A, p.2-15.) Based on this information, Mr. Davoodi determined that the February 27, 2004 fire originated in the southwest corner of the Carvalhals' kitchen at the precise location in which the water dispenser was located. (Ex. A, p.1.) Mr. Davoodi was able to further pinpoint the origin of the fire to the hot water heater system within the water dispenser. (Ex. A, p.1.)

12. NFPA 921 is entitled "Guide for Fire and Explosion Investigations." (Ex. H, cover.) Section 3.2 defines "guide" as "A document that is advisory or informative in nature and that contains only nonmandatory provisions. A guide may contain mandatory statements such as when a guide can be used, but the document as a whole is not suitable for adoption into law." (Ex. H, p. 9.) NFPA 921 states that it is a document "designed to assist" (sec. 1.1) and that "not every portion of this document may be applicable to every fire or explosion incident" (sec. 1.3.3). (Ex. H, p.6.)

13. Mr. Davoodi, testified that "[t]he NFPA 921 is a guide, its not a standard" and that NFPA 921 is "not perfect; that's why they don't call it a standard." (Ex. G, p.44, 53.) Mr. Davoodi conducted his fire investigation in accordance with NFPA 921. (Ex. G, p.54.) Mr. Davoodi's primary focus in his origin investigation was to identify and follow the burn patterns from the point of least damage to the point of heaviest damage. (Ex. G, p.85.) NFPA 921 Sec. 6.1.1 states that this type of investigation is one of the major objectives of a fire scene examination used in order to determine point(s) of origin. (Ex. H, p.30.)

14. Mr. Davoodi stated, on three separate occasions, that he took measurements of the kitchen. (Ex. G, p.118, 119, 121.) Mr. Davoodi not only took extensive photographs of the kitchen, but he also drafted a diagram indicating a general layout of the first floor of

the structure, drafted diagrams indicating the flow of fire based on burn pattern examinations, and took several measurements, including the height of the countertop. (Ex. G, p.116-122, 158; Ex. I; Ex. J.) NFPA 921 Sec. 15.2.1 states that photographs are the most efficient reminders of what an investigator observed. (Ex. H, p.109.)

15. Mr. Davoodi appended to his report a simplified floor plan of the first floor of the premises (Ex. I) as well as nine diagrams depicting fire pathways (Ex. J). NFPA 921 Sec. 15.4 states that various techniques may be used to prepare drawings, that they are intended to be used to support the investigator's memory, and that it is the investigator's decision as to the level of detail included in the drawings. (Ex. H, p.116.) With respect to the simplified floor plan, Mr. Davoodi testified that it was only intended to demonstrate a general area of origin within the structure. (Ex. I, Ex. G, p.116.) With respect to the nine diagrams depicting fire pathways, NFPA 921 Sec. 17.2.3 allows for the use of Heat and Flame Vector Diagrams which allow the investigator, through the use of arrows, to note his interpretation of the direction of heat or flame spread based on the fire patterns. (Ex. H, p.132.) NFPA 921 does not require that these vector diagrams be drafted using specialized software or that they contain precise spatial measurements. (Ex. H, p. 132.)

16. When Mr. Davoodi was assigned this investigation, he was not told anything about the potential cause of the fire. (Ex. G, p.23.) When Mr. Davoodi began his examination of the fire scene, he had received no information as to the potential cause of the fire and the water dispenser had been previously removed by the fire department. (Ex. G, p.77.) Mr. Davoodi subsequently determined the area of origin based on fire patterns with no knowledge that the water dispenser was previously present at that

location. (Ex. G, p.85.) Mr. Davoodi determined that the water dispenser was in the area of origin by taking measurements of the kitchen, including the adjacent countertop, reviewing fire department photographs depicting the water dispenser in place, and interviewing the Carvalhals and fire department personnel regarding the location of the water dispenser. (Ex. G, p.116-125, 128.)

17. NFPA 921 Sec. 16.2.2 states that the decision as to what evidence to collect from a fire scene rests with the fire investigator. (Ex. H, p.122.) Nowhere in NFPA 921 is there a suggestion that the fire investigator must retain evidence not located within his determined area of origin. (Ex. H.) Mr. Davoodi clearly testified that his area of origin was very small and the only potential ignition source within that area of origin was the water dispenser. (Ex. G, p.130.) Mr. Davoodi exceeded the requirements of NFPA 921 by retaining an electric mixer and wall outlet that were not in, but rather "near" (within 30 inches), the area of origin. (Ex. G, p.132, 141.) Mr. Davoodi was able to testify that it was the outlet retained was the outlet that the water dispenser was plugged into after reviewing additional materials. (Ex. G, p.193.) Mr. Davoodi testified that the "coffeepot" was not present at the time of his inspection, and that it would not have been in his area of origin. (Ex. G, p.171, 194.) Mr. Davoodi was 100% confident he accurately determined the area of origin and evaluated completely all items in and near that area. (Ex. G, p.33-34, 132, 141.) NFPA 921 does not require fire investigators to evaluate items located outside the area of fire origin. (Ex. H.)

