IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

| | | |
|---|---|---|
| THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL<br>Plaintiff<br><br>Vs.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br>Defendant | ) | No.CA:06-362S |
| EUGENIA CARVALHAL<br>Plaintiff<br><br>Vs.<br><br>GENERAL ELECTRIC COMPANY and MIDEA USA, INC.<br>Defendant | ) | No.CA-07-007S |

**PLAINTIFF, EUGENIA CARVALHAL'S, OBJECTION TO DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES AND FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, EUGENIA CARVALHAL, and hereby move this Honorable Court to deny the Defendants motion for good and sufficient cause.

In support of their Motion, Plaintiff, EUGENIA CARVALHAL, files a Memorandum of Law in support of Plaintiff's objection. In addition, the Plaintiff requests the opportunity for oral argument with respect to this motion.

WHEREFORE, Plaintiffs request that this Court deny the Defendants motion for good and sufficient good and award the Plaintiff costs and any other award that this Court may deem fit.

Respectfully submitted,
Plaintiff,
By and Through Her Attorneys,

/s/ Robert D'Amico, II, Esq.
/s/ Mark W. Dana, Esq.

Robert A. D'Amico, II, Esq. #4593
Mark W. Dana, Esq. #4150
**D'AMICO · BURCHFIELD, LLP**
536 Atwells Avenue
Providence, RI 02909
Main 401-454-1212
Fax 401-454-1233
rad@dblawri.com
mwd@dblawri.com

**CERTIFICATE OF MAILING AND ELECTRONIC SERVICE**

I, the undersigned, hereby certify that a true and correct copy of the above and foregoing was transmitted electronically to the following attorney(s) of record, on this 25th day of June, 2007.

Dominick W. Savaiano, Esq.
Rodd E. Elges, Esq.
CLAUSEN MILLER, P.C.
10 South LaSalle Street
Chicago, IL 60603-1098
relges@clauson.com

Joseph-Anthony DiMaio, Esq.
McKennon & Harwood
1168 Newport Avenue
Pawtucket, RI 02861
contact@mckinnonharwood.com

Erik Loftus
Law Offices of Stuart Blackburn
Two Concorde Way
PO Box 608
Windsor Locks, CT 06096
eloftus@sbcglobal.net

Richard Ari Van Tienhoven, Esq.
Van Tienhoven & Cotter, Ltd.
312 South Main Street
Providence, RI 02903
ravt.ksc@conversent.net

Patrick A. Sweeney

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

| | |
|---|---|
| THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL *Plaintiff* | |
| Vs. | No.CA:06-362S |
| GENERAL ELECTRIC COMPANY and MIDEA USA, INC. *Defendant* | |
| EUGENIA CARVALHAL *Plaintiff* | |
| Vs. | No.CA-07-007S |
| GENERAL ELECTRIC COMPANY and MIDEA USA, INC. *Defendant* | |

**PLAINTIFF, EUGENIA CARVALHAL'S, MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES AND FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, EUGENIA CARVALHAL, by and through her attorneys and submit this Memorandum of Law in Support of Their Objection to Defendants' Motion to Preclude the Testimony of Plaintiffs' Expert Witnesses and for Summary Judgment.

**FACTS AND TRAVEL**

1. On or about February 27, 2004, a fire occurred at the private residence of Alberto and Eugenia Carvalhal (hereinafter the "Carvalhals"), located at 76 Willet

Avenue, in East Providence, Rhode Island. The subject fire had originated in the kitchen area of the premises. The Carvalhals home was substantially destroyed and they were displaced from their home for approximately 8 months.

2. Pursuant to the homeowner's policy issued by The Hartford, the Carvalhals filed a claim seeking coverage of their related losses.

3. Shortly after being notified of the fire, the Plaintiff retained the services of Crawford Investigations to conduct a cause and origin investigation of the fire. Crawford assigned the file to Hossein Davoodi who conducted a site inspection on March 3, 2004. (Ex. A, Davoodi report, p.6). Mr. Davoodi determined that the fire originated in the southwest corner of the Carvalhal kitchen at the point where a General Electric hot/cold water dispenser (manufactured by Midea, Inc.) had been located.[1] (Ex. A, p.l). Further inspection of the water dispenser allowed Mr. Davoodi to pinpoint the exact origin of the fire as being the hot water heater components of the water dispenser. (Ex. A, p.l).

4. After being informed of Mr. Davoodi's conclusions, the Plaintiff retained the services of Thielsch Engineering to conduct a cause investigation relative to the water dispenser. Thielsch assigned the file to Ara Nalbandian who was present for a non-destructive visual examination of the water dispenser which took place at the Rhode Island State Fire Marshal's facility. (Ex. B, Thielsch report, p.2). Mr. Nalbandian made a determination at that time that further investigation was warranted and a destructive examination and testing subsequently took place at the Thielsch facility, with all interested parties present. (Ex. B, p.3). Mr.

