# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND
C.A. NO. [illegible]

---

THE HARTFORD INSURANCE COMPANY, as Subrogee of ALBERTO CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

UNITED STATES DISTRICT COURT
OF RHODE ISLAND
C.A. NO. 07-002 S

---

EUGENIA CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

DEPOSITION OF HOSSEIN DAVOODI, PE, taken on behalf of the Defendant at the offices of Dunn & Goudreau Court Reporting Services, Inc., One State Street, Boston, Massachusetts, on Friday, April 13, 2007, commencing at 10:15 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
(617)742-6900

Page 2

APPEARANCES:

ROBERT D'AMICO, II, ESQ.
D'Amico-Burchfield, LLP
536 Atwells Avenue
Providence, RI 02909
T(401)454-1217
F(401)454-1233
rad@dblawri.com
Represents Alberto Carvalhal and Eugenia Carvalhal

ERIK LOFTUS, ESQ.
Law Office of Stuart Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096-0608
(860)292-1116
eloftus@sbcglobal.net
Represents The Hartford Insurance Company

RODD E. ELGES, ESQ.
Clausen Miller, P.C.
10 South LaSalle Street
Chicago, IL 60603
T(312)855-1010
F(312)606-7777
Represents General Electric Company and Midea, USA, Inc.

Page 3

INDEX

| WITNESS | DIRECT | REDIRECT | CROSS |
|---|---|---|---|
| HOSSEIN DAVOODI | | | |
| By Mr. Elges | 4 | 195 | |
| By Mr. Loftus | | | 189 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 15 | Disclosure of Expert Witness | 11 |
| 16 | Bates H00512-HO0609 | 11 |
| 17 | Evidence Transmittal Form | 166 |
| 18 | Email | 171 |

Attorney Elges retained the exhibits

Page 4

PROCEEDINGS

(Whereupon the witness was sworn.)

DIRECT EXAMINATION

Q (By Mr. Elges) Would you please state your full name for the record.
A Hossein Davoodi.
Q Have you ever been known by any other names?
A My family calls me Saeed.
Q Nickname?
A Yep.
Q I'm going to call you Mr. Davoodi this morning for your deposition. My name is Elges; it's been mispronounced countless ways. If I mispronounce your name today I apologize.
Let the record reflect this will be the discovery deposition of Mr. Davoodi taken pursuant to notice in agreement with the parties.
Let the record further reflect that all parties in this lawsuit are now represented by counsel here this morning. It's 10:15 a.m. Eastern time on Friday, April 13th.
Let the record further reflect that Mr. Davoodi's deposition this morning will be taken

Page 37

there was a defective product issue?
A Again, one more -- there is one more I can recall right now, which is the case of little transformers that you use for phones; you hook them up to the line and use them for the phone.
Q You're talking about an electrical converter that converts AC into current that can be used by a phone; true?
A Something like that.
Q Any other product liability cases you can remember being involved in as an investigator?
A I've done more product liability cases but I can't recall specifically as a fire investigator. But I have done one as a mechanical engineer that I can recall.
Q What was that case about?
A That case was about a faulty -- actually, it was not a faulty -- that was about a double check valve. Double check valve that apparently malfunctioned and basically screwed up the entire pump house.
Q That was for steam, or water, or what was that for?
A That was water damage, yes.

Page 38

Q So we've got the toaster oven, the telephone adapter, we've got the fuse box, we've got the double check valve?
A These are the ones I remember right now.
Q The double check valve, that didn't have anything to do with a fire; true?
A No, it didn't.
Q So if you remember any other instances where you testified regarding the cause and origin of a fire regarding a defective product during the course of your deposition today, let me know.
A Okay.
Q As far as those first three we talked about where there was a fire involved, my understanding of your work as an expert on the issue of product defects occurred while you were living in Canada; true?
A I'm sorry, can you repeat that?
Q You were prior involved in origin cause and origin investigations regarding defective products, that was while you were living in Canada?
A Pre-'98.
Q Before '98?
A '98 I moved to the States.

Page 39

Q It was over 10 years ago?
A Some of them, yes.
Q Describe for me your educational, professional, or other background that qualifies you to rendered any opinions regarding the alleged defect in this case.
A Well, again, I'm giving you my opinion as a fire investigator that fire started -- where fire originated. As what kind of defect that product has that was the source of the -- the ignition source, I haven't rendered any opinion on that.
Q Okay. So as I understand it, as you sit here today what you're going to render opinions about is what you saw at the Carvalhal household as far as the origin of the fire?
A Not just that but that was -- I relied on that to form my opinion, but that wasn't the whole thing.
Q Okay. Just so I'm clear, I'm an attorney, what do I know? My understanding is when it comes to cause and origin investigations, it's called cause and origin because it's two separate things; right?
A Yeah.

