# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THE HARTFORD INSURANCE COMPANY
as Subrogee of ALBERTO CARVALHAL

vs. C.A. No. 06-362S

GENERAL ELECTRIC COMPANY and
MIDEA USA, INC.

DEPOSITION OF ARA D. NALBANDIAN, P.E., a Witness in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, LLP, 536 Atwells Avenue, Providence, Rhode Island, on May 15, 2007 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF STUART BLACKBURN
(Hartford) BY: ERIK LOFTUS, ESQUIRE
TWO CONCORDE WAY
WINDSOR LOCKS, CT 06096

FOR THE PLAINTIFF......D'AMICO & BURCHFIELD, LLP
(Carvalhal) BY: ROBERT A. D'AMICO, II, ESQ.
536 ATWELLS AVENUE
PROVIDENCE, RI 02909

FOR THE DEFENDANTS.....CLAUSEN MILLER, PC
BY: RODD E. ELGES, ESQUIRE
10 SOUTH LaSALLE STREET
CHICAGO, IL 60603

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Page 10

you've published in that fashion?
A. No, less than five.
Q. So less than five. Of those less than five articles you've published in peer-reviewed journals, do any of those have to do with any of the issues in this case?
A. No.
Q. Now, one of the attachments to Exhibit 19 is your CV. You've seen that, correct?
A. Yes.
Q. Is that a complete, current and accurate version of your CV?
A. It may be -- I see there is one thing over here which is missing, the registration in North Carolina. So there may be another one which is slightly added.
Q. That's the last sentence in this document?
A. Right.
Q. You're also a P.E. where, did you say?
A. North Carolina.
Q. Other than that addition to your CV, do you see anything else here that is now inaccurate, needs to be updated or otherwise supplemented?
A. I can look for that additional, and I'll provide you with the North Carolina and the text

Page 11

that goes along with it, and I'll get it for you.
Q. Would it be fair to say that there are no changes to your CV which relate to your opinions or qualifications to render opinions in this case, true?
A. Yes.
Q. Let me break it down, it was compound. I'm going to have to ask you two different questions. Are there any additional qualifications, education or background and experience that's not reflected in your CV that we have here in front of us today which serves as a foundation for you to render opinions in this case?
A. Experience. There is always more experience that we gain. So between this issue, this addition and the other addition, certainly, it may be additional areas of experience that may be referred to in the body of the resume.
Q. All right. What would those be?
A. Offhand, it's probably more of the areas where I have been involved since then from the engineering investigations that may not appear over here but, in general, they follow the same areas of expertise.
Q. Same question, are there any additional

Page 12

qualifications, education, experience or work that you have done that relate to your opinions in this case that aren't reflected in this CV?
A. I don't believe so.
Q. All right. You attended the University of Rhode Island, correct?
A. Yes.
Q. You received a Bachelor's Degree in mechanical engineering, true?
A. Yes.
Q. What year was that?
A. '64.
Q. Then you went on to get a Master's degree in industrial management; true?
A. Yes.
Q. What year was that?
A. '69.
Q. Are you relying upon your Master's Degree in rendering opinions in this case?
A. I rely on my education in total, and that includes that Master's Degree also.
Q. Is there any particular aspect of either your Bachelor's studies or Master's Degree work at the University of Rhode Island which impacts or forms your opinions in the Carvalhal case?

Page 13

A. That's my basic fundamental education, and the engineering field and the materials that gives me the basis for that.
Q. You have -- you're a professional engineer and mechanical engineer, correct?
A. Yes.
Q. That's current in Rhode Island?
A. I'm a professional engineer in Rhode Island but we don't have a classification at the time when we receive it.
Q. Has your license as a professional engineer been restricted, suspended, revoked in any state, ever?
A. No.
Q. You're not an electrical engineer, correct?
A. Yes.
Q. Are you an electrical engineer?
A. No.
Q. You don't have a list of cases that you testified in?
A. Yes, I have.
Q. Can I have that?
(DOCUMENT PRODUCED)
Q. I've just been tendered a one-page listing of your prior deposition and trial testimony. When this was generated -- it was revised in January of this

