# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

THE HARTFORD INSURANCE COMPANY,
AS SUBROGEE OF ALBERTO CARVALHAL

VS. C.A. NO. 06-623

GENERAL ELECTRIC COMPANY AND
MIDEA USA, INC.

DEPOSITION OF MICHAEL COONEY, a witness in the above entitled cause, taken on behalf of the Defendants, before Barbara Warner, RPR, Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, 536 Atwells Avenue, Providence, RI, on May 16, 2007, at 10:00 A.M.

APPEARANCES:

FOR THE DEFENDANTS: CLAUSEN MILLER, PC
BY: TODD E. ELGES, ESQUIRE

FOR THE PLAINTIFF: LAW OFFICE OF STUART BLACKBURN
BY: ERIK LOFTUS, ESQUIRE

FOR THE PLAINTIFF: D'AMICO & BURCHFIELD
BY: ROBERT A. D'AMICO, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND
(401) 946-5500



INDEX


| WITNESS | PAGE |
|---|---|
| MICHAEL COONEY | |
| EXAMINATION BY MR. ELGES | 3 |
| EXAMINATION BY MR. LOFTUS | 193 |
| RE-EXAMINATION BY MR. ELGES | 196 |

EXHIBITS

| NO. | DESCRIPTION (DEFENDANT'S) | PAGE |
|---|---|---|
| 27. | DEPOSITION NOTICE | 3 |
| 28. | UPDATED DEPOSITION TESTIMONY | 46 |
| 29. | PACKET OF PHOTOS | 189 |
| 30. | FAX COVER SHEETS | 189 |


*ALL EXHIBITS RETAINED BY ATTORNEY ELGES



(DEPOSITION COMMENCED AT 10:10 A.M.)

MICHAEL COONEY

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your name and spell your last name for the record.

THE WITNESS: Michael Cooney, C-O-O-N-E-Y.

EXAMINATION BY MR. ELGES

MR. ELGES: Mark this as Defendant's Exhibit 27.

(EXHIBIT 27 MARKED FOR IDENTIFICATION)

Q. Let the record reflect this will be the discovery deposition of Mr. Michael Cooney taken pursuant to subpoena. Let the record also reflect Mr. Cooney's deposition will be taken in accordance with the Federal Code of Civil Procedure and any applicable local court rules. Have you been deposed before?

A. Yes.

Q. How many times?

A. I believe six. I included a list of all of my prior depositions in the file.



Q. Thank you very much. And you have been deposed primarily in the context of you being a retained expert to testify in litigation, true?

A. Yes.

Q. By virtue of your prior experience with depositions, I am going to give you a short version of ground rules for taking a deposition just to refresh your recollection about how the process is going to work today. As you can see, we have a court reporter here. She is doing her best to take down everything we are saying. In light of that, I will try to speak slower than I normally do and keep my voice out load and clear. To the degree you can do that, that will help her today. The court reporter is good, but she can only take down once person at a time. I will do my best not to cut off your answer before you finish them and pay me the same courtesy of not cutting off my questions before I've finished, even if you know where I am going. During the course of everyone's deposition, just about every witness

Page 9

Q. Have you talked to anyone else other than Mr. Loftus or Mr. Nalbandian about your deposition testimony today?
A. No.
Q. One of the attachments to the Exhibit 27 is your CV, this is a true, accurate and up-to-date version of your CV?
A. There is one change. I am now a P.E.
Q. Congratulations. Is that in Rhode Island you received your professional engineering license?
A. No, in the State of Connecticut.
Q. Is that a P.E. in any particular specialty?
A. No. Connecticut only issues them for engineering in general.
Q. As far as your -- when did you receive your P.E.?
A. In January of 2006.
Q. How long did it take to get your P.E.?
A. The first time I took the exam.
Q. Other than your recently achieved status as a P.E. in that state, is there anything else that needs to be updated, revised or supplemented in your CV as it is attached to Exhibit 27?

