# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

THE HARTFORD INSURANCE COMPANY, :
AS SUBROGEE OF ALBERTO CARVALHAL:
:
VS. : C.A. NO. 06-362S
:
GENERAL ELECTRIC COMPANY AND :
MIDEA USA, INC. :

DEPOSITION OF MICHAEL COONEY, a witness in the above-entitled cause, taken on behalf of the Defendants, before Barbara Warner, RPR, Notary Public in and for the State of Rhode Island, at the offices of D'Amico & Burchfield, 536 Atwells Avenue, Providence, RI, on May 16, 2007, at 10:00 A.M.

APPEARANCES:

FOR THE DEFENDANTS............. CLAUSEN MILLER, PC
BY: RODD E. ELGES, ESQUIRE

FOR THE PLAINTIFF.............. LAW OFFICE OF STUART BLACKBURN
BY: ERIK LOFTUS, ESQUIRE

FOR THE PLAINTIFF.............. D'AMICO & BURCHFIELD
BY: ROBERT A. D'AMICO, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND
401-946-5500

Q. Explain to me how a fire ignited in the Carvalhal water dispenser?
A. Could have?
Q. No. I am asking for your opinions now. Thank you for clearing that up for me. I want to know is it your opinion to a reasonable degree of scientific certainty that a fire ignited within the Carvalhal water dispenser?
A. Yes.
Q. How did that happen to a reasonable degree of scientific certainty?
A. Due to the amount of damage, it is difficult to determine that with a high degree of scientific accuracy of where exactly it occurred. However, based upon the burn pattern and the fact that you had the condition which allowed water, the cracking in the stainless steel tank to allow corrosion product from the resulting water that leaked out and possibly deposits which precipitated out of the water to contact the heat sensor, cause the hot water heating system to malfunction to generate sufficient heat.

Q. Can you flip to Page 1 of that exhibit, it should be a cover letter that looks like this; do you see what I am talking about?

A. Yes.

Q. It is a cover letter dated November 5, 2004. We are looking at the same document?

A. Yes.

Q. Signed by Mr. Nalbandian?

A. Yes.

Q. In the third paragraph, the last sentence, do you see a sentence that reads, "The heater coil generated sufficient heat to cause localized burning in the fire that occurred on February 27, 2004." Am I reading that right?

A. You read that word for word.

Q. Do you hold an opinion to a reasonable degree of scientific certainty that that statement is true?

A. It should be amended to say the heating system, not necessarily the heater coil.

Q. So you do not hold an opinion to a reasonable degree of scientific certainty that, "The heater coil generated sufficient heat to cause localized burning in the fire

that occurred on February 27, 2004," true?
A. True. It was in the vicinity of the heater.
Q. Now I am confused. That is a statement that is on the cover sheet of this report?
A. It could have, it is not necessarily.
Q. That is a statement that is on the cover sheet of the report. Flip to Page 9.
A. Okay.
Q. Page 9 is your conclusions in this case, true?
A. Our conclusions, yes.
Q. By our, you are talking about yours and Mr. Nalbandian's, true?
A. Yes.
Q. Did anyone else work on this case? Is anyone other than you and Mr. Nalbandian responsible for the contents of this written report and the conclusions set forth therein?
A. No.
Q. If you look at Paragraph 3 on Page 9, the conclusion section, the heater coil -- strike that. It reads, "The heater coil generated sufficient heat to cause

localized burning in the fire that occurred on February 27, 2004." Is that correct?
A. Yes.
Q. And you are saying that you don't hold that opinion to a reasonable degree of scientific certainty, true?
A. That could have been one source, yes.
Q. We will talk about would have, could have, should have in a minute. For purposes of this question, I am asking you whether or not it is your opinion to a reasonable degree of scientific certainty that the heater coil generated sufficient heat to cause localized burning in the fire that occurred on February 27, 2004?
A. Yes, we still believe the heat came from the heater, heating system.
Q. But not the heating coil specifically?
A. It very well could have. The evidence is the burn pattern pointed right back to the hot water heater.
Q. Let's talk about what you just said. Assume for the moment that the heating coil, part of what you are now calling the heating system, did not cause this fire,

are you with me?
A. Go ahead.
Q. What did cause ignition in the water dispenser, specifically?
A. What could have?
Q. To a reasonable degree of scientific certainty, what other source of ignition was there other than the heating coil in this water dispenser in your scientific opinion?
A. The wires. The ignition source would have been the insulation on the wire. It could have been the insulation on the wires associated with the heating system.
Q. Anything else?
A. Not that I can think of.
Q. You are not an electrical expert, are you?
A. No.
Q. Are you qualified to render opinions regarding fires being generated by electrical shorts?
A. By electrical shorts, yes, I can identify a short metallurgically.
Q. And metallurgically you look for arcing?
A. Yes.

