# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR RHODE ISLAND
C.A. NO. [illegible]

---

THE HARTFORD INSURANCE COMPANY, as subrogee of ALBERT CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

UNITED STATES DISTRICT COURT
OF RHODE ISLAND
C.A. NO. 07-007 S

---

EUGENIA CARVALHAL,
Plaintiff,

vs.

GENERAL ELECTRIC COMPANY and MIDEA, USA, INC.,
Defendants.

---

DEPOSITION OF HOSSEIN DAVOODI, PE, taken on behalf of the Defendant at the offices of Dunn & Goudreau Court Reporting Services, Inc., One State Street, Boston, Massachusetts, on Friday, April 13, 2007, commencing at 10:15 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
(617)742-6900



APPEARANCES:

ROBERT D'AMICO, II, ESQ.
D'Amico-Burchfield, LLP
536 Atwells Avenue
Providence, RI 02909
T(401)454-1217
F(401)454-1233
rad@dblawri.com
Represents Alberto Carvalhal and Eugenia Carvalhal

ERIK LOFTUS, ESQ.
Law Office of Stuart Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096-0608
(860)292-1116
eloftus@sbcglobal.net
Represents The Hartford Insurance Company

RODD E. ELGES, ESQ.
Clausen Miller, P.C.
10 South LaSalle Street
Chicago, IL 60603
T(312)855-1010
F(312)606-7777
Represents General Electric Company and Midea, USA, Inc.



INDEX



| WITNESS | DIRECT | REDIRECT | CROSS |
|---|---|---|---|
| HOSSEIN DAVOODI | | | |
| By Mr. Elges | 4 | 195 | |
| By Mr. Loftus | | | 189 |



EXHIBITS



| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 15 | Disclosure of Expert Witness | 11 |
| 16 | Bates H00512-HOO609 | 11 |
| 17 | Evidence Transmittal Form | 166 |
| 18 | Email | 171 |



Attorney Elges retained the exhibits



PROCEEDINGS

(Whereupon the witness was sworn.)

DIRECT EXAMINATION

Q (By Mr. Elges) Would you please state your full name for the record.
A Hossein Davoodi.
Q Have you ever been known by any other names?
A My family calls me Saeed.
Q Nickname?
A Yep.
Q I'm going to call you Mr. Davoodi this morning for your deposition. My name is Elges; it's been mispronounced countless ways. If I mispronounce your name today I apologize.
Let the record reflect this will be the discovery deposition of Mr. Davoodi taken pursuant to notice in agreement with the parties.
Let the record further reflect that all parties in this lawsuit are now represented by counsel here this morning. It's 10:15 a.m. Eastern time on Friday, April 13th.
Let the record further reflect that Mr. Davoodi's deposition this morning will be taken

meant?
A Yeah. The location southeast corner of the kitchen.
Q Do you remember what specifically lead you to that conclusion at that early point in time?
A This was after my site investigation. The fire demarcations.
Q Was it to your understanding when you contacted that other individual at Crawford Investigations that the fire scene would be released for alteration, remediation?
A I cannot talk about this case specifically but usually after -- I'm told that after they preserve the scene until the investigator gets there and after that they can start repairing and gutting or whatever but they should preserve it until the investigator gets there.
Q It's your understanding other people were not instructed to alter the Carvalhal house until you had a chance to investigate that?
A I don't have specific knowledge of that; that's a common practice.
Q Let me ask you a question that hopefully you'll know the answer to. It was your



understanding once you left the scene and concluded your investigation of the Carvalhal household, the evidence and the fire scene were no longer going to be preserved?
MR. LOFTUS: Objection.
Q (By Mr. Elges) Do you understand my question?
A Not really.
Q It was your understanding that once you left the scene and completed your investigation on March 3rd, 2004, that the house was going to get gutted?
A Well, I just heard the conversation when I was doing my investigation that they're going to gut the house.
Q So that's what you heard. And did you believe that to be what was going to happen next after you left the house?
A I never thought about it.
Q Did you think you were going to be able to come back to the fire scene and collect evidence at some other date?
A Investigation is a one-shot deal. I did go back a few days later to get a second water



cooler from Mr. Carvalhal's daughter that had the same exact cooler. We met at that site, 76 Willet Street, I guess.
Q What was going on at that site the subsequent day when you met to collect the other water cooler, do you remember?
A Yes. I recall the house was gutted down to the basic wood framing.
Q So the house had been gutted by that point in time?
A Yes.
Q Was there a roll-off in the driveway with a bunch of debris in it or you just saw it was gutted?
A By roll-off --
Q A garbage -- dumpster.
A Yeah, I think there was a big one.
Q Full of debris; right?
A I don't remember. I know it was there.
Q The house had been gutted within how many days of your inspection?
A I don't remember when I went back.
Q You don't remember when you picked up the exemplar water cooler from the Carvalhal's daughter?