18. Ara Nalbandian has received both a B.S. and M.S. in Mechanical Engineering from University of Rhode Island and has been active in the engineering field for over 42 years. (Ex. C, Nalbandian resume.) He is a registered professional engineer in six states,

including Rhode Island and is an active member of the American Society of Mechanical Engineers, National Society of Professional Engineers, Rhode Island Society of Professional Engineers and the Providence Engineering Society. (Ex. C.) He has provided expert testimony in product liability cases on numerous occasions and has been retained by manufacturers to design residential water heater which operate on the same fundamental principals as the water dispenser at issue in this case. (Ex. C; Ex. K, p. 26-28.)

19. Michael Cooney has a B.S. in metallurgical engineering from the University of Notre Dame and is a registered professional engineer in Connecticut. (Ex. D, Cooney resume; Ex. L, p.9.) He is a member of the National Association of Corrosion Engineers and the American Welding Society and has extensive experience in performing corrosion analyses. (Ex. D.) He has extensive laboratory experience with a variety of metallographic techniques and has previously offered opinions in another water dispenser fire case. (Ex. D; Ex. L, p.11-12.) Mr. Cooney's primary role in the Carvalhal water dispenser examination was to conduct a metallurgical failure analysis of the metal components of the water dispenser, specifically the hot water storage tank and associated heating subsystem components and to interpret the metallurgical findings. (Ex. L, p.21.)

20. Mr. Nalbandian and Mr. Cooney opined that the stainless steel hot water storage tank was subject to cracking and corrosion pitting resulting from the presence of high chloride levels in the insulation attached to the outer surface of the tank. (Ex. B, Thielsch report, p.8-9.) They further opined that the cracking and corrosion to the tank resulted in corrosion deposits on the two heat sensors attached to the exterior surface of the tank, which caused the heat sensors to provide a proper temperature response, which resulted

in the heater coil overheating causing localized burning. (Ex. B, p.8-9.) Mr. Nalbandian and Mr. Cooney expanded upon this opinion at their depositions and acknowledged that due to the destruction caused by the fire, they could not precisely state that the heater coil was the ignition source of the fire, but burn patterns dictate that it was some component of the heating subsystem within the water dispenser, which included the insulated wires, wire connections and thermal switches. (Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.) It is their opinion that the design defect of placing a high chloride content insulation against the stainless steel tank caused the tank to crack and corrode allowing water and corrosion to escape and come into contact with the electrical heating subsystem which caused the same to malfunction and overheat igniting plastic within the water dispenser. (Ex. K, p.124; Ex. L, p.195-196.)

21. Mr. Nalbandian attended a visual examination of the water cooler at the office of the Rhode Island State Fire Marshal on May 7, 2004. (Ex. K, p.55.) At that point, Mr. Nalbandian determined that destructive testing was necessary as the source of the fire was not evident from this initial visual examination. (Ex. B, p.3.) On June 29, 2004, the water dispenser was transported to Thielsch Engineering where destructive testing occurred. (Ex. K, p.179.) Mr. Nalbandian enlisted the aid of Mr. Cooney to assist with the examination and inspection. (Ex. K, p.179.) The water dispenser was disassembled to remove the hot and cold water assemblies, and the insulation covering the hot water tank was removed. (Ex. B, p.3.) Beyond an exhaustive visual examination of the various components, the burn patterns and damage, an energy dispersive x-ray spectroscopy was performed on portions of the stainless steel tank and insulation to determine their elemental composition. (Ex. B, p.5.) Pieces of the stainless steel tank were removed and

subject to varying levels of magnification. (Ex. B, p.6.) From these examinations and tests, as well as their review of literature regarding stress cracking and fire investigation handbooks, Mr. Nalbandian and Mr. Cooney arrived at their opinions. (Ex. K, p.37-38, 44.)

22. Mr. Nalbandian and Mr. Cooney's testified that it was one of the components of the electrical subsystem that malfunctioned and overheated, not necessarily the heater coil or temperature sensors. (Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.)

23. Mr. Nalbandian determined that burn patterns trace the origin of the fire to the hot water heating system within the water dispenser. (Ex. K, p.83-91.) In that area of origin were numerous plastic combustibles including insulation wire and foam tube insulation which Mr. Nalbandian and Mr. Cooney clearly testified were the first fuel ignited. (Ex. K, p.153; Ex. L, p.195-196.) With respect to the energy source which ignited the plastics, the only available energy source was the electrical heating system, which included the heater coil, insulated wires, wire connections and thermal switches. (Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107.) The destruction to the internal components was too great for Mr. Nalbandian or Mr. Cooney to make a precise determination as to which electrical component malfunctioned, but it is clear that it happened. (Ex. K, p. 136; Ex. L, p.100-107, 147.) Mr. Nalbandian testified that the use of chloride rich insulation for the stainless steel tank caused the tank to crack and corrode releasing water and corrosion onto the heating subsystem overwhelming it to the point of malfunction. (Ex. B, p.9, Ex. K, p.146, 176.)

THE PLAINTIFF,

By: /s/ Erik Loftus, Esq.
Erik Loftus, Esq.
Law Offices of Stuart G. Blackburn
2 Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
Tel. (860) 292-1116
Fax (860) 292-1221

/s/ Richard A. van Tienhoven
Richard A. van Tienhoven, Esq
van Tienhoven & Cotter, Limited
312 South Main Street
Providence, RI 02903
Tel. (401) 454-5350
Fax (401) 454-5170