---

[1] The water dispenser had been previously removed from the scene by the East Providence Fire Department as they determined it was also the origin of the fire. (Ex. A,p.8).

Nalbandian, a registered professional engineer with a focus on mechanical engineering, enlisted the assistance of his associate Michael Cooney who was also a registered professional engineer, but with a focus on metallurgical engineering. (Ex. C, Nalbandian resume; Ex. D, Cooney resume). Together, through a series of visual, microscopic and chemical composition examinations, Mr. Nalbandian and Mr. Cooney determined that the root cause of the fire was a design defect within the water dispenser. (Ex. B, p.2-9). The insulation surrounding the stainless steel hot water tank contained chlorides which caused the steel tank to corrode and crack. (Ex. B, p.8-9). As a result, water was allowed to escape leaving residue and corrosion on various electrical components of the water heating subsystem. (Ex. B, p.8-9). Those electrical components malfunctioned, and generated sufficient heat as to ignite the surrounding plastic combustibles. (Ex. B, p.8-9).

5. After due notice and demand to both General Electric and Midea, the Plaintiff filed a subrogation lawsuit alleging negligence, product liability, breach of express warranty, and breach of implied warranty of merchantability as against both parties. Shortly thereafter, Eugenia Carvalhal, the only surviving insured of the Plaintiff, filed a similar suit seeking damages for uninsured losses. That suit was consolidated with the Plaintiffs suit and subsequently amended to seek damages only for emotional distress.

## APPLICABLE LAW

### I. SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the Court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). A material fact is one affecting the lawsuit's outcome under the applicable law. *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education, 915 F. Supp. 1267, 1279 (D.R.I. 1996)*. Factual disputes are genuine when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). To win summary judgment on a particular count of the complaint, the moving party, must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party, cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988).

The court ***must deny summary judgment*** when a genuine issue of material fact remains to be tried or where the moving party is not entitled to a judgment as a matter of law, in all other cases, the court may enjoy some discretion to deny summary judgment where the court concludes that a fuller factual development is necessary (*See Kennedy v. Silas Mason Co*., 334 U.S. 249, 68 S.Ct. 1031, 92 L.ED. 1347 (1948)) or where there is some particular reason to believe that the wiser course would be to

proceed to trial. (*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). (emphasis added).

## II. EXPERT TESTIMONY

Rule 702 of the Federal Rules of Evidence (which is identical to Rule 702 of the Rhode Island Rules of Evidence) governs the admissibility of expert testimony. As recently amended, it provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact and that his or her expert testimony must be relevant to the task at hand and rest on a reliable basis:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.*

This rule imposes a gate-keeping role on the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (holding that *Daubert* applies to all expert testimony). Expert testimony must be reliable, such that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The proffered expert testimony must also be relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v.*

*Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998) (citing *Daubert*, 509 U.S. at 591-92) (citations omitted).

The inquiry under Rule 702 is a "flexible one." *Daubert*, 509 U.S. at 594. The trial court enjoys broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow. *See Id.* The Supreme Court has emphasized the importance of such broad latitude, noting that, without it, the trial court "would lack the discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho*, 526 U.S. at 152.

The standards set forth in the amendment are broad enough to require consideration of any or all of the specific *Daubert* factors where appropriate. Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert.*, 43 F.3d 1311, 1317 (9th Cir. 1995).
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").
> (3) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition). *Compare Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).

(4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942 (7 Cir. 1997). *See Kumho,* 119 S.Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").
(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See Kumho,* 119 S.Ct.1167, 1175 (1999) (*Daubert's* general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."); *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5 Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiff's respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6 Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable).

All of these factors remain relevant to the determination of the reliability of expert testimony under the Rule as amended. Other factors may also be relevant. *See Kumho,* 119 S.Ct. 1167, 1176 ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Yet no single factor is necessarily dispositive of the reliability of a particular expert's testimony. *See, e.g., Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 155 (3d Cir. 1999) ("not only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.").

**ARGUMENT**

Under FRE 702, as at common law, an expert is essentially someone with specialized knowledge. *See* Mueller & Kirkpatrick, Evidence Under the Rules, 5th Ed. Aspen 2004, 602. Clearly FRE 702 embraces experts who have formal education or training, such as physicians, engineers and geologists. *Id.* The standard is intended to be

lenient. *Id.* A person with suitable training or education may qualify even if he is not a specialist or not renowned and even if he lack a certification or experience. See *Garrett v. Desa Industries*, 705 F.2d 721, 724-725 (4th Cir. 1983) (though he lacked "prior experience," a person holding a master's in engineering qualified as expert); *Payton v. Abbott Labortories*, 780 F.2d 147, 155-156 (1st Cir. 1985) (physicians properly testified about injuries resulting from use of DES during pregnancy, even though neither was a "research scientist" or a "specialist in the field"). FRE 702 reaches much further, embracing people with practical experience but no formal training. See *United States v. Thomas*, 676 F.2d 239, 245 (7th Cir. 1980) (testimony by person who had worked in car repair shop and had rebuilt cars as a hobby, to the effect that defendant was not operating such a shop, since he only had tools for "taking apart" cars and none for "assembling, repairing or painting"), cert. denied, 450 U.S. 931 (1981).