Page 40

Q You have to establish the origin of the fire --
A First.
Q If you can't establish the origin you can't establish the cause?
A That's correct.
Q As far as the origin opinions regarding this case, that has nothing to do with the alleged defects in the water cooler; true?
A Well, the origin of the fire, that's as far as my limited expertise is the fire originated here. What was the ignition source and why the ignition source was there, I haven't rendered an opinion on that. I just said the fire started at this location.
Q When we say "this location," my understanding is that you have used your expertise to establish the geographical physical location in the Carvalhal kitchen where this fire originated; true?
A In the kitchen and in the water cooler.
Q Now, that's where I get a little bit fuzzy about the opinions you're going to render in this case. You're saying that you will testify -- you

will render opinions to Mr. Davoodi's level of certainty, whatever that may be, establishing where in the kitchen this fire started; true?
A That's correct.
Q And you also rendered opinions to Mr. Davoodi's level of certainty that there was a fire inside the water cooler; is that true?
A I rendered an opinion that where in the water cooler fire started.
Q But as far as why the water cooler ignited, you're not going to render any opinions about that; true?
A I have not, yes.
Q So all you're going to say is there was a fire in the Carvalhal's kitchen in this particular corner and there was a fire inside of the water cooler that was sitting there; true?
A That's correct.
Q You're not going to say this is why the water cooler caught fire; true?
A That's correct.
Q You're not going to render an opinion saying this is the defect in the water cooler that caused it to catch fire; true?



A That's correct.
Q You don't have any product liability opinions in this case?
A No, I don't.
Q That will make your deposition much shorter. I thank you for kind of walking me through it. Having said that, let me ask one or two more questions. I think we talked about what you remember doing product liability analysis on; do you remember?
A Yes.
Q As far as your background in that aspect of what you do, you don't remember doing such a product liability analysis involving another water cooler other than this case; true?
A I have not done any other water cooler cases.
Q This is your first water cooler case as either a cause and origin expert? I'll object to my own question -- strike it. To avoid the compound nature of what I'm going to ask you, I'll ask a better question. As a cause and origin investigator, you have not investigated another fire involving a water cooler; true?



A To my knowledge. I don't recall any.
Q As far as your other work where you were involved rendering opinions regarding product defects, you don't ever remember being involved in a case where you rendered opinions about a product defect in a water cooler; right?
A That is correct.
THE WITNESS: Can we take a little break?
MR. ELGES: Absolutely. Take a short one.
(Off the record.)
MR. ELGES: (On the record.)
Q (By Mr. Elges) I want to revisit your CV real quickly, move on with this and get on with your opinions in this case. You're currently employed by the National Fire Protection Association; true?
A That is correct.
Q They issue guidelines regarding the work that you do as a fire investigator?
A One of their guidelines is -- their business is the fire and safety business. And one of their guidelines is NFPA 921, which is like the bible for fire investigators.
Q When you say "bible" -- people rarely use the word "bible." Let me see if I can explore what



you mean by "bible." NFPA 921, those are rules that fire investigators using cause and origins investigations must follow; true?
A Not really. The NFPA 921 is a guide, it's not a standard, but it's full of good information.
Q Your supervisor back in the office in Quincy wouldn't be upset to hear you say it was only a guide?
A They shouldn't be, that's my opinion.
Q Let me ask you about your work for your current employer. Are you involved in the amendment, development, revision of 921?
A No.
Q So if you come to court you're not going to come in and say, I work for NFPA and that means that I have particular expertise in 921? You're not going to say that?
A No. No. My knowledge of 921 has nothing to do with me working at NFPA.
Q So the fact that you work for that association doesn't give you special qualifications or authority to speak about 921?
A No.
Q What do you do for the association,

Page 73

generation of your report or your investigation in this case?
A No.
Q It was just you from Crawford Investigation?
A That's correct.
Q No one else involved?
A Not that I can recall.
Q Before we leave Page 15, file status notes that the file is being closed. Do you see that on Page 15, first line there?
A Yeah. Okay.
Q To your knowledge, your file at Crawford for the Carvalhal fire remained closed until you were contacted for your deposition; true?
A Until I was contacted. Mr. Loftus contacted me, I think it was a couple of months ago but I don't remember if it discussed, the position at the time. He just wanted to meet with me. I guess I don't remember very good.
Q Fair to say that until -- from the date that this report was issued until 2007 Crawford Investigations' file and your file, for that matter, remained closed?

Page 74

A As far as I knew, yes.
Q I need to take you a step back and ask you about your background and experience. Have you ever been involved in the design and manufacture of a water dispenser?
A No.
Q Have you ever been involved in the design or manufacture of any product?
A I can't recall but I would say, no.
Q You were involved in the destructive testing of this unit?
A Yes.
Q Was your involvement with the destructive testing with the water cooler an issue in this case the first time you disassembled and examined a water dispenser?
A No.
Q Tell me the other occasions where you disassembled and examined a water dispenser.
A Well, after the fire I disassembled two fire -- two water dispensers, water coolers to learn from them.
Q But getting back to my question -- I think you answered my question and you've clarified your

Page 75

background and experience so let me ask you another question. Other than the three water coolers that you disassembled and examined in this case, have you ever, for any reason, disassembled or examined any other water cooler?
A No, I have not.
Q I'm going to ask you some questions about what you did in this case, and I think most of your work was documented in the written report that we previously identified as your report dated September 10th, 2004.
A Okay.
Q Other than receiving a phone call from John, whose last name I'm not going to mispronounce --
A Pflanz.
Q -- did you do any work prior to your arrival to conduct your on-site visit on March 3rd, 2004?
A Prior to the site investigation did I do any work on this case?
Q Yes, sir.
A No. I just generated the worksheet and, no. I would say no.