ruptured and caused environmental damage.
Q. Were you plaintiff's or defense expert?
A. Let me see, who was the plaintiff and who was the defense? I think plaintiff.
Q. That didn't involve electrical failure, true, that case?
A. It involves electrical system failures, but somehow we take the system as part of the case, but the failed component is the one that was the subject of interest at the time.
Q. Did electrical failure cause that accident to happen?
A. I believe so.
Q. I found a posting for you on morelaw.com; are you aware of any other Internet sites where your name and/or qualifications are set forth?
A. We are on --
Q. Let me interject. I'm more interested in you rather than your firm. So if you can restrict your answer to Internet sites where you personally are held out as an expert for litigation purposes, that will be helpful.
A. That's the only place I think we are listed, and myself is listed on that website as far as expert witness.



Q. Drawing back on your 30 years -- you've been an expert witness for about 30 years; true?
A. Yes.
Q. When I say expert witness, during your deposition today, when I use that term, I'm talking about an expert who gives opinions in this case like this for litigation purposes. Do you understand what I'm getting at?
A. Yes.
Q. Now, as you're drawing back on your history as an expert witness, what percentage of time are you retained to work on behalf of a plaintiff?
A. There's no specific percentage, but it would be, basically, 50/50.
Q. So, you're saying that 50 percent of the time you and your firm work on cases on behalf of plaintiffs and the other half of the time, of course, you work on behalf of defendants, I guess; true?
A. Yes.
Q. Have you ever been barred as a witness in any case? Has the court ever said, Mr. Nalbandian's testimony is not coming in?
A. No.
Q. Ever?



A. That's right.
Q. How much annually do you earn as an expert witness for litigation purposes?
A. Not much. It's to the point where we don't have -- the litigation work is a very small percentage, 10 to 15 percent.
Q. Over the past five years or so?
A. Yes.
Q. So you personally -- you would attribute 10 to 15 percent of your overall income to work as an expert witness; true?
A. Yes.
Q. All right. What would that be?
THE WITNESS: In what sense?
Q. How much do you make annually as an expert witness doing what you're doing here today?
A. I don't have a specific number. I have made kind of a quantified number.
Q. You can't give me an estimate as you sit here today?
A. That's right.
Q. It could be $100, it could be $1 million?
A. Well, not that million dollars, no.
Q. Someone has got a Ferrari out in the driveway here.



A. It must be somebody else's.
MR. D'AMICO: It's a Lamborghini, and it's not mine.
Q. It's not yours, I take it?
A. That's right.
MR. ELGES: I just wanted to make sure I didn't miss the boat when I should have went to engineering school.
THE WITNESS: Well, we always discuss that, whether we should go both ways.
Q. What do you do with the rest of your time. You said 10 to 15 percent is working as an expert in litigation like this. What do you do when you're not working as an expert for Thielsch?
A. As you know, Thielsch Engineering Services do a lot of engineering inspections, condition assessment, engineering support to many clients, whether they are industrial concerns, commercial concerns or attorneys that they have certain needs that are not litigation.
Q. Have you ever done any work designing water dispensers?
THE WITNESS: Water dispensers?
MR. ELGES: Yes, sir.
A. No.

Q. And just so we're all on the same page, when I talk about -- you understand that the subject of this litigation is a water dispenser, true; do you understand that?
A. Correct.
Q. When I say water dispenser, I'm talking about the type of freestanding residential hot water/cold water dispensing unit that was at the Carvalhals' house on the day of the fire; we agree on that?
A. Yes.
Q. You've never designed a water dispenser like that, true?
A. That's right.
Q. Have you ever designed anything similar to that?
A. Yes. We have designed water heaters.
Q. Tell me about the water heaters that you've designed?
A. Water heaters are basically heat-transferred exchangers, what we call unit heaters, that are designed to do space heating. They use hot water to be -- or you design heat exchangers, they are also heaters. There are many ways of designing something that heats up, cools down. Those are the things that we have done in the past.
Q. Let me see if I can get a better understanding of



what you're talking about. Have you ever designed a water heater for residential use?
A. Yes.
Q. Tell me about the water heater that you designed for residential use.
A. It's basically a boiler, which is used in the residential system that heats up water.
Q. All right. Is that water used for ambient heat or is it used for opening the spigot here comes the hot water?
A. Open the spigot here comes hot water.
Q. The water heater that you designed, who retained you to design that water heater?
A. Well, manufacturers of boilers, manufacturers.
Q. What manufacturer?
A. There used to be a manufacturer, Trianco.
Q. All right. And what was the capacity of that water heater?
A. It's a domestic hot water heater, gas or oil fired.
Q. But not electric?
A. No.
Q. All right. So you've never designed an electric water heater; true?