Page 10

A. No.
Q. It is my understanding that you are a graduate of the University of Notre Dame?
A. Yes. I am from the Northeast originally.
Q. From Notre Dame you received a bachelor's degree in Metallurgic Engineering; is that true?
A. Yes.
Q. So the engineer-in-training in New York State is no longer relevant. I have gone over your CV and I am trying to figure out what portions of your CV relate to this case and I have a problem with that. By virtue of you being more familiar with your background and experience and CV, can you identify the portions of your CV that relate to your qualifications and foundations to render any opinions in this case? I found one area. There is the experience with energy dispersive spectroscopy, EDS for short because I can't get that out. Do you see that section there?
A. Yes.

Page 11

Q. You performed that in this case, true?
A. I did not perform it. I directed the technicians to perform it.
Q. And you interpreted the results?
A. Yes.
Q. So that would be an example of your qualifications, background and experience as set forth in this CV coming into play in the Carvalhal case. As far as anything else in the CV you think is relevant in your work, can you point that out to me?
A. The last sentence in the first paragraph.
Q. That last sentence makes reference to your work assessing fires, true?
A. True.
Q. How many residential fire investigations have you been a part of?
A. Two.
Q. Is one of them Carvalhal?
A. Yes.
Q. Tell me about the other residential fire investigation that you have been involved in?
A. It involved a water dispenser also.

Page 12

Q. Tell me about that case?
A. It was a Sunbeam water dispenser, and it resulted in damage to a lunchroom in a business facility due to malfunctioning of the water dispenser.
Q. What can you tell me about the Sunbeam water dispenser in this case?
A. There was an issue with the water dispensing mechanism that prevented water from accurately going into the heater. It has been a while, so I don't remember all of the details.
Q. Let me test your memory, if I could. If you don't remember, you don't remember. That Sunbeam water heater that you were investigating in that case, was that a residential water dispenser or a commercial water dispenser?
A. It was used for residential purposes.
Q. Do you remember the model number?
A. No.
Q. Can you describe it for me?
A. It utilized a water bottle melted on the top. It was a hot and cold water dispenser unit. I recall there was a

Page 13

recall on that model. We were investigating to determine what possible mechanisms were related to the overheating of this one facility.
Q. As part of your work on that case, tell me what protocol or process you used in evaluating that water dispenser?
A. I don't recall every step of the investigation, but it was similar to the investigation that we performed on the water cooler for GE.
Q. You disassembled the water cooler?
A. Yes.
Q. I will refer to that water cooler as the Sunbeam water cooler, can we agree when I say Sunbeam water cooler we are talking about that other case and that other water cooler?
A. Yes.
Q. When I say the Carvalhal water dispenser, I mean the water dispenser in this case; is that fair?
A. Yes.
Q. Tell me, you disassembled the Sunbeam water cooler; is that correct?

Page 14

A. Yes.
Q. Was that water cooler damaged in the fire?
A. Yes.
Q. How extensively was that damaged?
A. Not as extensive as this one.
Q. What else did you do other than to disassemble the Sunbeam water cooler?
A. I don't recall all of the details of the investigation.
Q. Do you know how you came to conclude -- strike that. What failure, if any, did you identify in the Sunbeam water cooler?
A. I don't recall the details.
Q. My understanding of your prior testimony is the Sunbeam water cooler caught fire in your opinion because water failed to flow into the container where hot water was being heated; is that true?
A. That is what I recall, but I don't recall the details of that.
Q. Do you remember why the water was not flowing into that particular vessel?
A. No. I would have to review the reports to go through the detail.
Q. Would it be fair to say that the defect in

Page 15

the Sunbeam water cooler was the valve that was supposed to direct water into that vessel to be heated?
A. I would have to review the report.
Q. Do you have the report?
A. With me today?
Q. In your office?
A. Yes.
Q. How did you come to conclude that the absence of water in the Sunbeam water cooler's hot water vessel was the cause of that fire?
A. We had had an exemplar and I recall doing the testing on the exemplar.
Q. Do you remember what kind of testing you did on the exemplar?
A. I don't remember the details. We watched and monitored the process.
Q. Did you perform any EDS testing on the Sunbeam water cooler?
A. I don't recall.
Q. Did you, who else was involved in the evaluation of the Sunbeam water cooler other than you?
A. Era Nalbandian.