Q. Anything else?
A. Arcing.
Q. For you to be able to render the opinion that wire in this water dispenser caused a fire, you need to find metallurgically related evidence such as arcing?
A. No. If you had sufficient energy in the wires to heat the insulation up, sufficiently heat the insulation, that could be a potential if the wires were constantly on or energized, because the water pressure was not shutting off because the heat sensors were insulated from the metal can because they were covered with an insulated material such as corrosion, the proper signal may not have been sent to shut the system off.
Q. Do you have any evidence that that occurred in this case?
A. Yes. We have the burn pattern that something happened in that area.
Q. I agree that something happened. There was a fire in the Carvalhal kitchen, that's established and that is not disputed. Do you have any tangible objective scientific

evidence that the cause of this fire had anything to do with any wiring whatsoever of the water dispenser in the Carvalhal kitchen?

A. No, because of the extent of damage to all of the components in this area.

Q. So you are saying you did not have sufficient evidence surviving the fire to perform an evaluation to determine scientifically whether the wires were the source of this fire, true?

A. Yes.

Q. Is there any literature or other basis for your belief that the wires could have been a competent source of this fire?

A. Not that I can cite, no.

Q. What kind of wires were involved -- strike that. What sort of wires were incorporated into the Carvalhal water dispenser?

A. The material?

Q. The material, the gauge, anything that you know about the wiring?

A. I recall they were copper wires.

Q. All of the wires you saw on this unit were all copper?

A. Yes.
Q. Do you know the thickness of those wires?
A. I don't recall.
Q. Do you know or do you have any evidence or foundation, for that matter, to render an opinion as to how hot any individual wire within that water dispenser could have gotten in this case?
A. No.
Q. You don't know whether it would achieve the temperature of 60 degrees or 600 degrees, true?
A. Correct.
Q. You don't know, true?
A. Yes.
Q. How can you render an opinion suggesting that the wires could have started this fire, what foundation or basis do you have?
A. The burn pattern, it goes right back to that area.
Q. I understand that. Just so you and I are talking about the same thing, you are talking about the burn pattern on the metallic casing of that water dispenser, true?

Q. Do you know if there was any way to test the temperature switches?
A. Not to my knowledge.
Q. Why is that?
A. Because of the substantial damage that was evident from the exposure to fire.
Q. You mentioned plastic components and wires as potential combustibles within the water dispenser; is that correct?
A. For the wires, the insulation covering the wires, yes.
Q. Were there any other combustibles in the water dispenser?
A. Not to my knowledge.
Q. It is your opinion that the fire originated within the dispenser; is that correct?
A. Yes.
Q. Based on the lack of other combustibles within the water dispenser, can you state with a reasonable degree of scientific certainty that the lack of other combustibles lead you to the conclusion that those combustibles found within the dispenser would be the fuel source?
MR. ELGES: Objection.

A. Based upon our identification of the initiation of the fire being inside the water component and those components being the only combustibles, one of them would have to have been the fuel source.

MR. LOFTUS: That is all I have.

RE-EXAMINATION BY MR. ELGES

Q. Exhibit 20, there is a cover sheet for that report. Look at Paragraph Number 3, "The presence of stress corrosion cracking in the stainless steel tank and corrosion deposits on the two heat sensors located on the outside surface of the cylinder wall further indicate that in the absence of proper temperature sensor response, the heating coil generated sufficient heat to cause localized burning in the fire that occurred on February 27, 2004." The word further makes it sounds like the first phrase in that sentence serves to further supplemental evidence suggesting that there was the absence of proper temperature sensor response in this case. Do you have any other evidence other than what that