MR. D'AMICO: Objection to characterization of the exemplar unit.
Q (By Mr. Elges) Do you know what I mean by that?
A Well, the Carvalhals bought the water coolers together at the same place.
Q That's my understanding as well. For identification purposes over objection, I'm going to refer to -- let's start -- just to keep things clear I'm going to take a step back. When I talk about "the water cooler" I'm talking about the water cooler involved in the fire. I'm talking about the water cooler that was in place at the Carvalhal household on the date the fire occurred.
A Yes.
Q That's in quotes "the water cooler." Do you agree so far?
A Go ahead.
Q There are two other water coolers in this case; do you understand that?
A Yes.
Q How do you mean to refer to those other two water coolers? What would be easiest for you? Let's start with the water cooler you were just

talking about.
A Okay.
Q My understanding is that you collected a second water cooler that had been purchased at the same store as the water cooler involved in the fire; true?
A At the same time, yes.
Q What do you want to call that one? We can't call it the water cooler.
A Call it second water cooler.
Q We'll call it the second water cooler. Then it's my understanding you obtained at some point in time the third water cooler. And that third water cooler is different than the first two inasmuch as it has a fiber blanket insulation rather than foam insulation; is that fair?
A On the heater, yes.
Q So we've got our designations. Number 1 water cooler was the water cooler that was in the Carvalhal house on the day of the fire?
A Right.
Q Number 2 water cooler is the one that the Carvalhals' daughter purchased roughly around the same time?



A Yes.
Q Number 3 water cooler is the third water cooler that didn't have foam insulation around the heated coil; fair enough?
A That's correct.
Q I want to talk about, do you remember what day you picked up Water Cooler No. 2 from the Carvalhals' daughter?
A I think it was approximately two weeks after my site investigation but I don't remember exactly.
Q So how certain are you it was 14 days after your site investigation? Are you real certain, not so certain, could have been seven, could have been three?
A No. I don't know it was -- it wouldn't be three.
Q Could it be seven days?
A I doubt it. I think it was closer to two weeks as I recall it.
Q If your site inspection was on March 3rd, would it be fair to say that by March 17th the house had already been gutted based upon your observations from being on the site the second time?



A Yes.
Q Now, do you have any documentation regarding how you came to possess Water Cooler No. 2 and its chain of custody? Do you know what I mean by "chain of custody"?
A Yes.
Q Do you have any documentation whatsoever about you obtaining Water Cooler No. 2 and the chain of custody of that water cooler until it left your possession or control?
A I never thought about that water cooler as evidence. I thought about it, Oh good, there is an undamaged water cooler I can look at to learn from it. I never thought about that as evidence.
Q Are you relying upon your evaluation of Water Cooler No. 2 in rendering your opinions about this case?
A Well, evaluating Water Cooler No. 2 and comparing it to Water Cooler No. 3 showed me that I -- I realized the insulation type has changed. That was it.
Q So you were relying upon it in rendering opinions in this case.
MR. LOFTUS: Objection.



MR. D'AMICO: Let me strike it and you can object and he'll answer it.
Q (By Mr. Elges) You are relying upon your disassembly evaluation of Water Cooler No. 2 in rendering your opinions in this case; correct?
MR. LOFTUS: Objection. You can answer it.
A Okay. As far as the insulation being changed, yes.
Q (By Mr. Elges) You're not relying on your evaluation of Water Cooler No. 2 for any other information this case?
A No. Actually, I will say yes.
Q Let's take a break. Not take a break, take a step back and I want you to think about all the opinions that followed as were part of your evaluation of Water Cooler No. 2, and take your time, I want to hear about all of them.
A As far as I can recall, evaluation of Water Cooler No. 2 showed me where things were or what they looked like before the fire; all different parts, what was there. I learned a lot from Water Cooler No. 2. Again, where things were, what size they were.