Further, the Supreme Court in *Daubert* also determined, in construing Rule 702 of the Federal Rules of Evidence, that guidelines should be provided for a trial judge to follow in determining the admissibility of scientific evidence: (1) whether the proffered knowledge can be or has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or the potential error rate, and (4) whether the theory or technique has gained general acceptance in the relevant scientific discipline. *Daubert,* 509 U.S. at 593-94, 113 S. Ct. at 2796-97, 125 L. Ed. 2d at 482-83.

Moreover, Rule 703 lets an expert witness base his testimony on facts or data of three sorts: firsthand knowledge, facts learned at trial and on the basis of outside

information, provided that they are "of a type reasonably relied upon by experts in the particular field, "even if not admitted (nor even "admissible") in evidence.[2]

For purposes of this motion, the focus will be on the first type, firsthand knowledge. Often, an expert personally observes, examines or tests the very place, object or person to be described in his testimony.[3] In these cases, the question is whether he has sufficient data to support an opinion and on this point the expert himself is likely to have a view worth hearing.[4]

## I. THIS COURT SHOULD DENY DEFENDANTS' MOTION TO PRECLUDE EVIDENCE AND FOR SUMMARY JUDGEMENT BECAUSE DEFENDANTS' MOTION IS PROCEDURALLY PREMATURE IN NATURE.

Rhode Island Rule of Evidence 104 states that "preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court subject to the provisions of subdivision (b).[5] In making its determination it is not bound by the rules or evidence except those with respect to privileges.

However, the requirement of a Rule 104 preliminary hearing is not applicable if an expert's expertise is so common and well understood that the necessary foundation can be laid while qualifying the witness as an expert during the trial, in front of the jury, in which case Rule 201 remains applicable. *DiPetrillo v. Dow Chem. Co.*, 729 A.2d 677, 688 (R.I. 1999).

---

[2] Mueller at 604.
[3] *Id.*
[4] *Id.*
[5] Rule 104 (b) is not relevant in this instance, however the rule states: When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

The Court in *State v. Quattrocchi,* 681 A. 2d 879 (1996) placed a burden "on the opponent of the expert to come forward with evidence showing deficiencies in the expert's testimony before the court has any obligation to engage in a Rule 104(a) analysis." Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 50-51 (West 1994) (quoted material) (*Daubert* leaves it to the courts to determine opponent's burden of showing deficiencies in the expert's testimony before the court has any obligation to engage in a Rule 104(a) analysis). *Quattrocchi* plainly indicates that (apart from mandatory situations, which are not present here) ***a trial justice is not absolutely required to convene a hearing whenever a Rule 104 motion is filed***, but is so obliged only if proffered scientific evidence is challenged "by an appropriate objection or motion to suppress." *Quattrocchi*, 681 A.2d at 884. (emphasis added).

Similarly, in *Quattrocchi*, the Defendant filed a motion to exclude Plaintiff's evidence. Justice Flanders, in his dissent, noted "but nowhere in his memoranda or in his oral communications to the court did he request a pretrial evidentiary hearing or suggest that the trial justice make the kind of determinations discussed in *Daubert*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Defendant, in the case at bar, finds himself in the same predicament. The Defendant has not specifically requested a preliminary hearing that would address the admissibility of Plaintiffs expert testimony. Even if such a pleading were properly made, this Honorable Court should deny a *Daubert* hearing because the experts background and experience along with their lengthy depositions taken by opposing counsel prove that a *Daubert* hearing is unnecessary. Therefore, without an initial pleading and ruling from this Honorable Court, the Defendants' motion should be denied for good and sufficient cause.

## II. THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT AND ALLOW THE TESTIMONY OF THE PLAINTIFF'S EXPERTS WITNESSES TO BE ADMITTED INTO TESTIMONY BECAUSE THE EXPERTS POSSESS THE KNOWLEDGE, SKILL, EXPERIENCE, TRAINING AND EDUCATION NECESSARY TO PRESENT SUCH EVIDENCE.

Before accepting expert testimony, a district court must determine that a witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "It is well-settled that 'trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses.'" *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir. 2000) (quoting *Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 20 (1st Cir. 1992)).

### A. The testimony of Hossein Davoodi, P.E., CFEI should be held admissible for his knowledge, skill, experience, training and education.