Page 76

Q When you say -- When you say "worksheet," is that something that's in your three-ring binder file or I have a copy?
A I saw a copy of it I think in one of the stuff you gave me but it's not in the report.
Q What does the worksheet have on it?
A The name of -- the file number, the name of the person that assigned -- gave us the assignment, and the contact number, the address of the place that was -- I guess, caught fire. Yeah, that's it.
Q All right. Just for the record, that's H515. It's -- is it a one-page document?
A One page.
Q It's a one-page document entitled "Acknowledgement investigation services." It doesn't contain much information at all. Other than that assignment sheet, do you recall being provided with any other information either verbally or written form --
A I don't recall.
Q -- prior to arriving to do your site inspection on March 3rd, 2004?
A I would say no.

Q So you received the assignment, you're told to do a cause and origin investigation at this address? True?
A That's correct.
Q You don't recall receiving any additional instructions regarding what the potential causes of this fire was before you arrived on scene?
A That's correct. I'd rather not know, actually.
Q Why do you say that?
A Because it can influence -- it may influence your judgment. I'd rather not know nothing about other people's reports, or anything like that, or who thinks what started where. I want to form my opinion.
Q That's a keen insight. You recognize the fact that things can influence people's judgments and affect their ability to be objective; correct?
A Correct.
Q Can you think of anything as you sit here today that may impact a fire investigator's ability to remain objective?
A Well, I don't know if it's the same thing but another thing that can effect the investigator's



judgment is fatigue.
Q Anything else?
A Nothing I can recall right now.
Q I'm going to ask you about your site inspection of the Carvalhal household on March 3rd, 2004.
A Hm-hm.
Q It's documented to a certain degree in your written report. I'm going to ask you if you have any independent recollections of doing the site inspection on that day, before we get into the specifics.
A What do you mean, "independent"?
Q What I mean by independently is I remember independently where I slept last night, it's the hotel down the street. No one needs to show me the receipt from the hotel to remind me of what the name was and where it was located. What I'm asking you is this: That when you were initially contacted about this case you might not have had your written report in front of you. When someone mentioned the Carvalhal fire did you have an independent recollection without looking at that report?
A That's correct.



Q Tell me about your independent recollection involving the Carvalhal investigation that you're not relying on your written report in talking about.
A What I recall was that -- well, actually about the original fire, who I saw there, what did I do when I first got there? I don't know. There were a lot of facts I remember.
Q Let's go through all that. What I'd like to do is find out what you remember independently of your report and what you're relying on in your written report in talking about it. What do you remember about the origin of the fire without relying on the report?
A Well, I remember that I traced the fire back to the cooler and I did destructive testing of the cooler, and pinpointed the exact origin of fire. That I remember independently without looking at this.
Q Just so I'm clear because I think we've talked about this before, you're saying that you're going to offer opinions regarding the location in the water cooler where this fire started?
A Yes.



Q You're going to say this is the point of ignition?
A That's correct.
Q But as far as it being defective, why the ignition occurred, you're not going to offer any opinions about that?
A No. That's not my expertise.
Q You say you remembered who else was on the scene when you did your investigation?
A Yes. I met Mr. Carvalhal and Mrs. Carvalhal at first, and I remember a number of the associates of Carvalhal came to the scene and I don't know what they were doing.
Q When you say "associates," do you have any idea who they were?
A I know his son showed up, Peter, I guess. And there were a few other people. I think they were talking about gutting the house because they were waiting for me to finish before they can start gutting the house and start repairing.
Q As far as the people that were going to gut the house, do you know what their names were? Was there a contractor on-site?
A I don't know. The only one I know for

to pinpoint the origin.
Q That explains why, as I understand it, you don't have any opinions regarding whether or not the water cooler in this case was defective; true?
A That's correct.
Q While you don't have an opinion there was a malfunction of the heating unit, you think that was the cause of the fire; true?
A I don't have an opinion of the electrical parts, that if they malfunctioned or not, but again, I was there to pinpoint an origin, which I did. It can be done independently without testing it.
Q So there was no nonelectrical malfunction or defect in Water Cooler No. 1 that caused the fire; true?
MR. D'AMICO: Objection.
MR. LOFTUS: Objection.
Q (By Mr. Elges) Do you understand my question?
A No. Repeat.
Q I asked you opinions about the water coolers in this case and you said to me you weren't going to offer any opinions regarding proper electrical functioning of these water coolers,



regarding a malfunction in the electrical operation of these water coolers? You agreed with that?
A That's correct.
Q But that leaves open the nonelectrical function of the water coolers. And I'm interested to know whether or not you're going to offer an opinion that a nonelectrical function, design or aspect of Water Cooler No. 1 led to this fire.
A Again, I was there to do cause and origin, origin and cause, and after I pinpointed the location of where I think the fire started I'm not -- I won't have an opinion after that as to what caused the malfunction or if it was a malfunction. I do not have an opinion on that.
Q Let me see if I can put a really fine point on what you're saying. You came to the Carvalhal household on March 3rd, 2004, and you were asked to do a cause and origin investigation; true?
A That's correct.
Q You looked at the entire house, and you narrowed the source of the fire, the origin to the kitchen; correct?
A Correct.
Q Then you did more evaluation and you