A. That's right.
Q. And the water heater you're talking about is like the one that I have in my basement that I stay away from, that generates enough hot water to go through the piping, through the house to be dispensed wherever anyone opens up a spigot, correct?
A. Correct.
Q. And the capacity is at least 40 gallons; true?
A. Yes.
Q. And all the ones that you were involved in the design of involved gas, natural gas heating, true?
A. It could be, or oil-fired, too.
Q. All right. And was there any electrical components involved in either of those units, or is it all -- well, any electrical components involved in those water heaters?
A. Sure. Where the burner has an electric component, too.
Q. In your disclosure, Exhibit 19, Page 1, my understanding is that you have two opinions in this case; one, that the water dispenser that is the subject of this litigation was the cause of the fire on February 27, 2004 at the Carvalhals' house; is that your opinion?



A. Yes.
Q. The other opinion is, as I understand it, that the water dispenser caught fire because it was improperly designed or assembled; is that your opinion?
A. Yes.
Q. Let me pin you down on that. Are you saying that this fire at the Carvalhal household was caused because the water heater was assembled improperly?
A. Assembled improperly, meaning their assembly of the components were not compatible, that's improper.
Q. All right. I guess that's what I'm trying to get at, and if you work with me, we may be able to make your deposition shorter today. As I understand -- I think I understand you find fault with the defendants in this case for using certain components which you, as you just put it now are, in your view, incompatible, and I view that as being critical of the design of the water dispenser?
A. Correct.
Q. My question is, are you saying that the defendants had this blueprint for the water dispenser, it went down to the factory floor, and in the process

Q. And you didn't do that in case, true?
A. We didn't have anything, except my experience, knowing that sometimes when you manufacture items, usually there is one link missing that it doesn't get done, so there is a potential for doing it.
Q. What was the missing link, as you put it, in this case?
A. Well, the missing link is I don't know whether they were going to sort of prevent the intimate contact of the insulation with another layer of separation between the base metal and insulation itself.
Q. If they were to follow that step, then the design would have been okay with you?
A. It may have been a little better.
Q. Would it have been defective if they would have followed that protocol you just described?
A. If they have alleviated the concern that basically inherently there is, then you had alleviated -- you may have prevented the occurrence.
Q. Right. So if this water dispenser was assembled appropriately, the design would have been fine?
A. If appropriate defines that there should have



not been --
THE REPORTER: Excuse me --
MR. ELGES: Just take it verbatim.
(QUESTION READ)
A. No.
Q. Can you tell me whether it was the design defect, as you put it, or an assembly defect that caused the Carvalhals' water dispenser to catch fire?
A. It's the design defect.
Q. So the assembly defect, if there was one, didn't cause this fire, true?
A. Well, that's the additional aspect of it, which sort of compounds the situation that would be design and assembly as well.
Q. Other than the water heater that we talked about before that you were involved in the design of, have you been involved in the design of any other residential-use appliances, and I can be more specific as to what I mean by that, but stuff like the Carvalhals' water dispenser, tell me what other products you have been involved in the design of?
A. Well, normally we do design investigations relative to the principle of design and



performance. Sometimes you don't design to manufacture a component but you do the design in a conceptual aspect to know if the design is relatively reliable.
So, you don't go into the design of the component because you don't manufacture, but you do the design in a conceptual way to find out if that design is relatively acceptable for good performance.
Q. All right. Now, based upon your description of what designing is, tell me about the residential products, residential appliances, like the water dispenser, that you did that sort of work on?
A. I have investigated other dispensers which have also been involved in a fire.
Q. Let me stop you right there. We'll get to that. That's not what I'm talking about. I'm interested in your personal involvement in the pre-manufacture design of any residential products whatsoever, any appliances. I'm not talking about post-accident investigations, you've done plenty of that. I'm asking about you personally, have you been involved in the pre-manufacture design of any consumer appliance other than the water heater we talked about?