Page 16

Q. Would it surprise you that Mr. Nalbandian could not recall that particular project when I spoke with him yesterday?
A. No. It was a small project that was several years ago.
Q. And you were retained by the party for that case?
A. It was not litigation. We were testing, it had not gone to litigation yet.
Q. So who retained you to do that work?
A. I don't remember. Mr. Nalbandian passed that on to me, so I don't recall who the contact was.
Q. Other than your work on the Sunbeam water cooler incident, for lack of a better way to put it, you have not been involved in any other residential fire investigations, true?
A. True.
Q. How many cases other than residential fires have you worked on as a retained expert as part of your employment with Thielsch Engineering?
A. Total projects?
Q. Yes.

Page 17

A. I don't know the exact number, but over 250.
Q. So you have been involved in over 250, we can subtract the Sunbeam and the Carvalhal case, you have been involved in over 248 separate investigations involving nonresidential fires, incidents, accidents or products, true?
A. Field investigation would be a better term.
Q. And you have been involved in -- let me take a step back. The Sunbeam case we just spoke about, that fire happened in a commercial facility?
A. Yes. It was a cooler used for residential purposes, but it was in a commercial lunchroom.
Q. Based upon your experience with consumer products, which we are going to explore in a minute, would it be fair to say there are commercial products and there are residential products, they are two different classes of certain products in your experience, true?
A. Yes.

Page 18

Q. And the reason there are classes like that is that certain products are meant for a commercial application and other products are meant for a residential application, true?
A. Yes.
Q. As far as the Sunbeam case goes, technically speaking, it is a fire that happened at a commercial establishment, not a personal residence, true?
A. True.
Q. You have been involved in over 249 failed unit analysis projects involving nonresidential properties, true?
A. Yes.
Q. And you have been involved in one failure analysis involving a residential property, and that is the Carvalhal case; is that correct?
A. Yes.
Q. With regard to Sunbeam, did you do any cause and origin investigation regarding the fire that resulted from the Sunbeam water cooler?
A. Repeat that question.

Page 19

Q. The Sunbeam case where there was a fire related to the Sunbeam water cooler, did you do a cause and origin investigation in that case or was your involvement limited to an evaluation of the product itself?
A. An evaluation of the product.
Q. You did not go back and look at photographs from the commercial establishment to try and learn anything about the cause and origin of the fire itself, true?
A. True.
Q. Have you ever, other than your involvement in the Carvalhal case, have you ever been involved in a cause and origin investigation related to a residential fire?
A. No.
Q. Have you ever been involved in a cause and origin investigation for any property, commercial or otherwise?
A. Yes.
Q. Tell me about that experience?
A. There was, one which is on the list of depositions. It was at a co-generation power plant in which a fire initiated in

Page 20

the inlet ducting for a gas turbine during a repair or modification process in which welding was being performed on the outside surface of the duct work and ignited combustible material on the inside of the duck work.
Q. That is Florida Power and Light?
A. Yes.
Q. And that involved welding gone awry?
A. Yes.
Q. Other than that case, can you tell me about any other involvement you have had in cause and origin investigations relating to fires?
A. Not that I recall.
Q. In the Carvalhal case, as I understand it, you did not do a cause and origin investigation in the Carvalhal case, true?
A. True.
Q. Your involvement in the Carvalhal case is analogous to your involvement with the Sunbeam case where you get a product and you are asked to evaluate it, fair?
A. Yes.
Q. Can you tell me anything else on your CV