Hossein Davoodi, P.E., CFEI (hereinafter "Davoodi") received his Bachelor of Science in Mechanical Engineering and his Masters in Fire Protection Engineering from the Worcester Polytechnic Institute (WPI). Davoodi started his career in Canada at Professional Loss Control Ltd. as a Project Engineer and Fire Investigator and later moved on to RJ Barlett Engineering & R.J.B. Forensic. Davoodi then moved to the United States and began working with Rolf Jensen & Associates, Inc. as a Consultant and Project Manager. Presently he is with Crawford Investigation Services, Inc. as a Forensic Engineer and Project Manager and is also employed with the National Fire Protection Association as a Senior Fire Protection Engineer. Davoodi is a Registered Professional Engineer in four states and is also a certified explosion and fire investigator. Davoodi has been published and holds six memberships and affiliations within his body of work. Davoodi has been in this line of work for eighteen years.

Davoodi has been offered by the Plaintiff as an expert in the field of fire investigation to give opinions related to the origin of the February 27, 2004 fire at the home of the Carva1ha1s. (Ex. E, Davoodi expert disclosure.)[6] With respect to Davoodi's qualifications to render such an opinion, the Defendants are correct in noting he has a Master's Degree in fire protection engineering. (See Defendants' Statement of Material Facts ("SMF"), p.3 ¶6.) However, the Defendants have failed to inform the Court that Davoodi is also a registered professional engineer in the field of fire protection in three states and a province in Canada, nor have the Defendants informed the Court that Davoodi is a Certified Fire Inspector with the National Association of Fire Investigators. (Ex. F, Davoodi resume.) Further, the Defendants have failed to note that Davoodi has investigated over 400 fires in a career spanning almost twenty years. (Ex. G, Davdoodi depo, p.35.) Certainly, with his education, certifications, and experience, Davoodi is more than competent to render expert opinions related to fire origin.

As noted previously, Davoodi conducted a fire scene investigation on March 3, 2004. (Ex. A, p.6). Davoodi conducted an extensive examination of the structure and primarily relied on the bum patterns within to arrive at his opinion regarding the origin of the fire. (Ex.A, p.8). However, in addition to the scene examination, Davoodi interviewed the Carvalhals and fire department personnel, reviewed fire department records and photographs of the scene, attended non-destructive and destructive testing of the water dispenser involved in the fire, and examined similar units to broaden his understanding of how such water dispensers operated. (Ex. A, p.2-15). Based on this information, Davoodi determined that the February 27, 2004 fire originated in the southwest comer of

[6] For all relevant purposes, The Hartford's Statement of Facts (as it pertains to the experts) are incorporated into this memorandum for The Hartford had retained the experts and to also avoid confusion and keep the facts more streamlined for this Honorable Court.

the Carvalhals kitchen at the precise location in which the water dispenser was located. (Ex. A, p.l.) Further, he was able to further pinpoint the origin of the fire to the hot water heater system within the water dispenser. (Ex. A, p.l.)

With respect to their allegations against Davoodi, the Defendants apparently insist that *NFPA* 921: *Guide for Fire and Explosion Investigations* ("NFPA 921") is a standard by which all fire investigators must follow, and failure to follow each provision makes an expert's fire origin opinion scientifically invalid. While NFPA 921 has been found to be a guide qualified as a reliable method endorsed by a professional organization, *Fireman's Fund Ins.* v. *Canon US.A., Inc.*, 394 F.3d 1054, 1058 (8th Cir. 2005), NFPA 921 itself declares that it is not a standard for fire investigation.

NFPA 921 is titled "Guide for Fire and Explosion Investigations." Section 3.2 defines "guide" as "A document that is *advisory or informative* in nature and that contains only *non-mandatory* provisions. A guide may contain mandatory statements such as when a guide can be used, *but the document as a whole is not suitable for adoption into law."* (Emphasis added.) (Ex. H, NFPA 921, p. 9). Indeed, NFPA 921 declares that it is a document "designed to assist" (sec. 1.1) and that "not every portion of this document may be applicable to every fire or explosion incident" (sec. 1.3.3). (Ex. H, p.6).

The Defendants have erroneously claimed that Davoodi testified that NFPA 921 is "the bible for fire investigators." (SMF, pg.3 ¶7). The actual quote from Davoodi was that NFPA 921 is "like the bible for fire investigators." (Ex. G, p.43). The Defendants also failed to note that Davoodi, shortly thereafter, qualified his statement by stating that "[t]he NFPA 921 is a guide, it's not a standard" and that NFPA 921 is "not perfect; that's why they don't call it a standard." (Ex. G p.44, 53). Davoodi's insistence that NFPA 921

is only a guide, not a standard, is synonymous with NFPA 921's stated scope and purpose as previously noted.

Despite the fact that NFPA 921 is not a standard by which fire investigators must abide, Davoodi did conduct his fire investigation in accordance with NFPA 921. (Ex. G, p.54.) Davoodi's primary focus in his origin investigation was to identify and follow the bum patterns from the point of least damage to the point of heaviest damage. (Ex. G, p.85.) NFPA 921 Sec. 6.1.1 states that this type of investigation is one of the major objectives of a fire scene examination used in order to determine point(s) of origin. (Ex. H, p.30.) It is curious that the Defendants have stated that Davoodi is unable to identify any reliable evidence (Le., publications) to support his conclusion when (1) defense counsel never asked Davoodi to identify such publications; and (2) the guide that Defendants insist is a standard contains an entire chapter devoted to bum pattern examinations. (Ex. G, Ex. H, Chapter 6).