narrowed it to one particular corner of the kitchen; correct?
A Correct.
Q Then you narrowed it to a water cooler which was sitting in the corner as the origin of the fire?
A Not at that date. By the time I went to the site the fire marshal has already taken the water cooler.
Q Thank you for clarifying that. The water cooler was the cause and origin of the fire on March 3rd, 2004, because the water cooler wasn't there; correct?
A Yeah. I couldn't come up with an opinion, like when I traced the fire demarcations to that corner I just asked Mr. Carvalhal what was here and he told me there was a water cooler, then he gave me some history.
Q Since you bought up Mr. Carvalhal and his history, as you sit here today do you remember outside of what's in your written report about what Mr. Carvalhal told you about the history of the water cooler?
A A number of points. That the bottle of



the water cooler was not the original bottle. He said he has purchased Sunbeam -- it was a Sunbeam replacement bottle with filter system.
Q Did that Sunbeam bottle with the filter play any role in the cause and origin of the fire? Do you have any opinions about that, first?
A That's where the Sunbeam water bottle was when I physically checked the water cooler, it's not in the area of fire origin. So I didn't -- I mean, if it's not in the area of fire origin you're not going to find any cause there.
Q Right. You explained to me before very kindly you were not qualified to render opinions about the electrical working of the water cooler, however, what's still out there and fuzzy for me are nonelectrical functions of the water cooler. Now, inasmuch as the Sunbeam water bottle would have been sitting on top of the filter led to leakage of water into the unit itself.
MR. LOFTUS: Objection.
Q (By Mr. Elges) Do you understand my question?
A I think I do.
Q Did you consider that hypothesis when you

Page 105

Q Under "Risk" it states, "AGE Water Smart hot and cold water dispenser Model GXF05D was the ignition source of the fire." Do you see that?
A Yes.
Q Do you recall what date you reached that conclusion?
A I reached that conclusion after examining all the facts. It wasn't at that date. It wasn't March 3.
Q Your cause and origin or origin and cause summary indicates you relied on witness accounts. What witnesses accounts are you referring to in that paragraph?
A Hm.
Q I know you talked to the Carvalhals.
A Yes.
Q Did you talk to anyone else?
A I don't remember talking to anyone else.
Q There is also a phrase saying "Information currently available," what does that mean?
A Which part are you reading?
Q Line 3 under the subject heading "Origin and cause summary."
A Ninety-three.

Page 106

Q "Witness accounts and information currently available."
A It's that I reached my decision with the information that I have to me, I have available to me.
Q Now, this summary paragraph indicates that the cause of this fire was the ignition of the insulation materials surrounding the heating element in the water dispenser. Do you see that?
A Yes.
Q So it's your opinion that while you don't know how it ignited, the insulation material caught fire?
A The insulation material at that location, yes.
Q How hot did the insulation material have to get to catch fire?
A Well, it's a function of many things. From what kind of plastic we're talking about.
Q What kind of plastic was the insulation material made out of?
A I don't know. It was a foam insulation.
Q Right. So as far as the foam insulation that you believe caught fire in this case, you don't

Page 107

know what its composition is; true?
A That's correct.
Q And unless you know its composition you can't tell me how hot you need to get that foam for it to catch fire; correct?
A That's correct.
Q So let me ask you another question. The heating element that you think was the source of the heat that ignited the insulation of which composition you know not, how hot did that heating element get under normal operating circumstances?
A I don't know.
Q All right. Before I forget, I know you disassembled Water Cooler No. 1 and Water Cooler 2 and 3, but as far as actually testing any of the components in any of those three water coolers, did you do any testing?
A I did not do any functional testing.
Q You didn't plug in or energize the heating element from any of these water coolers?
A That's correct.
Q You don't know how hot they operated under normal circumstances?
A That's correct.

Page 108

Q You don't know what temperatures they can reach if they malfunction?
A That's correct.
Q You don't know how the sensors on the outside of the hot water tank work?
A Which sensors are you talking about?
Q Let me back up and ask you, do you know how the heating element for the water cooler in Units 1 or 2 is energized?
A Did I know if they're energized?
Q Do you know how -- let me take a step back and ask a clearer question. Do you know how the water cooler sensors communicate to the heating element to advise it that it needs to be energized and heat up the water?
A I do not know the details of electrical aspects.
Q You don't know how the sensors on the outside of the water tank determine the temperature of the water inside it; true?
A That's correct.
Q You don't understand how the sensors more specifically on the outside of the water cooler, you don't know how they work in normal circumstances?