A. No.
Q. All right. Now, taking it to the next step down the line, tell me about your involvement, if any, in working as a consultant in a manufacturing context for that same sort of product, have you ever been brought in by, I don't know, Amana, and asked to look at their process for manufacturing their consumer products or any other sort of manufacturer during the manufacturing process?
A. No.
Q. And as far as literature goes, you've never published any literature regarding the design of residential appliances like the Carvalhals' water dispenser, correct?
A. Correct.
Q. You've never published any articles regarding the manufacturer of that sort of consumer product, correct?
A. That's right.
Q. Now, we talked a minute ago about your opinion that the design of the water dispenser in question here, the Carvalhals' water cooler/heater, was defective. Are you relying on any literature in reaching that conclusion?
A. Yes.

Q. What literature are you relying on?

A. Published literature in many of the books, handbooks and published documents that talk about stress causing cracking of stainless steel in a corroded environment.

Q. So, my understanding of what you're saying is this, that an aspect of your opinions regarding the defective design of the water cooler at issue in this case involves the corrosion of a stainless steel tank, correct?

A. Yes.

Q. And you're saying during the course of your career, you have read articles and textbooks and other secondary materials which talk about that in a generic sense; true?

A. No. It's a generic sense, your whole experience of dealing with materials is a generic sense is your experience, how do I make something my experience as a generic.

Q. When you were retained to evaluate this water dispenser, what articles, publications, textbooks did you rely upon in rendering your opinions regarding the design defect that you found?

A. I relied on my experience in investigating these materials, and I have relied on my



education, and I relied on all the published library that we have.

Q. My question is a little different. Did you pull a textbook down from a shelf when you were working on this water dispenser, or did you go to the Internet and pull up a journal article? I want to know did you actually look at any literature --

A. No.

Q. -- specifically for purposes of rendering opinions in this case?

A. No.

Q. You just remembered your -- it was -- let me clarify it this way. What you're saying is that you're relying upon your education, expertise and experience in this field in rendering your opinions in this case, correct?

A. Yes.

Q. And part of that experience, education and expertise is the fact that you read articles in the past and you were -- your experience, expertise and education were informed by those articles, correct?

A. I have written hundreds of reports also.

Q. All right. But the only report you wrote in this case is the one dated September 29, 2004, correct?



A. This is for this subject, yes.

Q. Now, shifting gears, regarding the manufacture. Your opinion that there was a manufacturing assembly defect in this case, same question. Did you pull down a specific textbook, did you look at a particular peer-reviewed article? Is there any literature that supports your opinion that the way this water dispenser was assembled or manufactured was defective?

A. That's based on my experience dealing with manufactured products.

Q. So, you can't point to any particular literature that supports your opinions regarding the manufacture, design of this water heater; true?

A. That's true.

Q. Now, you started to get into it before, and I cut you off, so I apologize for that, but I promise you we'd get to it. You've done investigations of fires like the fire at the Carvalhal house before, true?

A. Yes.

Q. Now, have you ever investigated a residential fire involving a water dispenser before the Carvalhal case?

THE WITNESS: Residential fire



involving what?

Q. A water dispenser like the one in the Carvalhal case?

A. Not that I recall.

Q. So this is your first one of those, true?

A. Yes.

Q. Do you remember ever investigating a residential fire involving the failure of any household appliance?

A. Yes.

Q. All right. Can you tell me, in generic terms, what the appliances were and why they failed in your opinion?

A. They were involving an electric dryer, a television, electrical system, heating system, those were some of the electrical appliances involved in fires.

Q. All right. The heating system, as you put it, is that a space heater?

A. Yes.

Q. So we've got an electrical dryer, a television set and an electrical space heater, correct?

A. Yes.

Q. What failure did you -- strike that. What defects or defects did you identify in the dryer?