Page 21

that we have not already talked about that reflects your qualifications or foundation, for that matter, for rendering any opinion in the Carvalhal case?
A. The second paragraph and the fourth paragraph.
Q. Can you point out to me how the second paragraph relates to your involvement in the Carvalhal case?
A. Performing metallurgical examinations of tanks, specifically. The last sentence in the second paragraph, corrosion-related failure mechanisms.
Q. How about the other paragraph you referenced?
A. It also references my performing failure analysis in corrosion investigations of stainless steel materials, which the tank and the hot water tank for this water cooler was fabricated from stainless steel. And the last sentence references my experience in evaluating stress corrosion cracking.
Q. That was my sense, that the expertise you were drawing upon in rendering opinion in

Page 22

the Carvalhal case relates essentially to your expertise in corrosion issues involving stainless steel, true?
A. Corrosion and failure mechanisms associated with stainless steel.
Q. And the failure mechanisms aspect of this investigation is your laboratory's supposed identification of chlorides being present in the foam insulation surrounding the stainless steel tank in the Carvalhal case, true?
A. Yes.
Q. Above and beyond that, can you tell me where you have experience, expertise for a foundation to render any other opinion in this case based upon your experience set forth in this CV?
A. No.
Q. So as far as electrical issues, you are not an expert in electrical engineering, true?
A. Correct.
Q. And you are not an expert in electrical systems incorporated into consumer products like the Hartford water cooler, like the Carvalhal water cooler, true?

Page 23

A. Yes.
Q. Other than your opinions related to what caused the stainless steel tank on the Carvalhal water cooler to corrode and leak, can you think of anything else you are qualified to render expert testimony about in this case?
A. Identification of a source of the initiation of the fire from prior research and discussions with other engineers and also with identification of the fire source from the FP&L case interpreting fire patterns.
Q. That is the welding case?
A. Yes.
Q. Tell me about your work interpreting burning patterns in the Florida case?
A. The burn patterns indicated the site of where the fire initiated based upon the V pattern came right back to the source of the fire.
Q. And that fire occurred in a power plant?
A. Yes.
Q. Do you recall what evidence you relied upon in that case in making that determination?

Page 24

A. I just described it.
Q. The V patterns?
A. Yes.
Q. So did you visit the scene?
A. Yes.
Q. So you yourself visited the scene in the Florida power case and you observed yourself directly the V patterns, as you put it, which indicated to you what the source of the fire was, true?
A. True.
Q. Did you visit the source -- strike that. Did you visit the Carvalhal house at any time in this case?
A. The home?
Q. Yes.
A. No, I didn't.
Q. The kitchen where this fire occurred?
A. No.
Q. You never visited there, true?
A. True.
Q. What else did you rely upon in the Florida power case in rendering your cause and origin opinions?
A. That was the sole piece of evidence.

Page 25

Q. Was it smoke, flame, describe to me the physical evidence you are talking about, are you looking at a wall next to where the fire occurred and saying, these are the patterns that show how this fire got started?
A. Yes. A stainless steel wall with burn patterns, oxidation and coloration from being exposed to the fire.
Q. In that case, you were drawing upon your experience as a metallurgist to interpret the evidence of fire that you observed, true?
A. True.
Q. And that is the sole source of your sole foundation as it were of your cause and origin opinions in the Florida power case, correct?
A. We also identified metallurgically the welding condition which initiated the fire also going back to that area from the visual evidence of the burn pattern.
Q. Which was the cause of the fire, true?
A. Yes.
Q. And you rely on the flame patterns or what

Page 26

is on the stainless steel to determine what the origin is, correct?
A. Yes.
Q. What training, specific training, do you have in conducting cause and origin investigations as far as fires go?
A. From Mr. Nalbandian predominantly and Mr. Thielsch before he passed away.
Q. Other than that on-the-job training, have you had any professional training to conduct cause and origin investigations?
A. No classes or courses, no.
Q. So you have no classes, no courses, your education back at the University of Notre Dame did not deal with doing cause and origin investigations, specifically, did it?
A. No.
Q. You have never taken a seminar or class and you have never been certified as a fire cause and origin investigator, true?
A. Correct.
Q. You never worked in a fire department or for a state fire marshal's office or any other entity responsible for conducting