The Defendants take specific exception to Davoodi's investigation with respect to four areas: (1) an allegation that Davoodi failed to take measurements in accordance with NFPA 921 (SMF p.2 ¶5); (2) an allegation that Davoodi's diagrams do not conform to NFPA 921 requirements (SMF p.4 ¶9); (3) an allegation that Davoodi failed to follow NFPA 921 as it relates to appliance fires (SMF p.2-3 ¶5); and (4) an allegation that Davoodi failed to retain key evidence as required by NFPA 921 (SMF p.4-5 ¶10).

With respect to the first area of contention, the Defendants specifically state in their Statement of Undisputed "Facts" that Davoodi took no measurements of the Carvalhal kitchen. (SMF p.4 ¶8). This is a blatant misrepresentation of the actual testimony of Davoodi and Defendants should be admonished for claiming it as an undisputed fact.

While Davoodi was unable to recall certain specific measurements at the time of his deposition, he clearly stated on three separate occasions that he did take measurements of the kitchen. (Ex. G, p.118, 119, 121).

The Defendants further allege that Davoodi failed to adequately document the key characteristics of the kitchen. (SMF p.4 ¶8). However, Davoodi not only took extensive photographs of the kitchen, but he also drafted a diagram indicating a general layout of the first floor of the structure, drafted diagrams indicating the flow of fire based on burn pattern examinations, and took several measurements, including the height of the counter (which Davoodi was able to recall, but which Defendants specifically allege he failed to do.) (Ex. G, p.116-122, 158). Despite the insistence by the Defendants that precise measurements were necessary, NFPA 921 Sec. 15.2.1 states that photographs are the most efficient reminders of what an investigator observed. (Ex. H, p.109).

Further, the Defendants claim that Davoodi took no empirical measurements to determine the location of the water dispenser. (SMF p.4 ¶9). Despite this allegation, it has already been demonstrated that Davoodi took measurements of the kitchen, including the adjacent countertop. (Ex. G, p.116-122, 158). In addition, Davoodi reviewed fire department photographs depicting the water dispenser in place, and interviewed the Carvalhals and fire department personnel regarding the location of the water dispenser. (Ex. G p.12S, 128).

The Defendants have also alleged that Davoodi's diagrams do not conform to NFPA 921 requirements in that they are not drawn to scale and contain spatial inaccuracies. Davoodi appended to his report a simplified floor plan of the first floor of the premises (Ex. I) as well as nine diagrams depicting fire pathways (Ex. J). NFPA 921 Sec. 15.4

states that various techniques may be used to prepare drawings, that they are intended to be used to support the investigator's memory, and that it is the investigator's decision as to the level of detail included in the drawings. (Ex. H, p.116). With respect to the simplified floor plan, Davoodi acknowledges that it is not to scale, but that it was only intended to demonstrate a general area of origin within the structure. (Ex. I, Ex. G, p.116). With respect to the drawing's intended purpose, the drawing is accurate, and there was no need to include exact measurements to achieve this stated purpose. With respect to the nine diagrams depicting fire pathways, NFPA 921 Sec. 17.2.3 allows for the use of Heat and Flame Vector Diagrams which allow the investigator, through the use of arrows, to note his interpretation of the direction of heat or flame spread based on the fire patterns. (Ex. H, p.132). NFPA 921 does not require that these vector diagrams be drafted using specialized software or that they contain precise spatial measurements, despite the Defendants contention that they must. (Ex. H, p. 132).

The Defendants also contend that Davoodi failed to follow NFPA 921 requirements for the investigation of appliance fires. (SMF, p.2-3 ¶5). This allegation is completely misplaced. When Davoodi was assigned this investigation, he was not told anything about the potential cause of the fire. (Ex. G, p.23). When Davoodi began his examination of the fire scene, he had received no information as to the potential cause of the fire and the water dispenser had been previously removed by the fire department. (Ex. G, p.77). Davoodi subsequently determined the area of origin based on fire patterns with no knowledge that the water dispenser was previously present at that location. (Ex. G, p.85). The Defendants contend that NFPA 921 requires that until an area of origin is determined, there should not be an exploration of an appliance as the source of the fire.

(SMF, p.2-3 ¶5.) Based on the foregoing, the Plaintiff is dumbfounded as to how Davoodi violated this guideline. The Defendants contend that NFPA 921 holds that in determining whether an appliance is the cause of the fire, location within the area of origin is important and that measurements should be taken to establish that location. (SMF, p.2-3 ¶5). Again, it is unclear what Davoodi did erroneously as he determined that the water dispenser was in the area of origin by taking measurements of the kitchen, including the adjacent countertop, reviewing fire department photographs depicting the water dispenser in place, and interviewing the Carvalhals and fire department personnel regarding the location of the water dispenser. (Ex. G, p.116-125, 128).