Page 113

you tell me what it was made out of?
A Well, a lot of it is steel. As far as the plastic part you're talking about?
Q Yes.
A No, I cannot tell you that.
Q There are many types of plastic?
A Many, many kinds.
Q Every type of plastic has different performance standards?
A That's true.
Q And every type of plastic has different combustible levels?
A That's correct.
Q As far as steel goes, steel is pretty much steel?
A It's not combustible.
Q You don't know the chemical composition of any combustible components that are part and parcel of Unit 1; true?
A I do not know that.
MR. ELGES: Off the record.
MR. ELGES: On the record.
Q (By Mr. Elges) I'm interested to know whether or not you took any notes, did any drawings,

Page 114

made any notations, or have any other information documenting your inspection of the Carvalhal household on March 3rd, 2004, other than the materials that are in front of you now.
A Well, I did have some hand notes, couple of pages.
Q The couple of pages of hand notes, have you had a chance to look at the materials we have before you to see if those hand notes are anywhere in the exhibits that we previously identified.
A I haven't seen them here yet.
Q Can you recall what those hand notes contained what they reflected?
A They wouldn't have anything that's not stated here.
Q Okay. All right. To kind of help things move along here I'm going to let you take the floor and I want you to describe to me how you as a fire investigator approached your inspection on March 3rd, 2004. To the degree you remember independently, you can say what you remember independently. If you need to refer to your report, if that refreshes your recollection, that's fine too. I want to know how you came to conclude by the

Page 115

time you left that house on March 3rd, 2004, that the fire in this instance originated in that particular corner of the Carvalhal kitchen. So however you want to explain it for me, I'm going to let you to that.
A Okay. On a typical -- I mean, any fire scene you go to, in general, you go from the least damaged area, you try to follow the traces to go to the most damaged area. So after I was in the house I first checked the first floor -- sorry, the basement and the second floor, and relative to the first floor they weren't damaged at all; it was mostly smoke damage. When following the patterns that was visible from -- I made a conclusion that the fire was on the first floor. Being in the first floor just by looking at the fire patterns at the two door openings of the kitchen -- there is one door opening into the hall and one into the dining room, which would be the one in the living room is south, the one in the dining room would be west -- that the fire was coming out of those two door openings from the kitchen into those areas.
Q I'm going to interrupt real quick because I've never been to the Carvalhal household. And to

Page 116

inform me and members of the jury and maybe the other attorneys here, I'm going to ask you to look at H348. Do you recognize that document?
A Yes, I did that.
Q And I'm going to stand close to you so we can both look at it without me looking upside down. Would it be fair to say that that particular document is a diagram of the first floor of the Carvalhal household that you generated based upon your inspection?
A Yeah. Grossly simplified one, yeah.
Q When you say "grossly simplified," one of the things that's grossly simplified is it's not to scale?
A That's correct also.
Q When I say "it's not to scale," there are no dimensions, measurements, or anything else reflected in that diagram; correct?
A You're correct. That was to show the relative area of fire origin.
Q Okay. Just to put a finer point on it, can you do me a favor and put a "K" in the center of the kitchen as it's depicted on that particular diagram?

Page 117

A (Witness draws.)
Q So "K" is where the kitchen is depicted on this diagram and your diagram is not intended to indicate that the kitchen at the Carvalhal household represented that proportion of the overall floor space of the first floor?
A That's correct; it's not in scale.
Q No. You were kind enough before to explain to us how the Carvalhal kitchen had two doorways; correct?
A Yes. One to the south and one to the west here.
Q And the diagram doesn't really depict the west door?
A Yeah. Again, this was just for showing the relative location of fire in the house.
Q Okay. And is that the southern door to the kitchen, that's the doorway to what room?
A I would call it the living room.
Q Could you put "LR" right below the area of origin so I can remember which doorway we're talking about. Suffice it to say, that the western doorway off of the kitchen of the Carvalhal household went to the dining room?

Page 118

A That's correct.
Q Can you put "DR" there so I can keep it straight?
A (Witness draws.)
Q Thank you very much. Did you do any other diagrams of the Carvalhal household?
A I did some figures to try to show how the fire pattern developed. But not -- no, I don't have any other floor plans or anything like that.
Q Suffice it to say, you don't have the physical dimensions of the first floor of the Carvalhal house; correct?
A That's correct. Not that I can recall.
Q You don't have the physical dimensions of their kitchen; correct?
A No.
Q You don't know how wide it was or how narrow it was or anything along those lines?
A General habit that I have -- I think I do remember measuring it but I don't remember what the dimensions are.
Q You think you measured the dimensions of the Carvalhal kitchen?
A Yes.

Page 119

Q Do you think you have those measurements here with you today?
A Well, I didn't bring anything with me today.
Q Well, to the degree somewhere out there in space there are dimensions to the Carvalhal kitchen, if you find them after the deposition is concluded I'm going to ask you to give them to Mr. Loftus so he can give it to me. If you think they're here today, let's look for them. I don't think you have documented the dimensions of the Carvalhal kitchen.
A You mean on paper?
Q Yes.
A I can't say yes or no. I remember measuring it.
Q When you measured it did you write it down, the dimensions of the Carvalhal kitchen?
A Generally I would.
Q Did you incorporate the dimensions of the Carvalhals' kitchen into your report dated September 10th, 2004?
A I don't remember if I did or not.
Q You can look for them or Mr. Loftus can look for them or Mr. D'Amico could look for them. If anyone can find the dimensions of the Carvalhal kitchen in any documents they produced by the defendants it would be helpful if they pointed that out to us. We talked about dimensions generally. I want to make sure we covered the waterfront. I'm not only concerned with the width, the horizontal dimensions of the Carvalhals' household. Do you know how high the ceilings were in the Carvalhal kitchen?
A I would say seven and a half to eight.
Q And that's your mental picture estimate? Yes?
A Yes.
Q You don't have any written documentation indicating you took a tape measure or laser device or any other device and measured floor to ceiling in the Carvalhal kitchen; correct?
A Not that I remember.
Q Just to drive a stake through the entire measurement issue, did you find anywhere in these documents any measurements of any of the interior aspects of the Carvalhal kitchen: How high the countertops were, how high the cabinets were, dimensions of anything inside the Carvalhal kitchen?