Page 27

cause and origin investigations involving fires, true?
A. True.
Q. Can you think of any other reason that a Federal Court judge should deem your cause and origin testimony in this case as admissible?
A. No, not other than what we have already discussed.
Q. Just so I am clear on what we already discussed, your foundation for rendering cause and origin opinions in this case is your prior on-the-job training from Mr. Nalbandian and Mr. Thielsch, and your one prior experience doing a cause and origin investigation in the Florida power case, true?
A. And review of other reports that have been developed by our company, by Thielsch Engineering.
Q. Did you bring those reports with you today?
A. No.
Q. What reports are you talking about?
A. The various reports, I can't give you specifics of each one because I didn't work

Page 28

on them directly, I just reviewed them.
Q. Getting back to the Federal Court judge, can you give us a little bit more detail as to what reports qualify you -- strike that. Can you give me a little bit more information regarding what reports you reviewed that make you qualified to render cause and origin opinions in this case?
A. There was one fire at a power plant in New York State, I don't remember the exact facility, that dealt with Thielsch Engineering performing a cause and origin of the fire.
Q. Anything else?
A. No.
Q. What you are referring to, at least the one example you can actual provide detail on, involves your review of a report generated by Thielsch Engineering regarding a different fire all together, true?
A. Yes.
Q. Did you write that report?
A. No.
Q. Who wrote that report?
A. I don't recall the author.

Page 33

A. No.
Q. Caldwell, what was that about?
A. Involved evaluating the shell surface of a water tank to determine if mil scale was present on the surface of the steel shell.
Q. Was there a fire in that case?
A. No.
Q. Did you perform a metallurgical analysis on Caldwell tanks?
A. Metallurgical evaluation.
Q. There were no consumer products involved in the Caldwell tanks case, true?
A. True.
Q. This indicates -- this is your deposition testimony history, did you testify at trial in any of these matters?
A. No.
Q. Have you ever testified at trial?
A. No.
Q. Has your testimony or opinions ever been deemed inadmissible in any litigation whatsoever?
A. Not that I am aware of.
Q. Other than the Carvalhal case, your

Page 34

personal litigation and these cases, have you ever been involved in any other civil litigation?
A. No.
Q. You don't hold yourself out as an expert in the design of products, true?
A. True.
Q. You don't hold yourself out as an expert in product manufacturing, true?
A. True.
Q. Are you an expert in the evaluation of heat sensing switches?
A. No.
Q. As far as those three or four issues we talked about, you would not offer opinions regarding any of those issues because you are not an expert, correct?
A. Correct.
Q. I asked you a catchall question before and I will get more specific, you never designed a water dispenser?
A. Correct.
Q. You never participated in the manufacture of a water dispenser, correct?
A. Correct.

Page 35

Q. Are you aware of literature regarding the design aspects of water dispenser like the Carvalhal water dispenser?
A. Rephrase that.
Q. Are you aware of any literature, text books, publications, that deal with issues related to the design of a water dispenser like the Carvalhal water dispenser?
A. No.
Q. When you rendered opinions in the Sunbeam case, did you rely upon any literature publications or text books when you rendered those opinions?
A. For metallurgical aspects, yes.
Q. Do you remember what those metallurgical aspects, do you recall what literature or publications you relied upon in rendering metallurgical opinion in the Sunbeam case?
A. I don't remember specifics.
Q. With regard to manufacturing of water dispenser, are you aware of any literature dealing with that issue?
A. No.
Q. So you are not relying upon any literature in rendering your opinion in the Carvalhal

Page 36

case, true?
A. Relative to manufacture of water dispensers, that is true.
Q. And the same with regard to the design of water dispenser, you are not relying on particular literature or authoritative text regarding the design of the Carvalhal water dispenser, correct?
A. Correct.
Q. What literature are you relying upon in rendering any opinion in the Carvalhal case above and beyond the case specific information that was provided to you by Mr. Loftus or anyone else? Do you understand the question?
A. No.
Q. Let me rephrase that. I know you have reviewed certain documents in this case. My sense is the bulk of those documents are in the file in front of us on this table. My question for you is this, did you review any text books, peer reviewed literature or any other outside materials in coming to your opinions in the Carvalhal case?
A. No, not specifically for this case.