The Defendants' final attack on Davoodi's methodology is their allegation that he failed to retain all physical evidence that could reasonably be considered potential causes of the fire. (SMF, p.5 - 10). NFPA 921 Sec. 16.2.2 states that the decision as to what evidence to collect from a fire scene rests with the fire investigator. (Ex. H, p.122). Nowhere in NFPA 921 is there a suggestion that the fire investigator must retain evidence not located within his determined area of origin. Davoodi was clear that his area of origin was very small and the only potential ignition source within that area of origin was the water dispenser. (Ex. G, p.130). Despite this determination, Davoodi went above and beyond the requirements of NFPA 921 by retaining an electric mixer and wall outlet that were "near" (within 30 inches) the area of origin. (Ex. G, p.132, 141). The Defendants emphasize that Davoodi retained the wall outlet despite not knowing if it was the outlet in which the water dispenser was plugged into at the time of the fire. (SMF p. 5 -10). However, this is another mischaracterization of the facts, as Davoodi was able to testify that it was the outlet the water dispenser was plugged into after reviewing additional

materials. (Ex. G, p.193). The Defendants claim that the fire department photographs depict a "coffeemaker" located on the countertop by the mixer, and that Davoodi failed to retain it as evidence. (SMF p.5 -l 0). It should be noted that the item was identified as a "coffeepot" by defense counsel only, Davoodi was unsure what it was. (Ex. G, p.170). Further, Davoodi testified that not only was the coffeepot not present at the time of his inspection, but that it was not otherwise in the area of the fire origin. (Ex. G, p.17l, 194). Finally, the Defendants criticize Davoodi's investigation because, they allege, he not only failed to retain other potential ignition sources, but failed to perform a detailed analysis of all the other items in the kitchen, including the gas range. (SMF p.5-6 ¶l0-11). This is a common theme throughout the Defendants' motion, as they constantly criticize the Plaintiffs' experts for failing to measure and evaluate each and every detail, whether or not relevant to the fire cause and origin. Davoodi was 100% confident he accurately determined the area of origin and evaluated completely all items in and near that area. (Ex. G, p.33-34, 132, 141). The Defendants have failed to cite to any publication which requires fire investigators to evaluate items outside the area of origin. NFPA 921 does not require as much, and Davoodi testified that he did not believe it would have made sense for him to check everything. (Ex. G, p.139).

B. <u>Ara Nalbandian's, P.E. knowledge, skill, experience, training and education.</u>

Ara Nalbandian (hereinafter "Nalbandian") received his Bachelor of Science and his Masters in Mechanical Engineering and Industrial Management from the University of Rhode Island. Nalbandian started as a plant engineer with UNIROYAL and soon thereafter began a career as an Engineering Manager for the Pipe Fittings Products Department, Research, Development and Engineering at ITT Grineel Corporation. In

1973, Nalbandian received the "Young Engineer of the Year" Award for the State of Rhode Island. Currently, Nalbandian is the Vice President of Mechanical Engineering at Thielsch Engineering, Inc. Nalbandian holds four memberships and affiliations within his body of work. He is also an active participant in various Standard and Code writing organizations, while also serving on several of those committees. Nalbandian is a Registered Professional Engineer in six states has been in this line of work for forty-one years.

C. Michael Cooney's knowledge, skill, experience, training and education.

Michael Cooney (hereinafter "Cooney") received his Bachelor of Science in Metallurgical Engineering from the University of Notre Dame and is a certified Engineer-in-Training (EIT) in New York State. Cooney has conducted many real life assessments of condenser water, chilled water, water waste and domestic water piping systems. He is involved in the performance of metallurgical examinations, condition assessment and failure analysis of pressure vessels, tanks, piping, fans, boilers and paper machines. Cooney also has extensive laboratory experience with metallographic techniques utilized in the evaluations and failure analyses of metallic and nonmetallic materials including optical and scanning electron microscopy (SEM), energy dispersive spectroscopy (EDS), x-ray differation (XRF) and mechanical testing for the determination of tensile strength, toughness, fatigue, creep and other metal properties. Cooney is a certified Welding Inspector (CWI) through the American Welding Society (AWS) and is a member of the National Association of Corrosion Engineers and the American Welding Society.

D. The testimony of Ara Nalbandian, P.E. and Michael Cooney should be held admissible for their knowledge, skill, experience, training and education.[7]

The Defendants have made a blanket statement that Nalbandian and Cooney lack sufficient qualifications to render an opinion as to an alleged defect in the Defendants' product. The Defendants have not, however, presented any background on Nalbandian or Cooney to support that vague assertion.