Page 121

A I don't know -- I don't think there are such numbers in the report.
Q Maybe when we take another break I'll flip through your report again, but my sense is the only dimension -- the only document as part of your cause and origin was the dimensions of the water cooler at issue. Does that sound fair to you?
A Yes. Well, the only dimensions I remember for sure I did are those. I remember measuring the kitchen, actually just length and width; those I remember taking.
Q As you sit here today you don't have those measurements with you; correct?
A No. I forwarded everything to Crawford.
Q Thank you very much to the degree that Crawford has those measurements or any other documents they haven't already produced in this case I'm going to ask that counsel for The Hartford look into it if there are any documents we haven't seen to the degree they preserve any documents we don't have today, we're going to reserve the right to redepose you regarding that newly-found information if it ever becomes necessary. You explained to me before we took a break how you went about narrowing

Page 122

the focus of your site inspection to the Carvalhals' kitchen. You visited the entire house and observed fire damage, smoke damage, and burn patterns which enabled you to narrow in and focus upon the kitchen. Fair to say?
A That's correct.
Q Now, during the process of doing that you took photographs?
A Yes.
Q All right. Other than the photographs, did you take videotapes?
A No, I did not take videotapes.
Q We talked about notes. You think you might have took some notes?
A Yeah, I took notes.
Q We don't have those. Do you remember anything you would have written down that would be on those notes we don't have today?
A Anything that was on those notes should be in the report.
Q You did that one diagram based on your site visit too?
A That's correct.
Q You generated some --

Page 123

A Computer-generated figures.
Q Can you identify the Bates number on that document you're now looking at?
A 349.
Q H349 is an example of a computer depiction of the Carvalhal kitchen?
A That's correct; not in scale.
Q I was going to ask you what computer program did you use to generate those drawings.
A It was a simple one, 3-D something Crawford gave me. When I was finished with them I just gave it back. I don't remember the exact name.
Q Was it Crawford's proprietary software?
A No.
Q It's off the shelf?
A I think it's one of the softwares that comes with the other softwares you buy.
Q Was it designed to depict findings in cause and origin investigations?
A No.
Q Is it like AutoCAD?
A No, it's very basic. AutoCAD is a lot more complicated than it was.
Q Using this simple computer program you

Page 124

generated -- what do you want to call those pictures?
A Figures. I call them figures in the report.
Q How did you go about -- what data did you enter into the computer that led to the generation of the figures that were incorporated into your report?
A I didn't put any data. This program is very simple. All -- you enter, like you said, Box Q, put a counter here. It's very easy. It's not comparable to a program like AutoCAD. It's a program for a really basic. And one application of it, as I recall, on the package for garden.
Q Gardening applications in the software used had to generate the figures in your fire cause and origin report aside, you sit down at the computer, as I understand it, you've got a blank screen, the software pops up, and you have to enter in some information for the program to be able to generate the figures you incorporated in your report. Let me tell you what I think. I don't think you put in the computer program any measurements; true?

and the outlet; right?
A Yes.
Q The microwave oven wasn't in that corner?
A I believe it was under the counter. Not under the counter, over the counter.
Q Over the counter in the southeast corner of the kitchen.
A Somewhere in that area.
Q How about the coffee maker?
A I don't recall.
Q How about the toaster oven?
A That I don't recall either.
Q Do you remember seeing a TV in the kitchen?
A Vaguely. I think there was a TV in the -- on the north side.
Q Of all those electrical appliances, the only one that you took with you to your recollection was the mixer and the outlet; right?
A Those are the ones that I remember.
Q There might have been more. You might have taken the coffee maker with you?
A That's probably.
Q In your report or anywhere else in the



files before you do you show any documentation regarding the evidence that you left the Carvalhal house with on the day you did your investigation?
A It should say what I took. My report should say that.
Q While you're looking through it, I found documentation in the paperwork indicating that you had the mixer?
A Okay.
Q I actually show a transfer chain of custody regarding storage of the mixer and I think my experts have seen the mixer. And I think we've seen the outlet. As far as the coffee maker, the microwave oven, toaster oven --
A I didn't take the microwave that I know.
Q Is there any documentation indicating you took anything else from the scene of the fire?
A Anything that I took from the scene of the fire is documented.
Q That's what I'm getting at. I've got documentation regarding the outlet and the mixer.
A Then that must be it.
Q I've got reference in correspondence indicating that someone thought you had the coffee