Page 53

Q. Can you tell me anything else regarding information you received, conversations you had or other involvement in this case prior to that day where the water cooler shows up to be disassembled?
A. Yes. In early June, I believe, I am not sure of the exact date, of 2004, Mr. Hossein Davoodi came to Thielsch Engineering's facility in Cranston with an exemplar water cooler that I looked at in the presence of Mr. Davoodi and Mr. Nalbandian.
Q. Tell me about the exemplar?
A. I recall that it was a similar water dispenser, but there was, it was a revised model of what we had. The insulation was different on the hot water tank and the insulation was different on the revised model than the water dispenser that was involved in the incident.
Q. As far as the exemplar goes, you performed testing on the insulation contained in the dispenser and concluded it was of a fiber nature and did not contain any chlorides, true?

Page 54

A. No. I didn't do any examination on the exemplar insulation.
Q. So I am clear as to what cooler we are not apparently not talking about, the exemplar you're speaking of that Mr. Davoodi brought to Thielsch, does Thielsch still possess that unit?
A. I am not sure if they possess that or not. We did not retain that at that time. Mr. Davoodi took that back in his possession. We were provided with another exemplar in November of 2006. I don't know if it's the same one or not.
Q. For purposes of clarity, we now have four water coolers that we are talking about in your deposition today. The Sunbeam water cooler, which has nothing to do with this case, agreed?
A. Yes.
Q. And that is another case you did an investigation of a water cooler involved in a fire, true?
A. True.
Q. And we have talked about that ad nauseum?
A. Yes.

Page 55

Q. And there are the three water coolers related to the Carvalhal case. We agreed we will call the water dispenser in the Carvalhal kitchen at the time of the fire, we will call that the Carvalhal water dispenser, correct?
A. Yes.
Q. And there is a second water dispenser, which I am going to call the fiber water dispenser. When I say the fiber water dispenser, I am talking about the exemplar you guys still have that you actually tested the insulation on; do you know what I am talking about now?
A. I know what you are talking about, but we did not test anything on that.
Q. Other than the testing you performed on the Carvalhal water dispenser, did you test any other water dispenser in the Carvalhal case?
A. Thielsch Engineering has not, no.
Q. Has someone else tested that?
A. Yes.
Q. Tell me about who tested it and identify what water cooler you are talking about?

Page 56

A. For the fiber water dispenser, which we received sometime in late November of 2004, it was shipped to us from Crawford Investigation Services. In late December of 2006, Mr. Dunkin Glover came to our facility, Thielsch, he cut samples of the insulation off the fiber water dispenser and brought them to Analytical Answers in Woburn, Massachusetts for testing. I witnessed the testing, but I did not perform it.
Q. As far as the fiber water dispenser, Thielsch Engineering has not performed any testing whatsoever on that, true?
A. True.
Q. And other than the testing performed by Mr. Glover, who is the defendant's expert in this case, you are not aware of anyone else testing the fiber water dispenser, true?
A. True.
Q. Prior to Crawford Investigations tendering to you the fiber water dispenser, you saw briefly another exemplar; for purposes of clarity I will call that the Carvalhal's

Page 141

fiber water dispenser, true?
A. Yes.
Q. And the same set of facts is true regarding exemplar number 1, you did not determine the ignition temperature or type of plastics in exemplar number 1, true?
A. Yes.
Q. You cannot testify to a reasonable degree of scientific certainty that the plastic in the Carvalhal water dispenser caught fire and caused this fire, true?
A. We only have visual evidence, we have no other testing, correct.
Q. I know about visual evidence. We talked about that before, the photographs you took, showing the panels on the water dispenser, those are metal, right?
A. Yes.
Q. So we know about the fire damage that was caused to the metal panels, your specialty, metallurgy, and we talked about that. My question is different. My question is, as you sit here today, based upon any information from any source that is available to you, you yourself cannot