Prior to examining the Defendants' allegations regarding Nalbandian and Cooney's opinions and methodology, it is important to understand their basic opinion as it relates to the cause of the Carvalhal fire.

Per their report, Nalbandian and Cooney determined that the stainless steel hot water storage tank was subject to cracking and corrosion pitting resulting from the presence of high chloride levels in the insulation attached to the outer surface of the tank. (Ex. B, Thielsch report, p.8-9). They further determined that the cracking and corrosion to the tank resulted in corrosion deposits on the two heat sensors attached to the exterior surface of the tank, which caused the heat sensors to provide a proper temperature response, which resulted in the heater coil overheating causing localized burning. (Ex. B, p.8-9). Nalbandian and Cooney expanded upon this opinion at their depositions and acknowledged that due to the destruction caused by the fire, they cannot precisely state that the heater coil was the ignition source of the fire, but burn patterns dictate that it was some component of the heating subsystem within the water dispenser, which included the insulated wires, wire connections and thermal switches. (Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107). Despite the electrical system

[7] It should be noted that Ara Nalbandian, P.E. and Micahel Cooney delivered a joint opinion which incorporates expert opinion from each based on their particular specialties. Based on the collaborative nature of the opinion, it is important to discuss both experts jointly.

being the ignition source, it is not their opinion that the electrical system was defectively designed. Rather, it is their opinion that the design defect of placing a high chloride content insulation against the stainless steel tank caused the tank to crack and corrode allowing water and corrosion to escape and come into contact with the electrical heating subsystem which caused the same to malfunction and overheat igniting plastic within the water dispenser. (Ex. K, p.124; Ex. L, p.195-196).

With respect to their methodology, Nalbandian attended a visual examination of the water cooler at the office of the Rhode Island State Fire Marshal on May 7, 2004. (Ex. K, p.55). At that point, Nalbandian determined that destructive testing was necessary as the source of the fire was not evident from this initial visual examination. (Ex. B, p.3). On June 29, 2004, the water dispenser was transported to Thielsch Engineering where destructive testing occurred. (Ex. K, p.l79). Nalbandian enlisted the aid of Cooney to assist with the examination and inspection. (Ex. K, p.179). The water dispenser was disassembled to remove the hot and cold water assemblies, and the insulation covering the hot water tank was removed. (Ex. B, p.3). Beyond an exhaustive visual examination of the various components, the burn patterns and damage, an energy dispersive x-ray spectroscopy was performed on portions of the stainless steel tank and insulation to determine their elemental composition. (Ex. B, p.5). Further, pieces of the stainless steel tank were removed and subject to varying levels of magnification. (Ex. B, p.6). From these examinations and tests, as well as their review of literature regarding stress cracking and fire investigation handbooks, Nalbandian and Cooney arrived at the opinions expressed in the preceding paragraph. (Ex. K, p.37-38, 44).

As with their attack on Davoodi, the Defendants focus their allegations against Nalbadian and Cooney not on some alleged defect in the testing and examination that they did perform, but rather on extraneous variables and factors that the Defendants claim should have been tested. The Defendants allege that Nalbandian and Cooney failed to adequately evaluate the heating coil and temperature switches on the damaged water dispenser, and failed to identify the plastic components within the water dispenser to determine their ignition temperatures. (SMF p.7-9 ¶15-l8). The Defendants gloss over the testimony that the components were too fire damaged to adequately test and claim that exemplar units should have been tested to determine this information. (Ex. K, p. 136; Ex. L, p.100-107, 147; SMF p.7-9 ¶15-18). Further, the Defendants claim that it is significant that neither Nalbandian nor Cooney were able to precisely describe the inner mechanics of the heat sensors used on the damaged water dispenser, ignoring testimony from both indicating that they were familiar with how such sensors operate. (SMF p.7-8, ¶15-17; Ex. K, p.155; Ex. L, p.145). Indeed, the Defendants' focus on testing of the heater coil and temperature sensors is misplaced in light of Nalbandian and Cooney's testimony that it was one of the components of the electrical subsystem that malfunctioned and overheated, not necessarily the heater coil or temperature sensors. (Ex. K, p.126-127, 136, 146, 176; Ex. L, p.100-107).

The focal point of the Defendants' attack on Nalbandian and Cooney relies on its interpretation of the experts' opinion as it relates to the scientific principle of the “fire triangle.” As correctly noted by the Defendants, for fire to occur, three factors must be present: oxygen, fuel and energy sufficient to ignite the fuel. The presence of oxygen is not an issue in this case. With respect to the remaining two factors, the Defendants

incorrectly argue that Nalbandian and Cooney are unable to prove to any degree of scientific certainty what material served as the fuel source and how that fuel was ignited. Indeed, the Defendants argument reveals its misunderstanding of materials performance when exposed to corrosive environments and fires.