maker too. Do you recall retrieving the coffee maker from the Carvalhal kitchen?
A I don't remember.
Q Okay. Now, I think you said that the only other electrical appliance in that corner of the kitchen was the mixer; correct?
A That I remember, yes.
Q Despite the fact you're saying the toaster oven, the coffee maker, and the microwave were not in that corner of the kitchen, you still evaluated those appliances when you were on scene that day; correct?
A I evaluated the appliances that were a little close to where I think or thought the area of origin is. Was for me when I think that the area of origin is in southeast of the kitchen, it makes no sense for me to go check something on the north side. It's not -- the fire patterns dictate that the fire was in another location, it makes no sense to check everything.
Q Your written report indicated that you reevaluated those other items and ruled them out as a ignition source; correct?
A If the report says so. I say, given those



things my report should say that even though not in area of fire origin I checked them.
Q On Page 9 of your report and 9 is in the upper right-hand corner you guys put on, do you see that?
A Yep.
Q What's the Bates number?
A 461.
Q H461 is Page No. 9 of your report. Under "Electrical appliances" it reads as follows: "The electrical appliances that could be readily identified in the kitchen were a coffee maker, microwave, toaster oven, and a mixer"; correct?
A Okay.
Q The last sentence, that subsection reads as follows: "However, all of these items were eliminated as a possible ignition source for this fire." Do you see that?
A Yes.
Q You wrote the report?
A Yes.
Q It reflects what you did on-site?
A Yes.
Q You didn't take any of this evidence, to

Page 141

your recollection, off-site?
A I didn't. Just because I checked them doesn't mean I took them.
Q Explain to me how you evaluated those items in the Carvalhal kitchen that enabled you to rule them out as an ignition source for this fire.
A You look for fire damage and fire pattern and you base your judgment on that.
Q So what you're saying to me, as I understand it, is you looked at those items and your visual evaluation of them enabled you to rule them out as an ignition source in this case?
A That's correct.
Q That's true for all the items listed in that section; correct?
A That's correct.
Q Why did you retain the mixer?
A The mixer was in the corner, the southeast corner right on the counter, right where the water cooler was.
Q So --
A Just because it was close to the area of origin I took it.
Q What you're saying is that as a

Page 142

responsible, competent fire inspector you took with you the mixer because it was close to the area of origin and might warrant further evaluation; correct?
A I took it just because somebody might come -- I was thinking somebody in the future might come and say, Did you check the mixer over here? I did not think it's in the area of fire origin or it had to do anything with the fire.
Q You thought that other investigators interested in determining the cause of this fire might find the mixer valuable as evidence to determine whether or not you could rule the mixer out?
A That's correct.
Q That was important to do, retain all of the evidence that could reasonably be considered a cause of this fire; correct?
A I think so.
Q That's something you're required to do according to the NFPA standard, correct, 921?
MR. LOFTUS: Objection.
Q (By Mr. Elges) Do you know what I'm talking about? Am I using the right acronym?

Page 143

A I'm not sure.
Q We walked about a standard that you did not participate in the development of.
A Again, it's not a standard, it's a guide.
Q NFP?
A A.
Q NFPA 921?
A That's correct.
Q Now, the guideline which you considered 921 to be, the guidelines say it's important to retain, preserve, and protect evidence from a fire scene that may enable someone else to further evaluate the cause and origin?
A That's correct.
Q In deciding to take the outlet and mixer you decided by virtue of their proximity of where you think the fire originated it was important to preserve the evidence?
A That's correct.
Q Did you do any subsequent testing on the mixer?
A No.
Q Did you do any subsequent testing on the outlet?

Page 144

A No.
Q Can you rule out the electrical outlet you retrieved from the Carvalhal kintchen as the cause of the fire?
A Yes.
Q How?
A It was not in the area of origin.
Q Did you consider any other hypothesis regarding the cause and origin of this fire other than the water cooler?
A Besides the water cooler there was no other ignition source in that area as far as I know.
Q Was a garbage can there when you were there?
A No.
Q Do you recall seeing a white garbage can in the photograph?
A There was a garbage can, I think it was in the other side. It was kicked around; it was not in its original place.
Q What makes you say that?
A The way it was sitting there. I think it was tipped over.
Q You didn't test the outlet?

Page 189

CROSS-EXAMINATION
Q (By Mr. Loftus) Good afternoon, Mr. Davoodi. How are you feeling today?
A Not very good.
Q Do you think you're sick?
A I am sick.
Q Did you inform everyone of that during the second break today?
A I think I did.
Q Okay. Can a cause and origin investigation be conducted in a NFPA 921 compliant manner without a site visit?
MR. ELGES: Objection as to form.
A I believe that it is but you need detailed documentation of the scene.
Q (By Mr. Loftus) So, for example, if someone was given photographs and reports of other investigators investigating the scene they could potentially conduct a 921 compliant cause and origination?
MR. ELGES: Objection as to form and complete hypothetical.
A Potential reports, but the reports have to be detailed.

Page 190

Q (By Mr. Loftus) Based on your report and the report of the state fire marshal, do you think there were detailed reports in this matter?
A I would believe so, yeah.
Q And do you believe the photographs taken between yourself and the fire department adequately document the scene?
A Yes. To reach the conclusion, yes. I'm sorry. To reach my conclusion, yes.
Q Can alternative hypotheses regarding cause and origin of fire be ruled out by the photographs, your report, and the fire department report?
A I'm sorry; can you repeat?
Q Based on your report, the fire department report, and all the photographs taken at the scene, can alternative hypotheses or theories as to cause and origin of the fire be ruled out?
MR. ELGES: Objection as to form.
A Yes.
Q (By Mr. Loftus) Just to reiterate what you discussed with Attorney Elges, had you never examined Water Cooler No. 2 or No. 3 would you still have arrived at the same cause and origin opinions which you arrived in this case?