Page 142

testify to a reasonable degree of scientific certainty that the plastic components located in the Carvalhal water dispenser ignited and caused this fire, true?
A. True.
Q. You don't have a foundation for that opinion and you are not going to offer that at trial, true?
A. True.
Q. Other than the plastic components, is there any other fuel source within the Carvalhal water dispenser that could have started on fire and caused the fire to spread throughout the kitchen, to your knowledge?
A. Not to my knowledge.
Q. I did an examination of the -- strike that. We talked before about the fire triangle?
A. Yes.
Q. I know there is oxygen in the kitchen, so you don't have to give me that to opine regarding the cause of the fire in this case. We just talked about the fuel, and you cannot offer testify regarding what the fuel was that started the fire, we have

Page 143

established that now, true?
A. Potential sources have not been definitive.
Q. What potential sources have you identified in this case other than the plastic?
A. That is a source.
Q. But you cannot say to a reasonable degree of scientific certainty the plastic caught fire and started the larger fire, true?
A. True.
Q. So you don't have the fuel, part of the triangle, you will not offer testimony regarding fuel that started this fire, correct?
A. I can't prove that, right.
Q. As far as a heating source, what was the heating source, if you know, to a reasonable degree of scientific certainty, the source of ignition?
A. We have not done testing to establish temperature, so I can't say what the temperatures would have been generated by any specific component.
Q. So you don't have that part of the triangle either to a reasonable degree of scientific

Page 144

certainty?
A. Yes.
Q. So how could you offer a causation opinion in this case, do you know?
A. Based upon the visual examination and showing you have a condition in the tank had deposit and corrosion products leak down to a thermal sensor covering it.
Q. Let's talk about that now. The thermal sensor, that is an electrical device?
A. Yes.
Q. And you are not an electrical engineer?
A. No.
Q. You don't hold yourself out as an expert in electrical devices?
A. That's correct.
Q. What foundation, basis, education or anything else do you have to render opinions regarding the functioning of the thermal sensors in the Carvalhal water dispenser?
A. It is a thermal insulating issue. I have extensive experience in boilers and generation of internal oxide which provides a thermal insulating barrier which results

Page 145

in overheating of weather tubes. In this case you had an insulating material being deposited on to a sensing device which could have prevented the proper temperature from being sensed.
Q. That is all depicted in Figure 30, correct?
A. Yes.
Q. Figure 30, it is three photographs, I personally like the middle photograph the best. What do those photographs depict, to your knowledge?
A. Deposit covering the thermal sensing devices.
Q. When you say deposit, is that the white substance depicted in Figure Number 2?
A. Yes. There is white and if you look closely, there is also rust coloration.
Q. What is the white substance?
A. We did not test that.
Q. What is the other substance you are talking about?
A. Rust is iron oxide.
Q. So the white substance you did not test, you cannot testify to a reasonable degree of scientific certainty what that is, true?

Page 146

A. Yes.
Q. You don't know what the properties are and the composition?
A. I know what contains soluble material and as it evaporates, you get hardening deposits.
Q. You cannot testify what the hardening deposits are to a reasonable degree of scientific certainty?
A. Visually I can, chemically, no.
Q. What are the properties of the white substance?
A. Calcium carbonate or magnesium carbonate.
Q. It is from evaporating water?
A. Yes.
Q. Do you know if that is evaporating water or you think that is the case?
A. It makes sense, based upon the evidence.
Q. Now, in the narrative of the report, the section that talks about Figure 30, it is on the bottom of Page 4, that paragraph there, the last sentence, what does that read?