Burn patterns trace the origin of the fire to the hot water heating system within the water dispenser. (Ex. K, p.83-91). While the Defendants may contest this fact, Davoodi was of the identical opinion. (Ex. G, p.79). Based on this determination, the fuel and energy sources become obvious. In that area of origin were numerous plastic combustibles including insulation wire and foam tube insulation. Nalbandian and Cooney's clearly testified that it was these plastics that were the first fuel ignited. (Ex. K, p.153; Ex. L, p.195-l96). It is of little consequence which type of plastic these were comprised of: because they all eventually heated to the point of ignition. With respect to the energy source which ignited the plastics, the only available energy source was the electrical heating system, which included the heater coil, insulated wires, wire connections and thermal switches. (Ex. K, p.126-l27, 136, 146, 176; Ex. L, p.100-l07). As mentioned previously, the destruction to the internal components was too great to make a precise determination as to which electrical component malfunction, but it is clear that it happened. (Ex. K, p. 136; Ex. L, p.100-107, 147). Because the precise failure is unable to be determined due to the fire damage, testing of the heater coil, temperature sensors or components in the exemplar unit would not have yielded practical results. Despite being unable to determine the precise electrical malfunction, Nalbandian and Cooney did determine the design defect which caused the electrical system malfunctioned. As stated previously, the use of chloride rich insulation for the stainless

steel tank caused the tank to crack and corrode releasing water and corrosion onto the heating subsystem overwhelming it to the point of malfunction. (Ex. B, p.9, Ex. K, p.146, 176). It is a general engineering proposition that electrical components exposed to moisture and corrosion will malfunction and can create conditions for overheating.

E. A preliminary hearing would be a waste of judicial resources due to the previously outlined expert qualifications.

A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: ***"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."*** *Daubert*, 509 U.S. at 595. (emphasis added).

Further, as the Ninth Circuit has determined, "although the [*Daubert*] Court stated that the inquiry is a 'preliminary' one, to be made 'at the outset,' this does not mean that it must be made in a separate, pretrial hearing, outside the presence of the jury." *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592) (finding voir dire of expert in presence of jury to be permissible under *Daubert*); see also *United States v. Nichols*, 169 F.3d 1255, 1262-1264 (10th Cir. 1999) (trial court has discretion not to hold pretrial evidentiary reliability hearing in carrying out its gate-keeping function).

Moreover, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert. *See Kumho,* 119 S.Ct.1167, 1176 (1999)

(noting that the trial judge has the discretion "both to avoid unnecessary reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

Also of is importance are the Advisory Committee's Note's to Fed. R. Evid. 104, which acknowledges that "[a] great deal must be left to the discretion of the judge who will act as the interests of justice require." Here, "convening a nonjury evidentiary hearing would be a colossal waste of everyone's time and money" when the Plaintiffs' experts' knowledge, skill, experience, training and education far exceed any evidentiary threshold that they may need to cross in order to testify. (quoting Justice Flanders, dissenting, in *Quattrocchi*, 681 A.2d at 889.)

## CONCLUSION

Based upon the foregoing facts and case law, the Defendants' are not entitled to summary judgment for the foregoing reasons: 1) Defendants' motion is procedurally premature; 2) the Plaintiffs' experts' are well qualified to provide reliable testimony in assisting the trier of fact, and 3) there is a genuine issue of material fact as to whether the watercooler in question was the proximate cause of the fire that destroyed the Plaintiff's home. The Plaintiff prays that this Honorable Court dismiss the Defendants' motion for good and sufficient cause.

Respectfully submitted,
Plaintiff,
By and Through Her Attorneys,

/s/ Robert D'Amico, II, Esq.
/s/ Mark W. Dana, Esq.

Robert A. D'Amico, II, Esq. #4593
Mark W. Dana, Esq. #4150
**D'AMICO · BURCHFIELD, LLP**
536 Atwells Avenue
Providence, RI 02909
Main 401-454-1212
Fax 401-454-1233
rad@dblawri.com
mwd@dblawri.com

**CERTIFICATE OF ELECTRONIC SERVICE**

I, the undersigned, hereby certify that a true and correct copy of the above and foregoing was transmitted electronically to the following attorney(s) of record, on this 25th day of June, 2007.

Dominick W. Savaiano, Esq.
Rodd E. Elges, Esq.
CLAUSEN MILLER, P.C.
10 South LaSalle Street
Chicago, IL 60603-1098
relges@clauson.com

Joseph-Anthony DiMaio, Esq.
McKennon & Harwood
1168 Newport Avenue
Pawtucket, RI 02861
contact@mckinnonharwood.com

Erik Loftus
Law Offices of Stuart Blackburn
Two Concorde Way
PO Box 608
Windsor Locks, CT 06096
eloftus@sbcglobal.net

Richard Ari Van Tienhoven, Esq.
Van Tienhoven & Cotter, Ltd.
312 South Main Street
Providence, RI 02903
ravt.ksc@conversent.net

Patrick A. Sweeney