Page 191

A Yes. Examining No. 2 and 3 didn't have anything to do with my -- with me reaching that conclusion.
Q Are you aware of any hose connecting the water cooler to an exterior source?
A No. As far as I know, this was a water cooler that had a water bottle on top of. There was no connection.
Q You previously testified that the day of the inspection, March 3rd, 2004, after your inspection you spoke with Glen Blackburn in order to give him a brief summary of your observations. Are you sure it was Glen Blackburn you spoke with?
MR. ELGES: Objection. Asked and answered.
A No.
Q (By Mr. Loftus) You mentioned the word "client." Who hired Crawford in this instance?
A I believe David Moses, an adjustor with Hartford Insurance.
Q So The Hartford Insurance Company hired you directly?
A Correct.
Q So they were the client in this matter?

Page 192

A That's correct.
Q So is it possible that it wasn't Glen Blackburn that spoke with you but either David Moses or Michael Kowalski?
MR. ELGES: Objection. Assumes facts not in evidence.
A It's possible.
Q (By Mr. Loftus) Do you know if you've ever spoken with Attorney Glen Blackburn regarding this matter?
A I don't recall.
Q Do the guidelines of NFP 921 require a cause and origin investigator to take measurements of the room in which the fire originated?
A Well, in NFPA 921 it says that take the measure, that's one of the things you should do in taking the measurements. However, this is a guideline, again. If taking the measurements would not help, or reach the conclusion, or has no effect in reaching the conclusion there is no need to comply with every word of NFPA 921. It's easy to -- NFP 921, you cannot do everything for -- you shouldn't do everything for every case. Based on the case you should see what you need to do. If

taking measurements wouldn't make any difference, no, you shouldn't do it.

Q In your opinion and experience as a cause and origin investigator, with respect to this case could a thorough cause and origin investigation be completed without taking measurements of the kitchen?

A Yes.

Q With respect to the fire department's report, Paragraph 3 of Bate-stamp H362 halfway into the paragraph it states that there were no electrical receptacles in the area of the cooler with the exception of the outlet that the cooler was plugged into.

A Okay.

Q Based on your observations of the fire scene, and the photographs, and other -- and your report documenting the scene, does that indicate to you that the electrical receptacle that you retrieved and kept from the scene was the receptacle in which the water cooler was plugged into?

MR. ELGES: Objection. Asked and answered. Also to form.

A Yes, it does.



Q (By Mr. Loftus) So based on the fire department's report you can conclusively state that the receptacle you took was the receptacle the cooler was plugged into?

MR. ELGES: Same objection.

A That's correct.

Q (By Mr. Loftus) To your understanding defense counsel agreed to provide payment at the time of your deposition today at deposition?

A Yes.

Q Did he bring a check with him today?

A No. He brought a copy of a check.

Q Now, you discussed a photograph that the fire department took in which it possibly depicts a coffee pot on the counter near the mixer. Would that coffee pot have been in your area of origin?

A It would be close to it but not in the area of origin. Area of origin was in a different elevation.

MR. LOFTUS: Okay. That's all I have.

REDIRECT EXAMINATION

Q (By Mr. Elges) Mr. Davoodi, you were asked questions about your physical condition today. I had no intention of asking you any questions of



something of such a personal nature. Inasmuch as Mr. Loftus has seen fit to inquire into it I'm a afraid I'm going to ask you some questions. Are you taking any medications?

A For the flu?

Q Any medications whatsoever, sir.

A Yes, I do.

Q What medications are you taking?

A Well, is that necessary?

Q I apologize for my need to ask these questions but Mr. Loftus by asking you about having the flu has called into question, as I understand it, your ability to testify this afternoon, so to a degree he's opened the door, I have to walk through it. What medications are you taking today?

A Today I took Paxil and Respiradol and Prevacid and Synthroid and Adderall.

Q Now, were you taking any of those medications during your site inspection of the Carvalhal household?

A No. Well, Synthroid is for my thyroid, yeah.

Q Based upon your knowledge of those medications, your experience with those medications,



and just how you feel, do you feel that the fact that you're taking any of those medications has impacted your ability to provide us with complete, accurate, and true testimony today?

A No.

Q Now, you noted that you're suffering from the flu. My condolences. Unfortunately, I was there myself earlier this year and I know how miserable the flu can be and I appreciate the fact that you sucked it up, for lack of a better way to put it, and come to your deposition despite the fact you have the flu. Do you believe the fact that you have the flu supposedly today affected your ability to give complete, accurate testimony today?

A No.

Q How were you paid to do your site inspection of the Carvalhal household; was it hourly or flat rate?

A I was on salary.

Q It didn't matter if it took you an hour or three hours to do this inspection, as they say, it all pays the same for Mr. Davoodi doing this inspection; correct?

A As for me getting paid, yeah, it doesn't