Page 147

A. Evidence in particular and electrical arcing or shorts was not observed.
Q. Based upon that observation in the report and your photographs there, there is no evidence that the temperature sensors used in this unit malfunctioned electrically, true?
A. They did not arch, that is what the statement says.
Q. Do you have any evidence that indicates that those temperature sensors malfunctioned electronically?
A. No.
Q. Do you have any evidence whatsoever that they malfunctioned?
A. No. We did not test them because of extensive damage. It was not worth the effort.
Q. How do they work under normal conditions?
A. They sense the temperature of the hot water on the surface of the tank, and there is a switch that due to expansion of metal surfaces that they expand and separate at a sufficient temperature to break the current, the connection.

Page 148

Q. Just so I understand what you believe to be the operation of the sensors, assume for the moment we have a water dispenser identical to the one in the Carvalhal fire?
A. Yes.
Q. How do the sensors on this unit, what do they do?
A. Once the temperature is reached, 190, that causes the breakage of the circuitry, it cuts off current flow to the coil so you have an absence of power being sent to the coil. It senses the temperature until it reaches the set point and then it opens the circuit.
Q. Your understanding is the default for these sensors is that the circuit is closed and if the circuit is closed, the heating element is energized, true?
A. Yes.
Q. If there is no water in there whatsoever, the circuit stays closed and the heating element will stay energized?
A. Yes.
Q. And that condition will come about if there was an empty water bottle on the top of the

temperature of approximately 190 degrees Fahrenheit.
Q. It is your testimony that that blurb in Appendix B serves as the foundation for your assertion that the switch dispenses the power to the heating coil at 190 degrees, true?
A. Approximately, yes.
Q. Other than that observation, do you have any other information regarding at what temperature that switch is going to discontinue power to the heating coil?
A. No.
Q. Did you test the heating sensors on that unit to determine what temperature would need to be reached before they discontinue the power to the heating coil?
A. No.
Q. Did you do a test of that nature with exemplar 1?
A. No.
Q. Did you do a test of that nature with regard to the fiber water dispenser?
A. No, nor did anybody.
Q. That's true. Was there anything stopping



you from doing that?
A. We had a budget for the first one, so.
Q. Why are there two heating sensors on the side of this unit?
A. I can't explain that.
Q. Do they serve different functions?
A. I don't know.
Q. How many heating sensors were on the side of exemplar 1?
A. I don't recall.
Q. How many heating sensors are inside of the fiber water dispenser?
A. I don't recall. From my recollection, it was the same number as on the Carvalhal water dispenser.
Q. Which one of the sensors on the Carvalhal water dispenser failed?
A. There was a deposit penetrating into the tank surface side on both sensors.
Q. You think both sensors failed?
A. Yes.
Q. Do you have any scientific evidence indicating that either sensor failed above and beyond your visual observations in this case?



A. No.
Q. For this fire to happen, did both sensors need to fail or would one failing be sufficient?
A. I don't know.
Q. Do you believe that the -- off the record.
(OFF THE RECORD)
MR. ELGES: Mr. D'Amico is outside of the room. In his absence I will walk Mr. Cooney through the contents of my file provided to me prior to his deposition today. I will not ask substantive questions outside of Mr. D'Amico's presence.
Q. You were kind enough to bring your file here today. Part of that file appears to be six CDs containing photographs related to your inspection of various water coolers in this case, true?
A. Yes.
Q. Other than the photos, do you have any other photographs above and beyond that?
A. Not color photographs, but I have black and white photographs.
Q. Those are part of the file that my arm is



on, correct, those other photographs are in there?
A. No.
Q. I was going to ask you about these. You provided all copies of photographs to Mr. Loftus; is that correct?
A. Yes.
Q. And it is your understanding he passed those on to us, true?
A. Yes.
Q. I will hand you a series of manila envelopes.
A. They contain negatives of the photo micrographs that were included in the metallurgical examination portion of our report, Exhibit Number 20.
Q. In addition to that small manila envelope, I have larger manila envelope, can you tell me what is inside of those?
A. Those are the negatives for all of the color photographs taken of which we included a CD copy of those photographs.
Q. Turning our attention now to some of the paper in your file, you got a copy of Mr. Davoodi's September 10, 2004 report